**No. 22-1129**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

BASF CORPORATION,

*Appellant,*

v.

INGEVITY SOUTH CAROLINA, LLC,

*Appellee.*

On Appeal from the Patent Trial and Appeal Board
of the United States Patent and Trademark Office
No. PGR2020-00037 (U.S. Patent No. 10,323,553 B2)

# NONCONFIDENTIAL VERSION
# OPENING BRIEF OF BASF CORPORATION

Brian Eutermoser
Mikaela Stone
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
beutermoser@kslaw.com
mikaela.stone@kslaw.com

Paul Alessio Mezzina
*Counsel of Record*
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com
jmitchell@kslaw.com

*Counsel for Appellant BASF Corporation*

July 13, 2022

## U.S. Patent No. 10,323,553 B2 Claim 1

**1.** An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentrations of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor, and wherein the canister system has a two-day diurnal breathing loss (DBL) of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant certifies the following:

1. The full name of the party represented by me: BASF Corporation.

2. The names of the real parties in interest represented by me: N/A.

3. Parent corporations and publicly held companies that own 10% or more of stock in the party: BASF USA Holding LLC, BASF Nederland BV, and BASF SE.

4. The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   - King & Spalding LLP
   - Cooley LLP
   - Lori A. Gordon
   - Steven Peters
   - Joseph Eng

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: N/A.

6. The organizational victims and bankruptcy cases applicable to this appeal: N/A.

Date: July 13, 2022

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for Appellant*
*BASF Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... v

CONFIDENTIAL MATERIAL OMITTED ..... ix

STATEMENT OF RELATED CASES ..... x

INTRODUCTION ..... 1

JURISDICTION ..... 5

STATEMENT OF THE ISSUES ..... 5

STATEMENT OF THE CASE ..... 6

A. The technology at issue ..... 6

B. The Prior Art ..... 11

C. The '553 Patent ..... 19

D. Procedural History ..... 23

SUMMARY OF THE ARGUMENT ..... 26

ARGUMENT ..... 29

Standard of Review ..... 29

I. The Board's rejection of the indefiniteness ground was arbitrary and capricious ..... 30

A. BASF's evidence demonstrated that the challenged claims are indefinite. ..... 31

B. The Board rejected this ground without a reasoned analysis or substantial evidence. ..... 37

II. The Board's rejection of the obviousness ground was arbitrary and capricious. ..... 43

A. Hiltzik claimed the ’553 patent’s vent-side adsorbents and motivated routine testing of those adsorbents. ............ 44

B. The Clontz references taught that Hiltzik’s system could meet the low-purge performance standard. .......................... 51

III. BASF has appellate standing. ...................................................... 61

CONCLUSION ........................................................................................ 66

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIALITY

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. Cooper Indus., LLC*,
635 F.3d 1345 (Fed. Cir. 2011)........................................................62

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020)........................................................61

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016)........................................................30

*Altaire Pharms., Inc. v. Paragon Bioteck, Inc.*,
889 F.3d 1274, *remand order modified by stipulation*,
738 F. App'x 1017 (Fed. Cir. 2018) ..................................................40

*Amerigen Pharms. Ltd. v. UCB Pharma GmbH*,
913 F.3d 1076 (Fed. Cir. 2019)........................................................62

*Application of Aller*,
220 F.2d 454 (C.C.P.A. 1955) ..........................................................50

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018)...........................................39, 40, 59

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017)...........................................39, 40, 59

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ..........................................................39

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
803 F.3d 620 (Fed. Cir. 2015)............................................31, 32, 37

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018)....................................................61, 62

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020)........................................................61

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020)....................................................................50

*Gerritsen v. Shirai*,
979 F.2d 1524 (Fed. Cir. 1992) ......................................................................5

*Honeywell Int'l, Inc. v. Arkema Inc.*,
939 F.3d 1345 (Fed. Cir. 2019)....................................................................29

*Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003)....................................................................32

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019)...............................................................36, 37

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017)....................................................................29

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012)....................................................................49

*In re Baxter Int'l, Inc.*,
678 F.3d 1357 (Fed. Cir. 2012)....................................................................30

*In re Ethicon, Inc.*,
844 F.3d 1344 (Fed. Cir. 2017)....................................................................49

*In re Gorris*,
847 F. App'x 889 (Fed. Cir. 2021) ..............................................................49

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994)........................................................................59

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016)...............................................................51, 60

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003)...............................................................49, 50

*Ingevity Corp. v. BASF Corp.*,
501 F. Supp. 3d 274 (D. Del. 2020) ............................................................16

*Ingevity Corp. v. ITC*,
2021 WL 3440786 (Fed. Cir. July 21, 2021) .......... 16

*JTEKT Corp. v. GKN Auto LTD.*,
898 F.3d 1217 (Fed. Cir. 2018) .......... 62, 65

*Merck & Co. v. Biocraft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989) .......... 59

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) .......... 31

*Paice LLC v. Ford Motor Co.*,
881 F.3d 894 (Fed. Cir. 2018) .......... 60

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......... 49

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
875 F.3d 1369 (Fed. Cir. 2017) .......... 43

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) .......... 29, 39, 40

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 65

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) .......... 32

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) .......... 30

**Statutes**

5 U.S.C. § 706 .......... 29

28 U.S.C. § 1295 .......... 5

35 U.S.C. § 103 .......... 19

35 U.S.C. § 112 .......... 31

35 U.S.C. § 142 ..... 5

35 U.S.C. § 321 ..... 5

35 U.S.C. § 329 ..... 5

**Other Authorities**

Memorandum from U.S. PTO on Approach to Indefiniteness Under 35 U.S.C. § 112 in AIA Post-Grant Proceedings to Members of the P.T.A.B. (Jan. 6, 2021) ..... 31

## CONFIDENTIAL MATERIAL OMITTED

The material omitted from this brief consists of information relating to the IAC-measurement findings of Ingevity researcher Dr. Yanping Guo, which are subject to Patent Trial & Appeal Board's Order Granting the Motion for Entry of Protective Order 37 C.F.R. § 42.54, No. PGR2020-00037 (July 29, 2020) (paper 12).

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant BASF Corporation states that no other appeal in or from the same proceeding was previously before this or any other appellate court. Counsel are unaware of any case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

This is an appeal from a decision of the Patent Trial and Appeal Board in a post-grant review. The Board upheld certain claims of Ingevity's U.S. Patent No. 10,323,553 B2, which BASF had challenged as indefinite and obvious. The Board's decision ignored critical evidence in the record, overlooked relevant legal principles, and otherwise failed to comport with the requirements of reasoned decisionmaking under the Administrative Procedure Act.

The '553 patent concerns systems and methods for reducing emissions of fuel vapor from a motor vehicle's gas tank. For decades, automotive engineers have used "fuel vapor canisters" containing activated carbon adsorbents to capture fuel vapor and prevent it from escaping into the atmosphere. When the vehicle is driven, airflow from the outside "purges" the canister and returns the captured fuel vapor to the engine for burning.

Ingevity makes and sells carbons for use in these canister systems. In 2005, Ingevity obtained a patent—the Hiltzik patent—for a canister system using multiple layers or stages of adsorbents. Hiltzik specified that the adsorbents closer to the fuel tank should have higher adsorptive

capacity (*i.e.*, they should capture and hold more fuel vapor), while those closer to the outside vent should have lower capacity. It explained that this arrangement—pairing higher-capacity fuel-side adsorbents with lower-capacity vent-side adsorbents—reduces emissions by limiting the amount that is available to diffuse into the outside air.

Multiple tribunals have now ruled the Hiltzik patent invalid. So Ingevity has announced its intent to rely on the '553 patent, which offers a routine recapitulation of Hiltzik's purported invention while claiming a subset of Hiltzik's range. In particular, the '553 patent adds claim limitations that (i) confine its vent-side adsorbents to the lower end of the adsorptive-capacity range Hiltzik claimed, and (ii) require the system to meet certain performance standards under "low purge" conditions created by modern cars that take in less outside air when driven. Ingevity itself described the '553 patent to investors as simply Hiltzik with a "narrower performance window."

As BASF demonstrated, the '553 patent's challenged claims are unpatentable on two independent grounds:

***First***, the claims are indefinite because they disclose two alternative methods of measuring a key parameter ("incremental

adsorption capacity"), those two methods produce disparate results, and the patent and prosecution history provide no guidance on which method to use—all of which makes it impossible for a skilled artisan to know for sure whether she is practicing the claims. In rejecting this argument, the Board considered only Ingevity's evidence, incorrectly concluded based on that evidence alone that the two measurement methods were capable of yielding similar results, and declared that in light of that conclusion it did not have to consider or address BASF's contrary evidence. The Board thus violated its duty of reasoned decisionmaking, which required it to consider *all* the evidence before it.

***Second***, the claims are obvious over Hiltzik in view of two other prior-art references, "Clontz SAE" and "Clontz WIPO." As BASF showed, Hiltzik claimed the entire range of vent-side adsorbents claimed in the '553 patent, and the Clontz references told a person of ordinary skill that the Hiltzik system could easily meet the '553 patent's low-purge performance requirement. Optimizing the Hiltzik system's vent-side adsorbent within Hiltzik's claimed range was a matter of routine experimentation and could be achieved by, *e.g.*, diluting the adsorbent—dilution that, moreover, Hiltzik affirmatively suggested. Given Hiltzik's

express teaching of exemplary vent-side adsorbents barely outside the range the ’553 patent claimed, the experimentation necessary to achieve the ’553 patent’s results could hardly have been anything *but* routine. The Board nonetheless concluded that a POSITA would not have applied Hiltzik’s teachings to low-purge systems, a conclusion it based entirely on the notion that one of the Clontz references taught away from the proposed combination. That conclusion was arbitrary and capricious, inadequately explained, and not supported by substantial evidence.

Finally, Ingevity has challenged BASF’s standing to appeal the PGR decision. The challenge is meritless. BASF is prepared to make and sell “EvapTrap XC,” a honeycomb adsorbent designed to compete directly with Ingevity’s honeycombs, and has identified customers who wish to incorporate EvapTrap XC into U.S. vehicle platforms to help the vehicles meet U.S. emissions standards. Ingevity already accused BASF of infringing the similar Hiltzik patent by manufacturing and selling EvapTrap XC, and Ingevity does not dispute that EvapTrap XC also meets the technical limitations of the ’553 patent. BASF thus has a reasonable fear that if the ’553 patent survives this appeal, Ingevity will accuse BASF of infringing the ’553 patent.

## JURISDICTION

BASF appeals the final written decision of the Patent Trial and Appeal Board in post-grant review No. PGR2020-00037. The Board had jurisdiction of the PGR under 35 U.S.C. § 321. U.S. Patent No. 10,323,553 B2 issued on June 18, 2019.[1] Appx76. BASF filed its petition for post-grant review on March 3, 2020, "not later than the date that is 9 months after the date of the grant of the patent." 35 U.S.C. § 321. The Board issued its final written decision in the PGR on September 9, 2021, and BASF filed its timely notice of appeal on November 5, 2021. Appx1654–1666; *see* 35 U.S.C. § 329; *id.* § 142. This Court has jurisdiction of the appeal under 28 U.S.C. § 1295(a)(4)(A). *See Gerritsen v. Shirai*, 979 F.2d 1524, 1526 (Fed. Cir. 1992). As explained in BASF's opposition, Doc. 16, to Ingevity's motion to dismiss and in Section III, *infra*, BASF has standing to appeal the Board's decision.

## STATEMENT OF THE ISSUES

1. Are the challenged claims of the '553 patent indefinite, where the claims rely on precise and accurate measurements of "incremental

---

[1] The Board ruled that the '553 patent's earliest potential effective filing date is October 10, 2013, and that it is therefore eligible for post-grant review under the AIA. Appx26–27. Ingevity has not appealed that ruling.

adsorption capacity," but the patent teaches two methods for measuring IAC that produce substantially different results when practiced by those of skill in the art and provides no guidance about which method to use?

2. Are the challenged claims of the '553 patent obvious over the combination of Hiltzik and the Clontz references, where Hiltzik disclosed the entire range of the '553 patent and motivated those of skill in the art to explore the low end of that range, and the Clontz references confirmed that Hiltzik's teachings could be applied in low-purge conditions?

3. Does BASF have standing to appeal the Board's decision given that it has concrete plans to manufacture and sell EvapTrap XC for use in U.S. vehicle platforms, Ingevity has already accused BASF of infringing Hiltzik by making and selling EvapTrap XC, and Ingevity does not dispute that EvapTrap XC meets the technical limitations of the '553 patent?

## STATEMENT OF THE CASE

### A. The technology at issue

Gasoline contains volatile organic compounds that evaporate at relatively low temperatures and can pass into the atmosphere as fuel vapor, which contributes to air pollution. Appx2008–2009. One important

cause of fuel vapor emissions is a process known as "diurnal breathing." The daily cycle of daytime warming and nighttime cooling causes vapor in a vehicle's fuel tank to expand and contract. To relieve pressure during daytime expansion, the fuel tank is equipped with a vent that allows fuel vapor to escape into the atmosphere. Appx2009–2010. The resulting, undesirable emissions are called diurnal breathing losses ("DBLs"). Appx2009.

Since the 1970s, the Environmental Protection Agency and the State of California have sought to combat air pollution by regulating DBL emissions. Appx2011. The current version of those regulations is known as "LEV-III/Tier 3." In 2012, California adopted the Low-Emission Vehicle III (LEV-III) program. Appx2018. EPA soon adopted similar requirements as part of the federal Tier 3 emission standards. Appx2002. The LEV-III/Tier 3 regulations require limiting DBL emissions from a vehicle's fuel tank to 20 mg or less over a two-day period. Appx2018.

To comply with regulatory requirements, automotive and environmental engineers have developed methods to control DBL emissions. Appx2008; Appx2011. One well-known method of controlling DBLs is by placing canisters containing adsorbent materials along the

vent path from the fuel tank. Appx2011–2013. "Adsorption" refers to a process through which hydrocarbon molecules collect on the surface of the adsorbent material:




Appx2013. Because adsorption occurs on the surface of an adsorbent volume, materials with large surface areas can adsorb more fuel vapor. Appx2013.

The primary adsorbent material used in fuel vapor canisters is "activated carbon," which is carbon with microscopic pores all over its surface. Appx2011–2013. The pores vastly increase the carbon's surface area without increasing its volume, making it an excellent adsorbent. Appx2013. The activated carbon may be in the form of pellets, granules, or solid monoliths (often honeycomb-shaped) composed of or coated with

activated carbon. Appx2011; Appx2025. When diurnal breathing causes fuel vapor to pass through the canister, the activated carbon adsorbs the fuel vapor while allowing lighter air components (such as nitrogen, oxygen, and carbon dioxide) to pass through.

Activated carbon's surface area, though large, is finite—it cannot continue to adsorb fuel vapor forever. However, adsorption is reversible: the adsorbed fuel vapor may be desorbed or "purged." Appx2014. When a vehicle's internal-combustion engine operates, it draws fresh purge air back through the emissions canister. Appx2014. Fuel vapor molecules collected on the surfaces of the adsorbent volumes are desorbed and drawn back into the engine, where they are burned. Appx2011–2012. Purge air is measured in "bed volumes" or BV, a unit that depends on the size of the adsorbent bed. For example, in a system where the volume of the adsorbent bed is 2.1 liters, 210 liters of purge air is equal to 100 bed volumes. Appx106 (2:11–12).

This cutaway schematic of a typical three-port canister shows the adsorption and desorption paths:




Appx2012.

When a vehicle sits idle between purge cycles, adsorbed fuel vapor in the canister can spontaneously desorb and diffuse into the atmosphere, producing what are known as "bleed emissions." Appx2014–2015. Beginning in the 1990s, engineers started addressing bleed emissions by using multiple adsorbent volumes. Appx2015. The typical procedure was to place a low-capacity adsorbent at or near the vent of a conventional high-capacity canister. Appx2015. That low-capacity adsorbent would capture the bleed emissions, delaying their escape into the atmosphere so that they could be drawn back into the engine and burned during the next purge cycle. Appx2015.

Standard fuel vapor canisters were designed so that normal operation of a vehicle's internal-combustion engine would generate enough purge air to desorb substantially all adsorbed fuel vapor in the canister. But modern vehicles take in less purge air than older vehicles. Appx2017. In particular, hybrid vehicles run their internal-combustion engines only part of the time. When a hybrid car is driven on its electric engine, it does not draw purge air through the emissions canister. Appx2017. The result is that, for the same amount of driving, a hybrid vehicle takes in significantly less purge air than a purely internal-combustion-driven vehicle. Appx2017–2018. In these "low-purge" conditions, more residual adsorbed fuel vapor will remain in the canister, which can result in greater bleed emissions. Appx2014–2015, 2017–2018.

### B. The Prior Art

As mentioned above, engineers have been developing solutions to the problem of bleed emissions for nearly thirty years. Appx2015. The most common solution was placing a low-capacity honeycomb adsorbent at the vent of a conventional high-capacity canister. Appx2015. Similarly, no later than 2007, engineers were addressing the particular problems of low-purge (*e.g.*, hybrid) engines, using honeycombs to capture bleed

emissions. *E.g.*, Appx2221 (MECA paper addressing the "challenging operating conditions for evaporative emission control technologies" posed by low-purge engines); Appx2272 (Clontz SAE, proposing solutions for low-purge vehicles). Although the '553 patent claims to offer an improvement over that prior technology, its purported invention consists only of routine experimentation iterating on the well-known results of earlier work.

In particular, BASF challenged the claims of the '553 patent as obvious over three pieces of prior art: Ingevity's own U.S. Patent No RE38,844 ("Hiltzik"); a 2007 article coauthored by named inventors of Hiltzik and the '553 patent ("Clontz SAE"); and a 2009 international patent application by Ingevity ("Clontz WIPO").

***Hiltzik.*** Hiltzik (U.S. Patent No. RE38,844) issued October 25, 2005. Appx2205. It shares two inventors with the '553 patent and covers the same subject matter. *Compare* Appx2205 *with* Appx76. Hiltzik taught the dual-canister, multistage design used in the '553 patent long before the '553 patent issued, as the following diagrams from the two patents illustrate:

<u>Hiltzik</u> <u>’553 patent</u>







Appx2208 (Hiltzik fig. 2, left); Appx82 (’553 patent fig. 4, right). In these figures, the “vent-side” adsorbents are those in the canister at the top of each figure—numbers 11 and 301, respectively—while the “fuel-side” adsorbents are those in the upper-right quadrant of the lower canister, numbers 7 and 201.

Hiltzik introduced the term “incremental adsorption capacity” or IAC, but did not define it. Appx2214 (9:34–37). Clues in the patent suggest that Hiltzik used IAC to refer to the difference between the capacity of an adsorbent material at two different points along an isotherm—a graph that plots the amount of vapor adsorbed as a function of its concentration while holding temperature constant, illustrated here:




Appx2209 fig. 3. Hiltzik appeared to use IAC to denote the difference between the amount of fuel vapor adsorbed by an adsorbent volume (measured in grams per liter) at two different vapor concentrations of n-butane (5% and 50%) at a constant temperature of 25° centigrade. *See* Appx2214 (10:39–44). Measured in this way, a lower IAC means a flatter isotherm, which indicates a material with less adsorptive capacity.

The industry-standard measurement of adsorptive capacity is "butane working capacity" or BWC, which measures "the mass of butane adsorbed and desorbed by a 100 mL volume." Appx2024 (citing ASTM international standard D5228). Because BWC and IAC measure essentially the same property of an adsorbent, they are strongly

correlated and vary in near-direct proportion to one another, as Ingevity's chart shows:




Appx2088.

Hiltzik's purportedly inventive teaching was that pairing a lower-BWC vent-side adsorbent with a higher-BWC fuel-side adsorbent causes the entire system to capture DBL and bleed emissions better:

> [In] one preferred embodiment of this invention, lower capacity adsorbents have BWC values **preferably below 8 g/dL**, which is well below the 9–15+ g/dL BWC normally deemed suitable for use in evaporative emission control canister systems. The **preferred selection of these low BWC materials for inclusion into a canister system as a vent-side layer to produce low emissions** was only realized once the dynamics within the adsorbent bed were realized (i.e., the significance of low residual vapor concentration within the vent-side bed volume and the interactive effect that the vent-side bed volume has on the

> distribution and diffusion of vapor across the entire canister system during the diurnal breathing loss period).

Appx2212 (6:2–14) (emphases added). For example, Hiltzik taught using a 200 ml vent-side adsorbent with a BWC of 4 g/dL, yielding a g-total BWC of 8 g. Appx2213 (8:21) (200 ml volume), Appx2213 (8:49) (4 g/dL BWC). Hiltzik then explained that these desirably low-BWC vent-side adsorbents may be achieved either by "begin[ning] with an adsorbent that has … [a] flat isotherm shape" or by "volumetrically dilut[ing] a high working capacity adsorbent" to "flatten[]" its isotherm. Appx2212 (6:23–29).

Multiple tribunals have determined that Hiltzik itself was not inventive. The International Trade Commission concluded that all the Hiltzik claims that Ingevity asserted before it were invalid as anticipated, obvious, or both, and this Court affirmed. *Ingevity Corp. v. ITC*, 2021 WL 3440786, at *1 (Fed. Cir. July 21, 2021). A federal district court has also ruled that all claims of Hiltzik that Ingevity asserted in that case were invalid as anticipated. *Ingevity Corp. v. BASF Corp.*, 501 F. Supp. 3d 274, 282 (D. Del. 2020).

***Clontz SAE.*** Clontz SAE is a paper presented two years after Hiltzik issued, at a 2007 meeting of the Society of Automotive Engineers.

Appx2265–2273. One of its authors, Roger Williams, is a named inventor on both Hiltzik and the '553 patent. *Compare* Appx2265 *with* Appx2205 *and* Appx76.

Clontz SAE evaluates several canister configurations, one of which is the same canister system used in Example 2 of Hiltzik—the example that taught using a vent-side adsorbent with a BWC of 4 g/dL and a g-total BWC of 8 g. *Compare* Appx2266–2268 (Clontz SAE tested canisters that "contained 2.1 liters of BAX 1500 carbon" on the fuel side and a vent-side carbon honeycomb of "41 mm diameter x 150 mm length" and "nominal cell density of 200 CPSI"), *with* Appx2212 (6:55–57), Appx2213 (8:19–25) (Hiltzik's Example 2 tested a carbon honeycomb of "41 mm diameter x 150 mm long, 200 cpsi" that was "placed in-line with the 2.1 L main canister of BAX 1500 pellets"). *See also* Appx2068 (BASF's expert noting that Clontz SAE's data "suggests to a POSITA Example 2 of Hiltzik and the 'baseline' of Clontz SAE are essentially equivalent").

Clontz SAE reported that even under low-purge conditions, the Hiltzik canister system achieved DBL emissions that satisfied the LEV-III/Tier 3 regulatory standard (*i.e.*, 20 mg or less over a two-day period). Specifically, Clontz SAE taught that resistive heating of the honeycombs

achieved sub-20-mg two-day emissions with purge as low as 50 bed volumes. Appx2269. What's more, Clontz SAE taught that even an *unheated* Hiltzik-style canister with a honeycomb achieved sub-20-mg two-day emissions at 100 bed volumes of purge:

Table 4. Heated honeycomb conditions during purge cycle.




Appx2269. As BASF's expert explained, Clontz SAE shows that "Example 2 of Hiltzik would have achieved DBL emissions of less than 20 mg at the claimed purge limit of 100BV without heating the honeycomb." Appx2069.

***Clontz WIPO***. Clontz WIPO (WO 2009/061533 A1) is an international patent application filed May 14, 2009, two years after Clontz SAE and four years after Hiltzik. Appx2239–2264. It shares two named inventors with the '553 patent and three with Hiltzik. *Compare*

Appx2239 *with* Appx76 *and* Appx2205. Two of its named inventors, moreover, are authors of Clontz SAE. *See* Appx2265.

Clontz WIPO achieves low emissions at low purge without a heating element, instead resistively heating the vent-side adsorbent honeycomb by including "electrically conductive, nonbinding additives." Appx2246 ¶ 12. It explains that this addition of non-adsorbent material plays "a dual role," simultaneously increasing resistivity and "adjusting the adsorption properties to flatten the equilibrium isotherm slope." Appx2247 ¶ 17. As BASF's expert pointed out, Clontz WIPO thus teaches to volumetrically "dilute the adsorbent material within the honeycomb, thereby reducing its nominal IAC and nominal BWC," as suggested in Hiltzik. Appx2070; *see* Appx2212 (6:23–29).

### C. The '553 Patent

After all this prior art, the '553 patent issued. *See* Appx76.[2] It purports to address the problem of DBL and bleed emissions in low-purge environments by means of a multi-stage canister system. *See* Appx16. Like Hiltzik and the Clontz references, the '553 patent teaches

---

[2] The earliest priority date the application can claim is October 10, 2013. Appx27. Accordingly, Hiltzik, Clontz SAE, and Clontz WIPO all constitute prior art. *See* 35 U.S.C. § 103.

embodiments including a vent-side adsorbent. *See* Appx19 (citing Appx102–103 (4:14–20, 4:61–5:3). And like the Clontz references, the ’553 patent teaches heating the vent-side adsorbent, including through “internal resistive elements.” Appx20 (citing Appx106 (12:29–34), Appx107 (13:29–31)).

As Ingevity acknowledged in a presentation to its investors, the ’553 patent is merely Ingevity’s Hiltzik patent with a “narrower performance window” and eleven more years of life:




Appx2416 (capitalization omitted). Ingevity has thus assured the public that the ’553 patent “will provide future support for us in the marketplace” following the invalidation of Hiltzik’s key claims. Doc. 16, Mezzina Decl. Ex. I at 16.

In particular, the *fuel-side* adsorbent limitations in the ’553 patent claims are essentially the same as those claimed in Hiltzik. *Compare* Appx2214 (10:38–41) (Hiltzik claims “an initial adsorbent volume having incremental adsorption capacity at 25° C. of greater than 35 g n-butane/L

between vapor concentrations of 5 vol % and 50 vol % n-butane"), *with* Appx112 (23:20–23) (the '553 patent claims a "fuel-side adsorbent volume having an effective [IAC] at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane").[3]

And the *vent-side* adsorbent limitations in the '553 patent claims are a *subset* of those claimed in Hiltzik—specifically, those at the lower end of Hiltzik's claimed adsorptive-capacity range. The challenged claims describe the vent-side adsorbent in terms of its IAC and two measurements of BWC—which, as discussed above, is closely related to IAC and measures essentially the same property of the adsorbent. Appx21; *see* Appx2024. The vent-side adsorbent must have: (1) an effective IAC of less than 35 grams n-butane/L; (2) an effective BWC of

[3] The '553 patent recites a limitation based on "effective" IAC instead of just IAC. "Effective IAC" measures IAC along a vapor flow path that can include both adsorbents and adsorbent-free spaces. *See* Appx105 (10:26–34) ("effective volumetric properties" of an adsorbent "take[] into account the air gaps, voids and other volumes between the nominal volumes of adsorbents along the vapor flow path that lack adsorbent"). Effective IAC is always less than or equal to nominal IAC—less if measured along a path that includes adsorbent-free spaces, and equal if measured along a path that does not include such spaces. Appx2085–86 ¶¶ 172–73. Ingevity's expert, Dr. Rockstraw, has stated that the effective volume of a single activated carbon honeycomb is equal to its nominal volume. Doc. 16, Mezzina Decl. Ex. H.

less than three grams per deciliter (g/dL); and (3) a gram-total or "g-total BWC" of 6 grams or less. Appx112 (23:28–29). G-total BWC is just BWC multiplied by the adsorbent's volume, Appx2030 ¶ 72, so an adsorbent with a BWC < 3 g/dL will necessarily have a g-total BWC ≤ 6 g when the volume of the adsorbent is 200 milliliters or less.

The '553 patent teaches two ways to measure IAC: the McBain gravimetric method, which weighs the adsorbent before and after adsorption, and the Micromeritics ASAP 2020 volumetric (or manometric) method, which measures the gas volume or pressure to determine how much has been adsorbed onto the adsorbent material. Appx107 (13:60–14:54). The patent expressly states that either method may be used to measure IAC, and does not teach a preference for one method over the other.

Finally, most of the challenged independent claims of the '553 patent (but not claim 64) include a low-purge performance limitation: the system must achieve two-day DBL emissions "of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step." Appx112 (23:38–40). As explained above, Clontz SAE taught that a Hiltzik canister could achieve this purge level without heating, and that

a heated Hiltzik canister could achieve compliant emissions levels even with drastically lower volumes of purge air. Appx2269 fig. 6.

### D. Procedural History

BASF petitioned for post-grant review challenging claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 of the ’553 patent (the “challenged claims”). Appx22. BASF maintained that the challenged claims were all invalid on two independent grounds.

***First***, BASF contended that the claims were indefinite because the ’553 patent teaches two different ways of measuring IAC—a gravimetric method (McBain) and a volumetric or manometric method (ASAP 2020)—and those methods provide substantially different results. Appx27. BASF offered into evidence test results demonstrating a 12–14% disparity between IACs determined using the two methods. BASF also offered a memorandum by an Ingevity researcher, Dr. Yanping Guo, whose qualifications far exceeded the level of ordinary skill in the art, and whose testing using the two methods yielded a [redacted].

***Second***, BASF contended that the claims were obvious over the combination of Hiltzik, Clontz SAE, and Clontz WIPO. Appx38. BASF pointed out that (i) Hiltzik taught and claimed the entire range of the

’553 patent, and a skilled artisan would have been motivated to optimize within that range; (ii) Hiltzik further taught that the vent-side adsorbent should have a low working capacity and that this could be achieved through volumetric dilution; and (iii) the Clontz references taught that the canister system disclosed in Hiltzik could readily achieve the ’553 patent’s low-purge performance limitation.

The Board instituted review. After a trial hearing in May 2021, the Board issued its final written decision on September 9, 2021, upholding the challenged claims. Appx14.

The Board first ruled that the claims were not indefinite because Ingevity’s evidence suggested that “gravimetric and volumetric measurement techniques” were “viewed as compatible” and that “under ideal conditions” those techniques could “yield the same results.” Appx29–30. Because the Board found that “the evidence submitted by [Ingevity]” established that the two methods were “comparable,” the Board concluded that it “need not address [BASF’s] allegations as to the measurement differences reported” in its independent tests. Appx31. The Board also did not address Dr. Guo’s finding of a [redacted]. *See* Appx29–31.

Turning to obviousness, the Board concluded that a person of skill in the art would not have been "motivated to dilute the honeycomb of Hiltzik's example 2 in order to meet emissions standards at low-purge conditions in view of Clontz SAE and Clontz WIPO." Appx47. The Board did not dispute that Hiltzik's disclosures encompassed the vent-side adsorbents claimed in the '553 patent, or that Hiltzik taught that lower-capacity vent-side adsorbents could help reduce emissions. Instead, the Board relied entirely on a few statements in Clontz SAE that it said discouraged using low-capacity vent-side adsorbents in low-purge conditions. *See* Appx48–50. In doing so, the Board—without explanation—discounted the statements of Ingevity's own expert, Dr. David Rockstraw, who opined in district court that an ordinarily skilled artisan would understand from Hiltzik "the potential desirability" of reducing BWC below 3 g/dL. Appx51 (quotation marks omitted).

Finally, the Board ruled that because the challenges to the independent claims failed, the challenge to the dependent claims also failed. Appx59.

This appeal followed. Ingevity moved to dismiss the appeal for lack of Article III standing. In response, BASF submitted a declaration and

other evidence establishing that BASF has concrete plans to sell EvapTrap XC, a product designed to meet U.S. emissions standards, to customers who plan to use it in U.S. vehicle platforms. Doc. 16, Moonjely Decl. ¶¶ 6, 29.

## SUMMARY OF THE ARGUMENT

**I.** The Board's rejection of the indefiniteness ground was arbitrary and capricious. Each of the challenged claims relies on precise measurements of "incremental adsorption capacity." The patent teaches two different methods of measuring IAC, without providing any guidance about which method to use. BASF's evidence showed that those two methods produce substantially divergent results, with IAC values varying by as much as 12–14% depending on which method is used. Under this Court's precedent, the existence of multiple methods of measuring IAC that yield different results, without guidance as to which method should be used, renders the claims indefinite.

In rejecting this ground, the Board departed from one of the most basic requirements of reasoned decisionmaking by considering only Ingevity's evidence and expressly and inexplicably refusing to consider BASF's evidence. That is reversible error. Moreover, even Ingevity's

evidence suggested a substantial variation between methods. The Board found the evidence suggested that some artisans in some contexts would not consider that variation significant; but none of that evidence dealt with measurements of n-butane adsorption in the ’553 patent’s critical range, and a measurement variance that is insignificant in certain experimental contexts may be highly significant in a context where precise measurement is necessary to determine infringement.

**II.** The Board’s rejection of the obviousness ground was likewise arbitrary and capricious. Hiltzik teaches and claims the entire range of vent-side adsorbents claimed in the ’553 patent. As a matter of law, a POSITA would have been motivated to explore and optimize within that entire range—as Ingevity’s expert, Dr. Rockstraw, acknowledged. Hiltzik’s basic insight is that lower-capacity vent-side adsorbents produce better results, and Hiltzik repeatedly suggested diluting vent-side adsorbents to achieve that desirable lower capacity. The only aspect of the ’553 patent not taught or claimed by Hiltzik was its system’s use in low-purge situations, and the Clontz references made clear that the system taught in Hiltzik could easily achieve compliant emission levels even at very low levels of purge.

The Board based its rejection of this ground entirely on a mistaken teaching-away analysis. It focused on a few statements in Clontz SAE that suggested higher-capacity vent-side honeycombs as one of several modifications that might help reduce emissions with low purge. But Clontz SAE did not suggest that increasing vent-side capacity was necessary for good low-purge performance. Nor did it contradict or undermine Hiltzik's teachings about the benefits of low-capacity vent-side adsorbents, which Clontz WIPO (published after Clontz SAE) reiterated. In any event, this Court has made clear that so long as the prior art teaches that a method is usable and has been used—as the prior art here clearly does—it makes no difference if a reference teaches away from that method.

**III.** BASF has appellate standing. The evidence introduced in response to Ingevity's motion to dismiss demonstrates the likelihood of an infringement suit over BASF's EvapTrap XC product—a product designed to meet California and U.S. federal emissions standards and for which BASF has already lined up U.S. customers. Ingevity's contention that in-house counsel is not a suitable witness for these purposes is baseless—Mr. Moonjely's involvement in business decisions related to

EvapTrap XC is to be expected, given that it is a product whose manufacture and sale may subject BASF to an infringement suit.

## ARGUMENT

### Standard of Review

Under the Administrative Procedure Act, this Court holds unlawful and sets aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Honeywell Int'l, Inc. v. Arkema Inc.*, 939 F.3d 1345, 1348 (Fed. Cir. 2019) (citing 5 U.S.C. § 706(2)(A)).

In applying that standard, this Court considers whether the Board "ma[de] the necessary findings and ha[d] an adequate evidentiary basis for its findings" and whether it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) (cleaned up). The Board must assess "both the evidence that justifies and [the evidence that] detracts from [its] opinion." *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015) (quotation marks omitted).

Because obviousness and indefiniteness are questions of law based on underlying factual determinations, this Court reviews the Board's ultimate conclusion *de novo* and its underlying factual findings for substantial evidence. *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1343 (Fed. Cir. 2016); *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012). This Court "must judge the propriety of [the Board's] action solely by the grounds invoked" in the Board's decision and "may not supply a reasoned basis for the [Board]'s action that the [Board] itself has not given." *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017) (quotation marks omitted).

## I. The Board's rejection of the indefiniteness ground was arbitrary and capricious.

The '553 patent discloses two different ways of measuring "effective incremental adsorption capacity," and those two methods produce inconsistent results. Because each of the challenged claims requires calculating effective IAC, the patent's indecisiveness concerning this key value's measurement renders all the challenged claims indefinite. The Board's rejection of this ground without substantial evidence, and without even considering BASF's evidence, was arbitrary and capricious.

### A. BASF's evidence demonstrated that the challenged claims are indefinite.

A patent must "conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the inventor … regards as the invention." 35 U.S.C. § 112(b) (emphasis added). A claim fails that requirement and is therefore invalid for indefiniteness if, when read in light of the specification and prosecution history, the claim "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).[4]

Under the *Nautilus* standard, when "different approaches to measurement are involved," the patent "must disclose a single known approach or establish that, where multiple known approaches exist, a [POSITA] would know which approach to select." *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 630 (Fed. Cir. 2015). Applying that standard, this Court held that claims reciting a type of plastic with a

[4] The Patent and Trademark Office agrees that "*Nautilus* is the correct approach for analyzing indefiniteness in AIA post-grant proceedings." Memorandum from U.S. PTO on Approach to Indefiniteness Under 35 U.S.C. § 112 in AIA Post-Grant Proceedings to Members of the P.T.A.B. 5 (Jan. 6, 2021), *available at* https://tinyurl.com/3eb7ph4z; *see* Appx25.

"slope of strain hardening coefficient greater than or equal to 1.3" were indefinite where there existed four methods for measuring the "slope of strain hardening," "the methods d[id] not always produce the same results," and the patent provided no guidance "as to which method should be used." *Id.* at 631, 633–35(quotation marks omitted).

In another case, this Court held that claims reciting a polymer with "a molecular weight of about 5 to 9 kilodaltons" were indefinite where "'molecular weight'" could "be ascertained by any of three possible measures," each of those measures "would typically yield a different result for a given polymer sample," and the patent did not "convey with reasonable certainty the measure of molecular weight to be used." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1338, 1341, 1344–45 (Fed. Cir. 2015) (emphasis omitted); *see also Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1336, 1339–40 (Fed. Cir. 2003) (under pre-*Nautilus* "insolubly ambiguous" standard, claims reciting polyester yarn with a particular "melting point elevation" were indefinite where multiple "methods [could] be used to measure the MPE," the results of the different methods could "vary greatly," and the patent did not require a specific method).

This case is on all fours with *Dow* and *Teva*. The ’553 patent explicitly teaches two different approaches to measuring IAC: McBain and ASAP 2020. Appx107 (13:60–14:54). McBain is a gravimetric method—an approach that, in essence, weighs the adsorbent volume before and after adsorption. ASAP 2020 is an automated manometric or volumetric method: instead of weighing the adsorbent, it measures the changes in the gas pressure (*i.e.*, the pressure of the mixture of air and fuel vapor) before and after adsorption. Appx2051–2053.

Unsurprisingly, these very different methods of measurement can and do produce significantly different results. BASF commissioned an independent laboratory, Intertek, to test three samples—two types of carbon pellets and a carbon honeycomb—using both the gravimetric and volumetric methods. The results showed that IAC measurements could vary by as much as 12–14% depending on the method used. At 5% vapor concentration, McBain measured a 14–18% higher adsorption capacity than ASAP 2020. At 50% concentration, McBain’s results were 3–7% higher. The discrepancy nearly “canceled out” for one of the two samples, but for the other two it resulted in an IAC that was 12–14% lower when measured using McBain than when measured using ASAP 2020. *See*

Appx2056–2059. Moreover, after Ingevity challenged these results, BASF submitted into evidence a *second* set of tests that confirmed the disparity between the two measurement methods. *See* Appx3092–3093; Appx4041–4047.

This disparity means that products that do not infringe when measured by one method would infringe when measured by the other. The ’553 patent claims a system in which the fuel-side adsorbent has an effective IAC of *more than* 35 g/L and the subsequent adsorbent has an effective IAC of *less than* 35 g/L. Appx112 (23:25–33). Yet the disparity between the two methods means that an adsorbent with an effective IAC of approximately 35 g/L could measure as both significantly more than 35 g/L and significantly less than 35 g/L, depending on which method of measurement is used. In other words, despite the patent’s requirement that the two adsorbent volumes have *different* effective IACs, a canister using the *same* material as both the fuel-side and the subsequent adsorbent might well infringe if one side were measured with ASAP 2020 and the other with McBain.

Dr. Guo, an Ingevity research engineer whose education and experience put her far above the level of ordinary skill in the art, also

compared the two methods and found a [redacted].[5] Appx3033–3046; Appx6230–6245.[6] She recognized that the 35 g/L cutoff in Ingevity's patents meant that "testing consistency, especially for samples with incremental adsorption capacities in the range of 30 to 40 g/L, is very important." Appx3034; Appx6231. Yet her attempts to calculate IAC using the two measurement systems yielded a [redacted] of approximately [redacted] to [redacted] g/L.[7] Appx3033–3034; Appx6230–6231. For a sample with IAC in the 30–40 g/L range, that amounts to a [redacted] of [redacted] to [redacted] Appx3090. Indeed, Dr. Guo reported that testing of a sample with IAC

---

[5] Under the definition the Board adopted, a person of ordinary skill in the art has a bachelor's degree in chemistry or in chemical or mechanical engineering, one year of experience in the field, and knowledge of the chemistry and physics of fuel vapor adsorption, desorption, and diffusion. Appx24. Dr. Guo had a doctorate in chemical engineering and, at the time she performed the tests reflected in her memorandum, seven years' experience working at Ingevity. Appx3091.

[6] Ingevity contended that portions of this memorandum were confidential and moved to expunge the memorandum and replace it with a redacted version. *See* Appx1649. BASF objected that doing so would remove evidence relevant to this appeal from the record. Appx1712–1713. The Board denied Ingevity's motion. Appx1717. For Ingevity's and the Court's convenience, this discussion cites both the confidential and the redacted versions of Dr. Guo's memorandum.

[7] Dr. Guo's memo refers to IAC as "incremental butane working capacity" or "incremental BWC." *See* Appx3033; Appx3037; Appx6230; Appx6234.

"in the critical range of 30–40 g/L" produced average results of [redacted] g/L from McBain and [redacted] g/L from ASAP 2020, a [redacted] of roughly [redacted]. Appx3033; Appx6230. Dr. Guo also noted that for a "sample with relatively low [IAC]," this [redacted] was [redacted] Appx3037; Appx6234.

This case, in short, is like other cases where this Court has found claims indefinite because different measurement methods produced disparate results and the patent and prosecution history provided no guidance on which method to use. "Effective IAC" in the '553 patent—like "slope of strain hardening" in *Dow*, "molecular weight" in *Teva*, or "melting point elevation" in *Honeywell*—is indefinite because it can be measured in multiple ways that produce significantly different results, and the '553 patent is indifferent as to which method is used.

This case also resembles *HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680 (Fed. Cir. 2019). The claims there addressed a topical formulation for treating arthritis, and they were drafted to cover unlisted ingredients that did not alter the claimed novel property of "better drying time." *Id.* at 693–94. The claims were indefinite because the specification disclosed "two different methods for evaluating

'better drying time'" and those methods did "not provide consistent results," *Id.* at 697–98. So too here: "the existence of multiple methods" of measuring IAC "leading to different results without guidance … as to which method should be used renders the claims indefinite." *Dow*, 803 F.3d at 634.

### B. The Board rejected this ground without a reasoned analysis or substantial evidence.

The Board rejected BASF's indefiniteness argument based on just over two pages of analysis and without even considering BASF's evidence of indefiniteness. *See* Appx29–31. Its decision failed to comply with the APA's requirements of reasoned decisionmaking.

The Board began its brief discussion of the issue by observing that Ingevity and its expert, Dr. Rockstraw, "present[ed] peer-reviewed scientific literature demonstrating that gravimetric and volumetric measurement techniques were known to measure equivalent adsorption capacities and were viewed as compatible with each other." Appx29 (citing three publications: Anson (2004), Belmabkhout (2004), and Zielinski (2007)). The Board concluded that Ingevity's evidence "demonstrate[d]" that the two methods of measurement "were well established in the art as comparable methods of measuring adsorption

capacity, and accordingly, not a basis for determining claim indefiniteness." Appx30–31. Finding that conclusion "dispositive," the Board stated that it "need not address" BASF's evidence concerning "the measurement differences reported by Intertek." Appx31. The Board also did not address Dr. Guo's memo.

The Board's analysis contained two fundamental flaws.

***First***, the Board failed to consider BASF's evidence showing substantial differences between IAC measurements achieved using the two methods. After finding the handful of industry publications cited by Ingevity persuasive, the Board expressly refused to consider BASF's competing evidence of independent laboratory testing. *See* Appx31 ("[W]e need not address Petitioner's allegations as to the measurement differences reported by Intertek in Exhibit 1020."). Nor did the Board consider the Guo memo, in which Ingevity's own extraordinarily skilled researcher found a [redacted] between the two methods, including in the "critical range" covered by the '553 patent.

That was error. Reasoned decisionmaking "means that the [Board] must take account of *all* the evidence of record"—not just the evidence that favors, "*but also the evidence that detracts from* its conclusion." *Aqua*

*Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (en banc) (lead opinion of O'Malley, J.) (emphasis added). Accordingly, "an agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1352 (Fed. Cir. 2018) (citing *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

The Board apparently believed that if it was persuaded by Ingevity's evidence that the two methods of measuring IAC were regarded as "compatible" and as yielding "consistent results," it did not have to even consider BASF's competing evidence that the methods were incompatible and produced inconsistent results. Appx29–31. No authority supports that mistaken assumption. At a minimum, the Board was required to consider BASF's evidence and weigh that evidence against Ingevity's before reaching a conclusion. An agency cannot decline to consider one party's evidence because it finds the other party's evidence persuasive. "Just as it may not short-cut its legal analysis, the Board may not short-cut its consideration of the factual record before it." *Princeton*, 786 F.3d at 970.

The Board's "selective weighing of the record evidence does not pass muster under the APA" and is reason enough to vacate the decision below. *Applications in Internet Time*, 897 F.3d at 1353; *see, e.g.*, *Altaire Pharms., Inc. v. Paragon Bioteck, Inc.*, 889 F.3d 1274, 1285, *remand order modified by stipulation*, 738 F. App'x 1017 (Fed. Cir. 2018) (per curiam); *Aqua Prods.*, 872 F.3d at 1326; *see also Princeton*, 786 F.3d at 970–71 (vacating because Trademark Trial and Appeal Board gave "controlling weight" to certain evidence while "overlook[ing] or disregard[ing]" competing evidence).

***Second***, even the limited evidence the Board considered fails to support its conclusion that the claims are not indefinite. As noted above, the Board relied on three industry publications cited by Ingevity's expert: Anson, Belmabkhout, and Zielinski. Appx29–30.[8] None of these publications so much as addresses adsorption of n-butane, let alone in the critical range of the '553 patent. And none suggests that McBain and ASAP 2020 are equivalent for purposes of measuring IAC within that critical range.

---

[8] *See* Appx4157–4163 (Anson); Appx2503–2513 (Belmabkhout); Appx6018–6025 (Zielinski).

Just the opposite: As the Board recognized, while Anson and Belmabkhout examined adsorption of hydrogen and nitrogen (not n-butane), both suggested at least "a 3% deviation in results" between gravimetric and volumetric methods. Appx30; *see* Appx2511; Appx4161–4162. Moreover, Anson acknowledges that "[i]t is very often difficult to find good correlation between adsorption data obtained by different measurement techniques for the same material" and that this has led to "great controversy" and "discrepancies around the real sorption capacity of a given carbon material." Appx4158–4159.

The Board nonetheless found that these publications supported Ingevity because they included highly general statements suggesting that, in the contexts in which the authors were operating, gravimetric and volumetric measurements of adsorption "were viewed as compatible." Appx29; *see* Appx4162 (Anson finding "good agreement" between the two methods); Appx2511–2512 (Belmabkhout finding no "important discrepancies between the two systems"); Appx6019, 6023–6024 (Zielinski claiming that the authors' new "non-traditional" measurement system produced "excellent agreement" with more traditional gravimetric and volumetric methods). The Board found that

these statements "suggest a person of ordinary skill in the art would not have seen [a 3%] deviation as significant." Appx30.

That reasoning is question-begging. A discrepancy that is insignificant for some purposes may very well be not just significant, but outcome-determinative, when assessing whether a canister system with adsorbents whose adsorption capacity is near 35 g/L infringes the challenged claims. None of the papers cited by the Board addressed when a discrepancy would be considered significant in the context of n-butane adsorption by a canister system like that claimed in the '553 patent. BASF's evidence, by contrast, did address that question. *See, e.g.*, Appx3037 & Appx6234 (Dr. Guo concluding that for a "sample with relatively low [IAC]," the measurement [redacted] was [redacted]).[9] Indeed, in a section highlighting the "business significance" of her tests, Dr. Guo emphasized that "testing consistency, especially for samples with incremental adsorption capacities in the range of 30 to 40 g/L, is

[9] Even Ingevity's expert did not claim that a 3% or larger disparity between the two methods was insignificant. Rather, he asserted that the two methods "provide *the same results* when proper experimental protocols are followed," Appx4917 ¶ 160 (emphasis added), and speculated that neither Intertek nor Dr. Guo had followed proper protocols—speculation which the Board did not adopt.

very important." Appx3034 & Appx6231 (capitalization omitted). She later reaffirmed that IAC "between 30-40 g/L is a very critical range to our low bleed emission patent." Appx3039; Appx6236.

The Board also cited *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 875 F.3d 1369, 1377 (Fed. Cir. 2017), for the proposition that disputes "'as to the proper application of [a] test methodology'" that is "well established in the art" do not render a claim indefinite. Appx31. But unlike here, the patent in *Presidio* disclosed a single, established method of measuring capacitance ("insertion loss testing") that was within the knowledge of someone skilled in the art. *See* 875 F.3d at 1375–77. There was no suggestion in that case that the patent allowed capacitance to be measured using multiple different methods that would produce disparate results.

For these reasons, the Board's conclusion that the challenged claims are not indefinite was arbitrary and capricious.

## II. The Board's rejection of the obviousness ground was arbitrary and capricious.

As Ingevity has acknowledged, the '553 patent is just Hiltzik with a "narrower performance window." Appx2416. It claims the same fuel-side adsorbents and a subset of Hiltzik's vent-side adsorbents—those at

the lower end of Hiltzik's adsorptive-capacity range—and adds a low-purge performance requirement. *Compare, e.g.*, Appx2214 (10:36–44), *with* Appx112 (23:18–40). The Board nonetheless ruled that the '553 claims were not obvious over Hiltzik in view of the Clontz references—which taught that Hiltzik's canister system could easily meet the low-purge performance requirement—for the sole reason that Clontz SAE supposedly discouraged applying Hiltzik's teachings in low-purge environments. That conclusion lacks substantial evidence, ignores applicable legal principles, and is arbitrary and capricious.

### A. Hiltzik claimed the '553 patent's vent-side adsorbents and motivated routine testing of those adsorbents.

The Board inexplicably determined that "Hiltzik alone would not suggest reducing its [vent-side adsorbent's] effective BWC below 3 g/dL or its g-total BWC below 6g." Appx51. That determination is contrary to the evidence and to legal principles long recognized by this Court.

At the outset, it is important to bear in mind that although the '553 patent includes limitations for three different properties of the vent-side adsorbent—IAC, BWC, and g-total BWC—these are just different expressions of the same basic property, adsorptive capacity. IAC and BWC are strongly correlated: Ingevity proffered the equation y = 0.18x +

1.60, where "y" is BWC and "x" is IAC. Appx2088; *see supra* p. 15. And g-total BWC is just a function of BWC and volume. Appx2030; *see supra* p. 22. The upshot is that an IAC of approximately 7 g/L corresponds to both (i) a BWC less than 3 g/dL, and (ii) for the 200 mL honeycomb disclosed in Hiltzik (*see* Appx2213 (8:22)), a g-total BWC less than or equal to 6 grams. *See* Appx2100; Appx3063.

In short, a vent-side adsorbent with an IAC toward the low end of Hiltzik's claimed range will also satisfy the BWC and g-total BWC limitations of the '553 patent. This means that the question for obviousness is whether a skilled artisan who knew Hiltzik's teaching to use a vent-side adsorbent with an IAC below 35 g/L, *with no lower bound*, would be motivated to test adsorbents with adsorptive capacities toward the lower end of that range, even for low-purge applications. The evidence clearly demonstrated that she would.

To begin, Hiltzik itself teaches a preference for lower-working-capacity vent-side adsorbents and provides an example with working-capacity values very close to those claimed in the '553 patent. Hiltzik explains that DBL emissions are "lower when the [vent-side] adsorbent has a flatter adsorption isotherm"—that is, when it has a lower IAC and

BWC. Appx2211 (4:61–63). Hiltzik accordingly encourages the use of vent-side adsorbents with "BWC values preferably below 8 g/dL," with no lower bound specified. Appx2212 (6:3–10). Hiltzik also discloses that its Example 2 honeycomb (with a volume of 200 mL) has a BWC of 4 g/dL, which corresponds to a g-total BWC of 8 grams—values just slightly above the ranges claimed in the '553 patent. Appx2213 (8:49). And Hiltzik teaches the means to further reduce adsorptive capacity through "volumetric dilu[tion]," which simply means incorporating non-adsorptive "filler" material or "voidages" (empty spaces) into the adsorbent volume. Appx2211 (3:55–60); *see also* Appx2212 (6:24–29); Appx2089.

Not only that, Hiltzik explains *why* lower-capacity vent-side adsorbents are "preferred": because of the "dynamics within the adsorbent bed" and the "interactive effect that the vent-side bed volume has on the distribution and diffusion of vapor across the entire canister system during the diurnal breathing loss period." Appx2212 (6:9–14); *see generally* Appx2211 (4:31–63); Appx2212 (5:22–45). Briefly stated, the overall effect of using a high-capacity fuel-side adsorbent in combination with a low-capacity vent-side adsorbent is to "retard[] the rate of bulk

phase diffusion across the flow length of the canister system," Appx2212 (5:37–38), thus limiting the amount of fuel vapor available to diffuse into the outside air. This dynamic also improves "purge efficiency," Appx2211 (4:33–34), because the low-capacity vent-side adsorbent gives up less fuel vapor during purge than a high-capacity adsorbent would, which means the purge air is cleaner when it reaches the fuel-side adsorbent.

Given these disclosures, BASF's expert, Dr. Lyons, explained that Hiltzik itself would have motivated a skilled artisan "to dilute Hiltzik's honeycomb to achieve a honeycomb with a BWC below 3 g/dL." Appx3059; *see generally* Appx2087–2102; Appx3059–3078. And achieving such dilution would have been a matter of routine experimentation.[10]

Ingevity's expert, Dr. Rockstraw, agreed. In district court litigation over Hiltzik, Dr. Rockstraw opined that in 2001, "a person of skill in the

[10] Hiltzik explains that its honeycomb adsorbents were manufactured in accordance with U.S. Patent No. 5,914,294 ("Park"). Appx2213 (7:30–43). Park teaches adding "voidages"—in particular, "open frontal area[s]"—to honeycomb adsorbents. Appx2091 (quotation marks omitted). Adding a voidage in Park's "desirable" range of "73.8%" or greater would have diluted Hiltzik's honeycomb to less than 3 BWC. Appx2091–2092 (quotation marks omitted). And indeed, carbon adsorbents with BWC values below 3 were disclosed in U.S. Patent No. 5,510,063 as early as 1994. Appx2092–2093 ¶ 184.

art would [have] underst[oo]d the potential desirability" of "reducing BWC below 3 grams per deciliter." Appx3492 (106:2–11). He explained that a skilled artisan would naturally be motivated to "explore all of the boundaries of the system" and "the entire range of possible operating conditions" that Hiltzik taught. Appx3501 (115:16–24); Appx3502–3503 at 116:23–117:2. The artisan also would have understood that reducing the working capacity of Hiltzik's vent-side adsorbent would "reduc[e] the driving force for mass transfer" within the canister system "and therefore reduce the level of bleed emissions." Appx3487 (101:18–24); *see also* Appx3481–3482 (95:8–96:25); Appx3493–3494 (107:17–108:4).

Dr. Rockstraw also confirmed that achieving honeycombs with BWC values in the range claimed in the '553 patent would have been a matter of routine experimentation. A skilled artisan "could use the concept of volumetric dilution presented in [Hiltzik] to easily create subsequent adsorbent volumes" with values in that range. Appx3490 (104:9–14). And in fact, that is exactly what the named inventors of the '553 patent did in conceiving of the claimed invention: Applying Hiltzik's teachings, they simply "dilute[d] the carbon in a standard honeycomb to flatten its isotherm and reduce its working capacity." Appx3066 (Lyons

reply declaration); *see* Appx3693–3694 (46:15–47:12) (deposition of Roger Williams).

All of this evidence powerfully demonstrated that the vent-side adsorbents claimed in the ’553 patent were obvious over Hiltzik. This Court has recognized that “[a] *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art.” *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003). And the case for obviousness is “even more compelling” when, as here, “the claimed ranges are completely encompassed by the prior art.” *Id.* at 1330. Indeed, this Court has recognized (as did Dr. Rockstraw) that “[t]he normal desire of artisans to improve upon what is already generally known can provide the motivation to optimize variables” within a previously disclosed range. *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017); *see also In re Gorris*, 847 F. App’x 889, 892 (Fed. Cir. 2021) (per curiam) (same; quoting *Ethicon* and collecting cases).

Accordingly, the “discovery of an optimum value of a variable in a known process is usually obvious.” *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368 (Fed. Cir. 2007); *accord In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (“Where the general conditions of a claim are

disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." (quoting *Application of Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955))). Systematically testing adsorbents throughout Hiltzik's range was the most routine of experimentation. And selecting "narrow ranges from broader ranges disclosed in the prior art" is precisely the kind of optimization that yields obvious results. *Peterson*, 315 F.3d at 1330; *see also Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341–42 (Fed. Cir. 2020) (concluding that a skilled artisan would have been motivated to optimize the temperature in a claimed process and that "finding an optimal temperature range would have been nothing more than routine experimentation").

The Board nonetheless concluded that "Hiltzik alone would not suggest reducing its effective BWC below 3 g/dL or its g-total BWC below 6g." Appx51. It offered no reasoned explanation for that conclusion. It did not even acknowledge (i) that Hiltzik's teachings completely encompassed the range of working-capacity values claimed in the '553 patent; (ii) that a skilled artisan would naturally be motivated to optimize within Hiltzik's range through routine experimentation; or (iii) that Hiltzik supplied further motivation by teaching that lowering

the working capacity of the vent-side adsorbent tends to reduce DBL emissions. The Board did at least concede that Dr. Rockstraw's testimony "weigh[ed] against" its conclusion; but it did not explain why it declined to credit that testimony. Appx51.

That is not reasoned decisionmaking. The Board cannot simply declare that it is rejecting one side's arguments "without explaining why [it] accepts the prevailing argument." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016). The Board's finding that Hiltzik does not suggest diluting the vent-side adsorbent to achieve BWC and g-total BWC values in the ranges claimed by the '553 patent—which are fully encompassed by the ranges claimed in Hiltzik—is arbitrary and capricious, contrary to law, and unsupported by substantial evidence.

### B. The Clontz references taught that Hiltzik's system could meet the low-purge performance standard.

Given Hiltzik's disclosure of the entire range of IAC and BWC limitations claimed in the '553 patent, the only thing missing from Hiltzik is the low-purge performance limitation (two-day DBL emissions of no more than 20 mg with no more than 100 bed volumes of purge air) that appears in many of the challenged independent claims (but is absent from claim 64). The Board concluded that the prior art did not teach or

suggest the use of Hiltzik's teachings to meet the performance limitation. Appx38.

The Board failed to provide a reasoned explanation for that conclusion, which was not supported by substantial evidence. As BASF's expert explained, Clontz SAE and Clontz WIPO demonstrate that Hiltzik's canister system can easily meet emissions requirements in low-purge conditions. *See* Appx2103–2105; Appx3065–3072. Given those teachings, a skilled artisan would have been motivated to perform routine experiments further diluting Hiltzik's Example 2 honeycomb to achieve the optimized values claimed in the '553 patent.

Clontz SAE presents data concerning the performance of a "baseline" 200 mL honeycomb with the same dimensions and cell density as Hiltzik's Example 2. Although Clontz SAE does not expressly disclose the BWC of its baseline honeycomb, a skilled artisan would have understood that Clontz SAE's baseline honeycomb was "essentially equivalent" to Hiltzik's honeycomb—which, as noted above, had a BWC of 4 g/dL and a g-total BWC of 8 grams. Appx2068–2069; *see* Appx2213 (8:21, 8:49). Clontz SAE teaches that this honeycomb achieves sub-20 mg emissions at 100 bed volumes of purge with no heating, satisfying the

’553 patent’s low-purge performance limitation. Appx2269 fig. 6. Clontz SAE also teaches that when heated, the same honeycomb achieves sub-20 mg emissions with half as much purge air—just 50 bed volumes. At a minimum, this would have given a skilled artisan a reasonable expectation that a slightly more diluted honeycomb, with a BWC of 3 g/dL and a g-total BWC of 6 grams, could achieve similar emissions at 100 bed volumes and thus satisfy the performance limitation.

Clontz WIPO lends further support. It teaches that with heating, a honeycomb with a much lower volume (just 66 mL, which translates into significantly lower g-total working capacity), even when further diluted by the addition of electrically conductive ingredients, can yield 2-day DBL emissions of just 4 mg with only 75 bed volumes of purge—drastically below the ’553 patent’s performance threshold of 20 mg with 100 bed volumes of purge. Appx2252; *see* Appx3072. Clontz WIPO would have bolstered a skilled artisan’s expectation that a honeycomb with BWC and g-total BWC values slightly below those of Hiltzik’s Example 2 could satisfy the performance limitation.

Ignoring this evidence, the Board found that Clontz SAE would have dissuaded a skilled artisan from using low-capacity honeycombs

when trying to achieve compliant low-purge emissions. Appx51; *see also* Appx47–48. That finding was based entirely on Clontz SAE's inclusion of "[h]igher capacity honeycombs" on a list of four factors that appeared to improve emissions performance at low purge. Appx2272. For several reasons that BASF explained but the Board failed to address, Clontz SAE "would not have dissuaded a POSITA from applying Hiltzik's teachings … to low-purge systems." Appx3068.

***First***, the Board relied on what it called "Clontz SAE's strong suggestion that honeycombs with higher capacity than Hiltzik's would be desirable" for meeting low-purge emissions requirements. But the Board misconstrued Clontz SAE's teaching, which was directed to "[i]ncreased *honeycomb* working capacity," Appx2269 (emphasis added)—that is, the equivalent of *g-total* BWC, rather than BWC. Clontz SAE's disclosure teaches using larger honeycombs, not varying the inherent BWC property of those honeycombs:




Figure 5. Results obtained with 27 mm diameter honeycombs evaluated with 150 bed volumes of purge.

Appx2269 (Fig. 5). As discussed above, because g-total BWC is calculated by multiplying BWC by the volume of the adsorbent, a larger honeycomb with *the same or lower* BWC as a smaller one might still demonstrate "[i]ncreased honeycomb working capacity," or g-total BWC. Contrary to the Board's reasoning, nothing in that teaching would discourage an ordinarily skilled artisan, performing routine experiments based on Hiltzik's disclosures, from diluting Hiltzik's vent-side adsorbent to determine the effect of lower BWC on low-purge emissions. *See* Appx3067–3068. In short, Clontz SAE tests the effect of expanding and contracting the overall *size* of the honeycombs used, while Hiltzik, by contrast, teaches altering the adsorption characteristics of the honeycombs used.

***Second***, Clontz SAE did not draw any firm conclusions about the importance of "[i]ncreased honeycomb working capacity"—*i.e.*, higher *g-total* BWC. Appx2269. It listed three other factors that also appeared to contribute to lower emissions—"[l]onger diffusional path length," "[f]low redistribution," and "[r]esistively-heated honeycombs," Appx2269—and noted that "[f]urther research" was needed to understand the factors' "relative importance." Appx2272. Clontz SAE surely did not suggest that greater g-total BWC was *necessary* to meet emissions standards at low purge; on the contrary, it and Clontz WIPO both suggested that the standards could be met in a variety of other ways, including by heating the honeycomb.

***Third,*** Clontz SAE's comments regarding higher g-total BWC do not teach away from the '553 patent's claim limitation regarding lower g-total BWC. That is so because Clontz SAE suggests potential benefits from increasing the g-total BWC of the entire "configuration" of honeycombs in the system, which may include multiple honeycombs. *See* Appx2268–2269 (testing various configurations of honeycombs, including multiple honeycombs in series, and suggesting possible benefits from increasing "total working capacity" of the entire configuration). The '553

claims, by contrast, require only that "*at least one* subsequent adsorbent volume" have a g-total BWC ≤ 6g, Appx112 (23:24–29) (emphasis added), which does not preclude using multiple subsequent adsorbent volumes (*e.g.*, multiple honeycombs) that *in combination* have a higher g-total BWC. For this reason, Clontz SAE's teachings regarding g-total BWC are not inconsistent with the solution claimed in the '553 patent.

***Fourth***, Clontz SAE did not contradict or undermine Hiltzik's teachings about the advantages of lower-BWC honeycombs for reducing DBL emissions, either. That is clear from Clontz WIPO, which was published after Clontz SAE and continued to emphasize the benefits of volumetrically diluting the honeycomb to reduce BWC. The Board incorrectly stated that Clontz WIPO teaches *only* "the use of resistive heating of the honeycomb" and does not "suggest[] further dilution." Appx50. That ignores the plain language of Clontz WIPO, which states that its "electrical conductivity additives" play "a *dual role* of adjusting the adsorption properties [of the honeycomb] to flatten the equilibrium isotherm slope, *plus* obtaining resistivity within the desired range." Appx2247 (emphases added). If Clontz SAE had caused those of skill in the art to believe, contrary to Hiltzik's teaching, that there was no benefit

to reducing honeycomb working capacity, then Clontz WIPO would not have touted flattening the isotherm—*i.e.*, reducing capacity—as one of the dual benefits of its approach.

Nor was Clontz WIPO the only post–Clontz SAE evidence confirming Hiltzik's teaching that vent-side adsorbents should have low BWCs. A 2010 paper ("MECA") by the Manufacturers of Emission Controls Association, Appx2217, taught that carbons with "high working capacity also have a tendency for stronger adsorption or heel during purging," leading to "higher diurnal emissions," Appx2234; *see also* Appx78 (citing the MECA reference as background art). Accordingly, MECA suggested using "[a]dvanced carbon designs that release [hydrocarbons] easily with a small volume of purge" for "hybrid powertrains," and taught that "[t]hese carbons tend to have a lower working capacity." Appx2234. Such "advanced carbon technology" allowed "hybrid vehicles" to "achieve near-zero evaporative emissions despite low purge volumes." Appx2237. Though BASF highlighted MECA both in its petition and during the hearing, Appx140–142, Appx1554, Appx1615, the Board ignored MECA in reaching its conclusion that Clontz SAE taught away from Hiltzik's disclosure of low-capacity vent-

side adsorbents, *see* Appx49–52. Its failure to consider MECA—evidence that detracted from its conclusion—was error. *Aqua Prods.*, 872 F.3d at 1325; *Applications in Internet Time*, 897 F.3d at 1352.

***Fifth***, to the extent Clontz SAE suggested some potential benefit from using higher g-total BWC vent-side adsorbents, that does not make the use of a lower g-total BWC vent-side adsorbent patentable. When the prior art shows that a claimed method "is usable and has been used," a teaching-away argument does not refute obviousness, even if a reference suggests that the method is inferior. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *see also Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807–08 (Fed. Cir. 1989) (prior art may be relied on for all it reasonably suggests, including its non-preferred embodiments). Here, Clontz SAE made clear that heating Hiltzik's vent-side honeycomb, with g-total BWC only slightly above the level claimed in the '553 patent, produced extremely low DBL emissions, easily meeting the emissions limitation in the '553 patent at *half* the purge claimed. Clontz SAE, in other words, demonstrated that Hiltzik's canister system was "usable and ha[d] been used" to meet those limitations. Again, it would have been a trivial

matter for an ordinarily skilled artisan to further optimize Hiltzik in light of Clontz SAE's disclosure.

The Board did not acknowledge, much less refute, any of these arguments. Instead, it simply declared, with no reasoned explanation, that Clontz SAE's tentative support for increasing honeycomb capacity canceled out the clear contrary teachings of Hiltzik and Clontz WIPO. Once again, the Board rejected BASF's position "without explaining why [it] accept[ed]" Ingevity's. *Nuvasive*, 842 F.3d at 1383. Such "conclusory analysis" cannot supply the necessary reasoned explanation for the Board's decision. *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905 (Fed. Cir. 2018).

* * *

To sum up: Hiltzik's disclosures encompassed the purported invention in the '553 patent and rendered it a matter of routine experimentation within a known range, and the Clontz references confirmed that the Hiltzik system could achieve desirable emissions levels at low purge. The Board's conclusion that a skilled artisan would not have been motivated, in view of Hiltzik and the Clontz references, to explore the full range of Hiltzik's teachings was arbitrary and capricious.

At a minimum, that error requires vacatur and remand. Alternatively, given that the evidence in the record shows that all the limitations in the ’553 patent were obvious over Hiltzik and the Clontz references, this Court may simply reverse the Board’s conclusion of non-obviousness.

## III. BASF has appellate standing.

BASF has Article III standing because it reasonably expects that Ingevity will accuse BASF of infringing the ’553 patent by selling and testing BASF’s carbon honeycomb product, EvapTrap XC. After Ingevity moved (Doc. 9) to dismiss this appeal for lack of standing, BASF submitted a response (Doc. 16) with evidence demonstrating its standing beyond any reasonable dispute. Ingevity’s reply (Doc. 19) all but conceded the issue, raising only two trivial objections that are addressed below.

To establish standing to appeal a decision of the Board, a party need only show that it “has engaged in, is engaging in, or will likely engage in activity that would give rise to a possible infringement suit.” *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1357 (Fed. Cir. 2020) (cleaned up); *see also, e.g.*, *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1341–42 (Fed. Cir. 2020); *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005 (Fed. Cir. 2018). The appellant “need not face ‘a specific threat

of infringement litigation by'" the patent owner. *DuPont*, 904 F.3d at 1004 (quoting *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011)). Nor does it need to "concede infringement to establish standing." *JTEKT Corp. v. GKN Auto LTD.*, 898 F.3d 1217, 1221 (Fed. Cir. 2018). This Court "accept[s] as true [an appellant's] material representations of fact for purposes of assessing its standing." *Amerigen Pharms. Ltd. v. UCB Pharma GmbH*, 913 F.3d 1076, 1083 (Fed. Cir. 2019).

As BASF explained in response to Ingevity's motion to dismiss, BASF has concrete plans to manufacture, test, and sell EvapTrap XC, including for vehicle platforms in the United States. *See* Doc. 16, Moonjely Decl. ¶¶ 29–30. Ingevity has already accused EvapTrap XC of infringing the highly similar Hiltzik patent. *See id.* ¶ 9; Mezzina Decl. Ex. B (complaint filed by Ingevity in the District of Delaware). And BASF has shown that the minor differences between the '553 patent and Hiltzik, considered in light of Ingevity's prior allegations and expert testimony, do not substantially alter the infringement analysis that Ingevity appears to have performed, and do not diminish the substantial likelihood that Ingevity would claim that the same conduct it accused of

infringing Hiltzik also infringes the ’553 patent. *See* Doc. 16, Moonjely Decl. ¶¶ 16–27.

Ingevity’s reply disputed hardly any of this. Ingevity did not deny that EvapTrap XC “meets the technical limitations of the ’553 Patent claims.” Doc. 19-1 at 2. It did not deny that the manufacture and sale of EvapTrap XC would infringe the ’553 patent; nor has Ingevity offered a covenant not to sue BASF over EvapTrap XC. Instead, Ingevity picked at imaginary nits, pressing two arguments that BASF’s evidentiary submissions had already rebutted.

***First***, Ingevity argued that the Court should discount Mr. Moonjely’s declaration because he is an in-house patent attorney instead of a “business person” and so, for some reason, could not have sufficient knowledge of BASF’s business plans. Doc. 19-1 at 8. This argument is meritless. Mr. Moonjely’s declaration was “based on [his] own personal knowledge or belief following reasonable investigation.” Doc. 16, Moonjely Decl. at 1. That he is a lawyer does not, of course, exclude him from having personal knowledge of BASF’s business plans—especially when those plans implicate the possibility of an infringement suit should Ingevity’s patent be upheld. Ingevity offers no reason to doubt Mr.

Moonjely's knowledge. BASF could of course provide a declaration from a non-lawyer echoing Mr. Moonjely's assertions if the Court desired one, but there is no legal or practical basis for requiring such redundancy.

***Second***, Ingevity argued that BASF had provided no evidence of "activities *in the United States* that could give rise to an infringement suit." Doc. 19-1 at 3. But BASF did present such evidence. As Mr. Moonjely explained, EvapTrap XC is designed to help auto manufacturers meet *U.S.* emissions standards, Doc. 16, Moonjely Decl. ¶¶ 3, 6, which is why customers wish to purchase EvapTrap XC for use in *U.S.* vehicle platforms, *id.* ¶ 29. Ingevity admits that EvapTrap XC would raise infringement concerns if it were "incorporated into a fuel vapor canister in the United States." Doc. 19-1 at 3. Plainly, a product sold to help U.S. vehicles meet U.S. emissions standards is likely to be incorporated into fuel vapor canisters in vehicles in the United States.

Ingevity is left to quibble that Mr. Moonjely did not identify the "specific customer[s]" who expressed interest in EvapTrap XC and that those customers are "no[t] guaranteed" to actually purchase the product. Doc. 19-1 at 5; *see also id.* at 7. But no precedent requires such specificity or certainty. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158

(2014) (standing requires only a "substantial risk" of future harm). And it is no wonder that BASF would not want to name names, since Ingevity has a history of meddling in BASF's customer relationships and retaliating against customers who deal with BASF—conduct that a jury found both violated federal antitrust law and amounted to tortious interference under state law. *See* Doc. 16, Mezzina Decl. Ex. E (jury verdict). Ingevity's demand for even more evidence of BASF's confidential business plans amounts to insisting that BASF "concede infringement," which BASF is not required to do. *JTEKT*, 898 F.3d at 1221.

## CONCLUSION

For the foregoing reasons, BASF respectfully requests that this Court reverse the Board's decision and rule that the challenged claims are unpatentable. In the alternative, the Court should vacate the decision below and remand for further consideration.

Respectfully submitted,

*/s/ Paul Alessio Mezzina*

Paul Alessio Mezzina
*Counsel of Record*
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com
jmitchell@kslaw.com

Brian Eutermoser
Mikaela Stone
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
beutermoser@kslaw.com
mikaela.stone@kslaw.com

July 13, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Federal Circuit Rule 32(a) because it contains 12,253 words, including footnotes and excluding the parts of the brief exempted by Federal Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(f); and

(ii) complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared using Microsoft Office Word and is set in 14-point Century Schoolbook font.

July 13, 2022

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

*Counsel for Appellant*
*BASF Corporation*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 22-1129

**Short Case Caption:** BASF Corp. v. Ingevity South Carolina, LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 9 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/13/2022

Signature: /s/Paul Alessio Mezzina

Name: Paul Alessio Mezzina

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 12
Entered: July 29, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BASF CORPORATION,
Petitioner,

v.

INGEVITY SOUTH CAROLINA, LLC,
Patent Owner.

PGR2020-00037
Patent 10,323,553 B2

Before CHRISTOPHER L. CRUMBLEY, CHRISTOPHER M. KAISER, and JULIA HEANEY, *Administrative Patent Judges*.

HEANEY, *Administrative Patent Judge*.

# ORDER
## Granting Motion for Entry of Protective Order
*37 C.F.R. § 42.54*

On July 28, 2020, Patent Owner Ingevity South Carolina, LLC filed a Revised Unopposed Motion for Entry of a Protective Order. Paper 11. ("Mot."). Patent Owner also filed a Proposed Stipulated Protective Order (Ex. 2013) and a tracked changes version showing the differences between the Default Protective Order and the Proposed Stipulated Protective Order (Ex. 2014).

Following our instructions in denying Patent Owner's original motion for entry of a protective order (Paper 10), the parties have revised paragraph 4(A)(i) so that it now tracks paragraph 5(A)(i) of the Default Protective Order and requires that any documents submitted under seal to the Board be accompanied by a motion to seal that provides a non-confidential description of the nature of the confidential information and sets forth the reasons why the information is confidential and should not be made available to the public. Ex. 2013. Further, Patent Owner asserts that good cause exists to enter the Proposed Stipulated Protective Order, as set forth in Patent Owner's original motion (Mot. 3 (citing Paper 8)).

Having considered the Revised Unopposed Motion for Entry of a Protective Order and Exhibits 2013–2014, we determine that there is good cause for granting the motion.

It is, therefore,

ORDERED that Patent Owner's Revised Unopposed Motion for Entry of a Protective Order is *granted*; and

FURTHER ORDERED that the Proposed Stipulated Protective Order (Ex. 2013) is hereby adopted by the Board, and shall govern all future proceedings in this case.

PETITIONER:

Lori A. Gordon
Steven W. Peters
Joseph D. Eng, Jr.
KING & SPALDING LLP
lgordon@kslaw.com
speters@kslaw.com
jeng@kslaw.com

PATENT OWNER:

Brian M. Buroker
Omar F. Amin
GIBSON, DUNN & CRUTCHER LLP
bburoker@gibsondunn.com
oamin@gibsondunn.com

Spencer W. Ririe
MANGUMRIRIE LLP
spencer@mangumririe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BASF CORPORATION
Petitioner

v.

INGEVITY SOUTH CAROLINA, LLC
Patent Owner

---

Case No. PGR2020-00037

Patent 10,323,553

---

# [PROPOSED] STIPULATED PROTECTIVE ORDER

Mail Stop **Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

This standing protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Any confidential technical, financial or internal business material (documents or testimony) that is produced in this PGR during discovery or other proceedings before the Board may be designated as "PROTECTIVE ORDER MATERIAL" and clearly marked as such. In particular, Petitioner has requested that Patent Owner produce in this PGR a document that was produced in co-pending district court litigation (in U.S. District Court for District of Delaware Case No. 18-1391-RGA) with the Bates Number NGVT0264661 and designated as Confidential under the Amended Protective Order entered in that case. The parties agree that Patent Owner may designate the document that corresponds to NGVT0264661 as PROTECTIVE ORDER MATERIAL in this PGR and that Petitioner will not challenge that document's designation as PROTECTIVE ORDER MATERIAL in this PGR. The parties will continue to treat that document as Confidential under the terms of the Amended Protective Order in the district court.

2. Access to PROTECTIVE ORDER MATERIAL, for purposes of this proceeding, is limited to the following individuals:

(A) Party Representatives. Representatives of record for a party in the present PGR proceeding.

(B) Experts. Retained experts of a party in the proceeding that have executed the Acknowledgment appended to this order.

(C) In-House Counsel. The in-house counsel that are permitted to see Confidential Information under the Amended Protective Order in the District Court case (18-1391-RGA).

(D) The Patent and Trademark Office. Employees and representatives of the Patent and Trademark Office (the "Office") who have a need for access to said PROTECTIVE ORDER MATERIAL. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

(E) Support Personnel. Administrative assistants, clerical staff, court reporters, and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding. Such individuals shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives said PROTECTIVE ORDER MATERIAL.

3. Persons receiving PROTECTIVE ORDER MATERIAL shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to PROTECTIVE ORDER MATERIAL understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of PROTECTIVE ORDER MATERIAL to a reasonable number of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

4. Persons receiving PROTECTIVE ORDER MATERIAL shall use the following procedures to maintain the confidentiality of the information:

(A) Documents and Information Filed With the Board.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and

should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The documents or information shall remain under seal unless the Board determines that some or all of it does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed under seal. The redacted information shall remain under seal unless the Board determines that some or all of the redacted information does not qualify for confidential treatment.

5. The parties agree that PROTECTIVE ORDER MATERIAL will be used only in connection with this proceeding and for no other purpose, except that as provided by law, or by the Parties' agreement.

6. Neither Party shall oppose a request by the other party to expunge PROTECTIVE ORDER MATERIAL, including specifically NGVT0264661, from this Proceeding.

[SIGNATURE BLOCKS ON FOLLOWING PAGE]

DATED: July 28, 2020


*<u>/s/ Lori A. Gordon</u>*
Lori A. Gordon
(Reg. No. 50,633)
Steven W. Peters
(Reg. No. 73,193)
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, DC 20006-4707
Tel: 202-737-0500
lgordon@kslaw.com
speters@kslaw.com

Joseph D. Eng, Jr.
(Reg. No. 54,084)
King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: 212-556-2100
jeng@kslaw.com

*Attorneys for Petitioner*

*<u>/s/ Brian M. Buroker</u>*
Brian M. Buroker
(Reg. No. 39,125)
Omar F. Amin
(Reg. No. 60,885)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: 202-955-8500
bburoker@gibsondunn.com
oamin@gibsondunn.com

Spencer W. Ririe
(Reg. No. 66,740)
Mangum Ririe LLP
999 Corporate Dr. #260
Ladera Ranch, CA 92694
Tel: 949-302-0393
spencer@mangumririe.com

*Attorneys for Patent Owner*

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BASF CORPORATION
Petitioner

v.

INGEVITY SOUTH CAROLINA, LLC
Patent Owner

---

Case No. PGR2020-00037

Patent 10,323,553

---

**Acknowledgment for Access to Protective Order Material**

I, ________________________________________________, affirm that I have read the Protective Order; that I will abide by its terms; that I will use PROTECTIVE ORDER MATERIAL only in connection with this proceeding and for no other purpose; that I will only allow access to support staff who are reasonably necessary to assist me in this proceeding; that prior to any disclosure to such support staff I informed or will inform them of the requirements of the

Protective Order; that I am personally responsible for the requirements of the terms of the Protective Order and I agree to submit to the jurisdiction of the Patent and Trademark Office and the United States District Court for the Eastern District of Virginia for purposes of enforcing the terms of the Protective Order and providing remedies for its breach.

DATE:__________ SIGNATURE:______________________

Trials@uspto.gov
571-272-7822

Paper 75
Entered: September 9, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BASF CORPORATION,
Petitioner,

v.

INGEVITY SOUTH CAROLINA, LLC,
Patent Owner.

PGR2020-00037
Patent 10,323,553 B2

Before CHRISTOPHER L. CRUMBLEY, CHRISTOPHER M. KAISER, and JULIA HEANEY, *Administrative Patent Judges*.

HEANEY, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Dismissing Motions to Exclude as Moot
*35 U.S.C. § 328(a)*

## I. INTRODUCTION

BASF Corporation ("Petitioner") filed a Petition to institute a post-grant review of claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 of U.S. Patent No. 10,323,553 B2 (Ex. 1001, "the '553 patent"). Paper 3 ("Petition" or "Pet."). Ingevity South Carolina, LLC ("Patent Owner") filed a Preliminary Response. Paper 7. In our Institution Decision (Paper 19, "Dec. on Inst."), we determined Petitioner had shown it was more likely than not to prevail with respect to its challenge to claims 1 and 21 of the '553 patent based on obviousness. Dec. on Inst. 37. Accordingly, we instituted trial as to all claims challenged in the petition and on all grounds in the petition. Consolidated Trial Practice Guide 5 (Nov. 2019) ("Trial Practice Guide"), http://www.uspto.gov/TrialPracticeGuideConsolidated ("In instituting a trial, the Board will either (1) institute as to all claims challenged in the petition and on all grounds in the petition, or (2) institute on no claims and deny institution.").

During the course of trial, Patent Owner filed a Patent Owner Response (Paper 44, "PO Resp."); Petitioner filed a Reply to the Patent Owner Response (Paper 52, "Pet. Reply"); Patent Owner filed a Sur-reply (Paper 61, "PO Sur-reply"). The parties also filed motions to exclude evidence (Papers 56 and 57), which we address *infra*. An oral hearing was held on June 11, 2021, and a transcript of the hearing is included in the record. Paper 71 ("Tr.").

### *A. Related Proceedings*

The parties identify PGR2020-00035 as a related proceeding involving the '553 patent. Pet. 101; Paper 5, 2. In that case, we denied

institution of trial. PGR2020-00035, Paper 11. The parties state they are not aware of any other judicial or administrative proceeding involving the ’553 patent. *Id.*

*B. The ’553 Patent*

The ’553 patent, titled “Evaporative Fuel Vapor Emission Control Systems,” describes canister systems that employ activated carbon to adsorb fuel vapor emitted from motor vehicle fuel systems and reduce hydrocarbon air pollution. Ex. 1001, code (54), 1:29–33. The adsorbed fuel vapor can be “periodically removed from the activated carbon by purging the canister systems with ambient air [while the engine is turned on] to desorb the fuel vapor from the activated carbon,” after which the “regenerated carbon is then ready to adsorb additional fuel vapor.” *Id.* at 1:33–38; 53–58. According to the ’553 patent, however, “[t]he purge air does not desorb the entire fuel vapor adsorbed on the adsorbent volume, resulting in a residue hydrocarbon (‘heel’) that may be emitted to the atmosphere.” *Id.* at 1:58–61.

The ’553 patent states “[a]n increase in environmental concerns has continued to drive strict regulations of the hydrocarbon emissions from motor vehicles even when the vehicles are not operating.” *Id.* at 1:39–41. “When a vehicle is parked in a warm environment during the daytime heating (i.e., diurnal heating), the temperature in the fuel tank increases resulting in an increased vapor pressure in the fuel tank.” *Id.* at 1:42–45. The ’553 patent explains that the “heel in local equilibrium with the gas phase also permits fuel vapors from the fuel tank to migrate through the canister system as emissions,” and “[s]uch emissions typically occur when a vehicle has been parked and subjected to diurnal temperature changes over a period of several days, commonly called ‘diurnal breathing losses’

[“DBL”].” *Id.* at 1:61–67. The ’553 patent further states that the “California Low Emission Vehicle Regulation (LEV-III) requires canister DBL emissions not to exceed 20 mg.” *Id.* at 2:6–8.

The ’553 patent explains that DBL emissions may be “more severe for a hybrid vehicle that includes both an internal combustion engine and an electric motor,” because, in such vehicles, “the internal combustion engine is turned off nearly half of the time during vehicle operation.” *Id.* at 2:46–51. “Since the adsorbed fuel vapor on the adsorbents is purged only when the internal combustion engine is on, the adsorbents in the canister of a hybrid vehicle is purged with fresh air less than half of the time compared to conventional vehicles.” *Id.* at 2:51–55. Yet, “[a] hybrid vehicle generates nearly the same amount of evaporative fuel vapor as the conventional vehicles.” *Id.* at 55–57. The ’553 patent explains “[t]he lower purge frequency of the hybrid vehicle can be insufficient to clean the residue hydrocarbon heel from the adsorbents in the canister, resulting in high diurnal breathing loss (DBL) emissions.” *Id.* at 57–60. Therefore, according to the ’553 patent, “it is desirable to have an evaporative emission control system with low diurnal breathing loss (DBL) emissions even when a low level of purge air is used, or when the adsorbents in the canister are purged less frequently such as in the case of hybrid vehicles, or both.” *Id.* at 2:61–65.

The ’553 patent describes several example embodiments of evaporative emission control canister systems to address the above problems. *Id.* at 4:10–20. Figures 1–3 of the ’553 patent, reproduced below, depict a first group of canister system embodiments.




Figures 1–3 are evaporative emission control canister systems having "an initial adsorbent volume and subsequent adsorbent volume(s) ... located within a single canister." *Id.* at 4:10–14. An "adsorbent volume" refers to "an adsorbent material or adsorbent containing material along vapor flow path, and may consist of a bed of particulate material, a monolith, honeycomb, sheet or other material." *Id.* at 6:32–36. Figure 1 illustrates "[c]anister system 100 includ[ing] a support screen 102, a dividing wall 103, a fuel vapor inlet 104 from a fuel tank, a vent port 105 opening to an atmosphere, a purge outlet 106 to an engine, an initial adsorbent volume 201, and a subsequent adsorbent volume 202." *Id.* at 4:24–28. The '553 patent explains the operation of canister system 100 as follows:

> When an engine is off, the fuel vapor from a fuel tank enters the canister system 100 through the fuel vapor inlet 104. The fuel vapor diffuses into the initial adsorbent volume 201, and then the subsequent adsorbent volume 202 before being released to the atmosphere through the vent port 105 of the canister system. Once the engine is turned on, ambient air is drawn into the canister system 100 through the vent port 105. The purge air flows through the subsequent adsorbent volume 202 and then the initial adsorbent volume 201, and desorbs the fuel vapor

> adsorbed on the adsorbent volumes 202, 201 before entering an internal combustion engine through the purge outlet 106.

*Id.* at 4:29–40.

The embodiment of Figure 2 includes additional subsequent adsorbent volumes 203 and 204, and the embodiment of Figure 3 adds empty volume 205 between subsequent adsorbent volumes 203 and 204. *Id.* at 4:41–57.

Figures 4–6 of the '553 patent, reproduced below, depict a second group of canister system embodiments.




Figures 4–6 are evaporative emission control canister systems that include more than one canister, "wherein an initial adsorbent volume and at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor." *Id.* at 4:14–20. Figure 4 depicts main canister 101 having similar elements as shown in Figure 2, along with supplemental canister 300 including conduit 107 connected to main canister 101, subsequent adsorbent volume 301, and vent port 105. *Id.* at 4:61–5:3. Main canister 101 and supplemental canister 300 operate similarly to the embodiments of Figures 1–3: when the engine is off, fuel vapor enters main canister 101 through inlet 104, diffuses through the

adsorbent volumes 201–204, and then enters adsorbent volume 301 before releasing to the atmosphere at vent port 105. *Id.* at 5:4–14. Once the engine is turned on, ambient air is drawn into the canister system through vent port 105, the purge air flows through the adsorbent volumes in supplemental canister 300 and main canister 101 to desorb the fuel vapor adsorbed on the adsorbent volumes, before entering the internal combustion engine through purge outlet 106. *Id.* at 5:14–23. The embodiment of Figure 5 includes additional subsequent adsorbent volume 302, and the embodiment of Figure 6 adds empty volume 304 between subsequent adsorbent volumes 302 and 303. *Id.* at 5:24–38.

The '553 patent further discloses "the evaporative emission control system may include a heat unit for heating the purge air, at least one subsequent adsorbent volume, or both," in order to enhance the purge efficiency. *Id.* at 12:29–34. "The heat input units may include, but are not limited to, internal resistive elements, external resistive elements, or heat input units associated with the adsorbent." *Id.* at 13:29–31.

The '553 patent describes adsorbent volumes in terms of three adsorptive characteristics: "incremental adsorption capacity," "butane working capacity (BWC)," and "g-total BWC." *Id.* at 6:10–22. These properties are described as "nominal," which includes adsorbent component volumes but excludes conduits, gaps, or other non-adsorbent volumes, and "effective," which includes all volumes of the system both adsorbent and non-adsorbent. *Id.* at 6:37–42; 10:26–34. Nominal incremental adsorption capacity of an adsorbent component is a function of the difference between the gram mass of adsorbed butane at 50 vol. % butane concentration and 5 vol. % butane concentration, multiplied by the "nominal volume apparent

density" (defined as the mass of adsorbent material divided by the nominal volume of adsorbent material). *Id.* at 6:56–64; 9:6–25. Nominal volume BWC is determined by placing the adsorbent component in a test system that loads the adsorbent material with butane and then purges it with air, and measuring the difference in mass of the adsorbent component before and after the purge. *Id.* at 9:26–10:24. The g-total BWC is defined as the total gram amount of butane purged during the test. *Id.* at 10:24–25. The "effective" property of each characteristic (i.e., effective incremental adsorption capacity, effective butane working capacity (BWC), and effective g-total BWC) is a function of each respective nominal property that takes into account the total effective volume of the system. *Id.* at 10:25–62.

The '553 patent provides an exemplary embodiment of an evaporative emission control canister system with specified adsorbent material properties, comprising:

> an initial adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol% and 50 vol% n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of between 2 grams and 6 grams. . . .
> The evaporative emission control canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.

*Id.* at 3:56–67; 4:5–9.

The ’553 patent provides further examples of evaporative emission control canister systems, and lists specific characteristics for each example. *Id.* at 13:60–20:12; *see also* col. 19–col. 24, Tables 1–5.

*C. The Challenged Claims*

Petitioner challenges claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 of the ’553 patent (“the challenged claims”). Pet. 1. Claims 2–10 and 14–20 depend from claim 1; claims 22–28 and 32–38 depend from claim 21; claim 52 depends from claim 51; claims 56, 57, and 59 depend from claim 55; and claims 65–72 and 76–82 depend from claim 64.

Claim 1, reproduced below with additional paragraphing to separate the limitations at issue in this Decision, is illustrative of the subject matter of the challenged claims:

> 1. An evaporative emission control canister system, including one or more canisters and comprising:
>
> **[A]**[1] a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and
>
> **[B]** at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane,
>
> **[C]** an effective butane working capacity (BWC) of less than 3 g/dL, and
>
> **[D]** a g-total BWC of ≤6 grams,

[1] We label each of the relevant claim limitations with the lettering the parties apply in the Petition and Patent Owner Response.

> **[E]** wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor, and
>
> **[F1]** wherein the canister system has a two-day diurnal breathing loss (DBL) of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step.

*Id.* at 23:18–40.

### *D. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claims Challenged | 35 U.S.C. [2] | Reference(s)/Basis |
|---|---|---|
| 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 | § 112(b) | Indefiniteness |
| 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 | § 103(a) | Hiltzik,[3] Clontz WIPO,[4] and Clontz SAE[5] |

Pet. 3. Petitioner relies on the Declaration of James M. Lyons (Ex. 1003) ("Lyons Declaration") and Reply Declaration by James M. Lyons (Ex. 1042) ("Lyons Reply Declaration"). Patent Owner relies on the Revised Declaration of Dr. David A. Rockstraw in Support of Patent Owner

---

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. § 103 that became effective on March 16, 2013. As discussed below (II.C), we determine that the '553 patent issued from an application that has an effective filing date after March 16, 2013, and, thus, we apply the AIA versions of the statutory bases for unpatentability.

[3] US Patent No. RE38,844 E to Hiltzik et al., issued Oct. 25, 2005 (Ex. 1007).

[4] WO 2009/061533 A1 to Clontz et al., published May 14, 2009 (Ex. 1009).

[5] Clontz, R., *et al.*, "Effects of Low-Purge Vehicle Applications and Ethanol-Containing Fuels on Evaporative Emissions Canister Performance," Society of Automotive Engineers of Japan (2007) (Ex. 1010).

Response (Ex. 2022) ("Rockstraw Declaration") and the Revised Declaration of Roger Williams in Support of Patent Owner Response (Ex. 2027).

## II. ANALYSIS

### *A. Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field." *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.*

Petitioner argues a person of ordinary skill in the art at the time of the invention "would possess at least a B.S. in chemistry or chemical or mechanical engineering and would have at least one year of experience working on control of automotive evaporative emissions," and "would also understand the chemistry and physics associated with the phenomena of fuel vapor adsorption, desorption, and diffusion." Pet. 28 (citing Ex. 1003 ¶ 17). Patent Owner does not dispute the level of ordinary skill in the art. We adopt Petitioner's definition of the level of ordinary skill in the art because it is consistent with the '553 patent and the asserted prior art.

### *B. Principles of Law*

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification . . . and the prosecution history, fail to inform, with

reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014); *see Memorandum on the Approach to Indefiniteness Under 35 U.S.C. § 112 in AIA Post-grant Proceedings* (Jan. 6, 2021), https://www.uspto.gov/sites/default/files/documents/IndefinitenessMemo.pdf.

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when available, evidence such as commercial success, long felt but unsolved needs, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966); *see KSR*, 550 U.S. at 407 ("While the sequence of these questions might be reordered in any particular case, the [Graham] factors continue to define the inquiry that controls.").

The Supreme Court made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id*. at 417. Reaching this conclusion, however, requires more than merely

showing that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

In a post-grant review, Petitioner bears the ultimate burden of persuasion regarding unpatentability, which never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375, 1379 (Fed. Cir. 2015) (discussing petitioner's burden of proving unpatentability in *inter partes* review); *RetailMeNot, Inc. v. Honey Science Corp.*, PGR2019-00060, Paper 17 at 7–8 (PTAB Mar. 10, 2020) (petitioner has the burden of demonstrating eligibility for post-grant review).

### *C. Post-Grant Review Eligibility of the '553 Patent*

The post-grant review provisions set forth in section 6(d) of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (September 16, 2011) ("AIA"), apply only to patents subject to the first-inventor-to-file provisions of the AIA. *See* AIA § 6(f)(2)(A) (The provisions of Section 6(d) "shall apply only to patents described in section 3(n)(1)"). Patents subject to the first-inventor-to-file provisions are those that issue from applications "that contain[] or contained at any time . . . a claim to a claimed invention that has an effective filing date as defined in section 100(i) of title 35, United States Code, that is on or after" March 16, 2013. AIA § 3(n)(1). Additionally, "[a] petition for a post-grant review may only be filed not later than the date that is 9 months after the date of the

grant of the patent or of the issuance of a reissue patent (as the case may be)." 35 U.S.C. § 321(c).

In the Institution Decision, we determined that Petitioner sufficiently showed the '553 patent is eligible for post-grant review because the earliest potential effective filing date is October 10, 2013. Neither party has challenged that determination during trial. Accordingly, for purposes of this Decision, we do not further consider eligibility of the '553 patent for post-grant review.

### *D. Indefiniteness of the Challenged Claims*

#### *1. The Parties' Contentions*[6]

Petitioner argues that claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 are indefinite under 35 U.S.C. § 112(b). Pet. 41–56.

Petitioner contends the term "effective incremental adsorption capacity (IAC)" in the challenged claims is indefinite, because the '553 patent discloses two different methods for calculating effective IAC, McBain (using gravimetric instruments) and ASAP 2020 (using volumetric instruments), which Petitioner contends result in substantially different values for IAC, and a person of ordinary skill in the art would not have known which method to select. Pet. 43–44 (citing *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620 (Fed. Cir. 2015); *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1344–45 (Fed. Cir. 2015)). Petitioner presents argument and evidence concerning testing by a third party, Intertek, of three

---

[6] Several of the exhibits discussed herein were the subject of motions to seal, which we granted in an Order dated July 22, 2021 (Paper 73). We do not discuss any of the confidential information contained in any sealed portion of those exhibits in this Decision.

different adsorbent materials under both methods, and asserts that the methods produce a potential 12–14 % difference in effective IAC. Pet. 47–48, 52 (citing Ex. 1003 ¶¶ 112–117, 128; Ex. 1020; Ex. 1035 ¶¶ 4–13).

Patent Owner contends adsorption capacity is a physical parameter that is fixed for an adsorbent-adsorbate system, provided that the adsorbate identity, concentration, and temperature are fixed, i.e. specifying these three outcome-determinative variables in turn fixes the adsorption capacity for a given adsorbent. PO Resp. 72 (citing Ex. 2022 ¶¶ 59–67; Ex. 2056, 40:10–12; Ex. 2071 ¶ 54). Patent Owner thus contends effective IAC as recited in the ’553 patent claims is a fundamental property independent of measurement technique, which is confirmed by the fact that equivalent adsorption capacities can be measured using different measurement techniques. *Id.* at 73. Patent Owner and Dr. Rockstraw rely on several peer-reviewed publications as evidence that gravimetric and volumetric instruments measure equivalent adsorption capacities if the instruments are accurate and proper laboratory protocols are observed. *Id.* at 73–74 (citing Ex. 2007; Ex. 1021; Ex. 2069; Ex. 2022 ¶¶ 95–103, 109–116). Patent Owner also contends Petitioner fails to show that the McBain and ASAP 2020 methods, as analyzed by Intertek, provide fundamentally different measurements of adsorption capacity (*id.* at 75–81) and asserts that the differences in the measurements in the Guo Memo (Ex. 1041) are attributable to instrument inaccuracies and experimental error. *Id.* at 81–85.

In its Reply, Petitioner argues “[a]ll of the evidence shows significant differences between adsorption capacity results measured using different instruments.” Pet. Reply 27. Petitioner contends the Guo Memo’s conclusion confirms that the methods yield significantly different

measurements (*id.* at 24–25) and that Intertek's results also confirm substantial differences in the McBain and ASAP 2020 results. *Id.* at 25–26. Petitioner also argues the peer-reviewed papers relied upon by Patent Owner do not address adsorption capacity determinations regarding n-butane, and also confirm that different measurement methods produce different results.

*2. Discussion*

Upon review of the parties' arguments and evidence, we determine Petitioner has not shown by a preponderance of the evidence that the gravimetric and volumetric methods provide fundamentally different measurements of adsorption capacity.

Patent Owner and Dr. Rockstraw present peer-reviewed scientific literature demonstrating that gravimetric and volumetric measurement techniques were known to measure equivalent adsorption capacities and were viewed as compatible with each other. *See* Ex. 2022 ¶¶ 95–107 (addressing Anson[7] (Ex. 2007), Belmabkhout[8] (Ex. 1021), Zielinski[9] (Ex. 2069)). For example, Belmabkhout reported similar results between measurements by gravimetric and volumetric instruments, except at very high pressures. Ex. 1021, 856–57. Zielinski reported "excellent agreement" between volumetric and gravimetric adsorption capacity measurements (Ex. 2069, 5–6); Dr. Zielinski (who oversaw the testing reported by Intertek

---

7 Anson, A., *et al.,* "Hydrogen adsorption on a single-walled carbon nanotube material: a comparative study of three different adsorption techniques," *Nanotechnology* 15 (2004), 1503.

8 Belmabkhout, Y., *et al.*, "High-pressure adsorption measurements. A comparative study of the volumetric and gravimetric methods," *Measurement Science and Technology* 15 (2004) 848.

9 Zielinski, J. *et al.,* "High pressure sorption isotherms via differential pressure measurements," *Adsorption* 13 (2007), 1–7.

in Ex. 1020) also testified that he would expect capacity measurements for either a gravimetric or volumetric technique to yield the same results, or be "superimposable" under ideal conditions, because they represent "the same experimental measured quantities." Ex. 2026, 52:11–53:7, 54:13–22, 69:12–70:3, 139:8–19.

Petitioner's argument that these papers are not relevant because they do not address measurements on the adsorption capacity of n-butane (*see* Pet. Reply 26) is not persuasive, because Petitioner does not direct us to sufficient evidence showing a reason why measurements of n-butane's adsorption capacity would have been subject to different measurement inconsistencies. Further, Petitioner's argument about a 3% deviation in results between the measurement techniques reported in Anson and Belmabkhout is not persuasive because the papers' conclusions suggest a person of ordinary skill in the art would not have seen such a deviation as significant (e.g., Ex. 1021, 849: "we have not observed important discrepancies" between gravimetric and volumetric measurements).

Dr. Rockstraw also testifies as to numerous additional texts and standards that confirm persons of ordinary skill in the art understood that gravimetric and volumetric measurement techniques would provide consistent results when proper experimental protocols are followed and the instruments' accuracy and precision are taken into consideration. *See* Ex. 2022 ¶¶ 88–91, 119–127. This evidence is essentially unrebutted by Petitioner. We find that the evidence submitted by Patent Owner as to the gravimetric and volumetric measurement techniques demonstrates that they were well established in the art as comparable methods of measuring adsorption capacity, and accordingly, not a basis for determining claim

indefiniteness. *See Presidio Components, Inc. v. Am. Technical Ceramics Corp.,* 875 F.3d 1369, 1377 (Fed. Cir. 2017) (explaining that where the test methodology was sufficiently well established in the art, "disputes between the parties as to the proper application of the test methodology in the circumstances of an individual case ... are disputes about whether there is infringement, not disputes about whether the patent claims are indefinite).

Because this determination is dispositive as to Petitioner's indefiniteness challenge, we need not address Petitioner's allegations as to the measurement differences reported by Intertek in Exhibit 1020. For the reasons discussed above, Petitioner has not established indefiniteness of the challenged claims by a preponderance of the evidence.

*E. Obviousness Based on Hiltzik, Clontz WIPO, and Clontz SAE*

*1. Overview of the Asserted References*

*Hiltzik (Ex. 1007)*

Hiltzik relates to "a method for reducing emissions from evaporative control systems including activated carbon particulate-filled canisters and adsorptive monolith-containing canisters." Ex. 1007, 1:14–19. Hiltzik describes "the use of multiple beds (or layers, stages, or chambers) of adsorbent materials, which, in combination, significantly reduce [diurnal breathing loss] emissions while maintaining the high working capacity and low flow restriction properties of the canister system." *Id.* at 4:9–13. Figure 2 of Hiltzik is reproduced below.




FIGURE 2

Figure 2 depicts an exemplary embodiment of a canister system with multiple adsorbents. *Id.* at 6:31–32. The canister system comprises primary canister body 1, support screen 2, dividing wall 3, vent port 4 to the atmosphere, vapor source connection 5, vacuum purge connection 6, fuel source-side region 7, vent-side canister regions 8–11 of varying low-capacities, supplemental canister body 12, and connecting hose 13 permitting fluid stream flow from primary canister body 1 to supplemental canister body 12. *Id.* at 6:33–40. Hiltzik describes several examples of the canister system, including Example 2, a system using a honeycomb structure as the adsorbent bed in the supplemental canister body 12. *Id.* at 6:55–57; 7:6–67. Hiltzik describes measuring the diurnal breathing loss (DBL) emissions for each example, and provides the emission performance results. *Id.* at 6:50–7:5; col. 8, Table. In one specific embodiment, Hiltzik describes a cansister system comprising:

> the initial volume of vapor adsorbent material is characterized by an incremental adsorption capacity at 25° C. of greater than 35 g n-butane/L between vapor concentrations of 5 vol % and 50 vol % n-butane before routing the fluid stream through at least one subsequent volume of vapor adsorbent material[, and] wherein the subsequent volume of vapor adsorbent material is characterized by an incremental adsorption capacity at 25° C. of less than 35 g n-butane/L between vapor concentrations of 5 vol % and 50 vol % n-butane.

*Id.* at 9:33–42.

Hiltzik also discloses example butane working capacities (BWC) for the system of about 6 g/dL or less (*id.* at 5:2–5, 8:49) and a two-day DBL of 10–29 mg at 150 BV purge (*id.* at 8:33–35).

*Clontz WIPO (Ex. 1009)*

Clontz WIPO relates to "a hydrocarbon emissions scrubber, and to using the scrubber to remove volatile organic compounds, and other chemical agents from fluid streams." Ex. 1009 ¶ 1. Clontz WIPO refers to Hiltzik (Ex. 1007) in the Description of Related Art section, and notes

> [a]lthough the adsorbents-in-series as taught in [Hiltzik] are effective for substantial reductions in bleed emissions for typical vehicle designs and engine operation, recent designs of [hybrid] vehicle engines for improved fuel efficiency . . . do not achieve comparable reductions in emissions in some instances even with adsorbents-in-series in the evaporative emission control system.

*Id.* ¶ 6. Clontz WIPO explains

> [t]hese [hybrid] engine designs do not provide enough volume of purge during carbon regeneration in order to sufficiently reduce the amount or alter the distribution of residual hydrocarbon heel in the carbon bed for the needed low levels of emissions during subsequent diurnal breathing conditions.

*Id.* ¶ 6. Clontz WIPO discloses

> the use of multiple stages or chambers of electrically heatable adsorbent monoliths or honeycombs, which, in combination with conventional evaporative emission control canisters, significantly reduces DBL emissions under low purge flow conditions while maintaining the high working capacity and low flow restriction properties of the canister system.

*Id.* ¶ 17. Figure 3 of Clontz WIPO is reproduced below.

FIGURE 3




Figure 3 depicts an exemplary embodiment of a canister with multiple adsorbents. *Id.* ¶ 18. "The vapor flow path has an emission control system canister 31 in-line with an auxiliary canister 33 containing a bleed emission adsorbent scrubber 32 with desirable resistivity properties." *Id.*

Clontz WIPO discloses several examples of the canister system ("Example 1", "Example 2," and "Example 3") using an electrically

conductive carbon honeycomb structure. *Id.* ¶¶ 21–26. Clontz WIPO describes measuring the diurnal breathing loss (DBL) emissions for each example, and provides the emission performance results. *Id.* at Table I, Table II.

*Clontz SAE (Ex. 1010)*

Clontz SAE is titled "Effects of Low-Purge Vehicle Applications and Ethanol-Containing Fuels on Evaporative Emissions Canister Performance," and is directed to "optimiz[ing] the use of the activated carbon honeycomb [in evaporative emissions canisters] under reduced purge conditions and under conditions of exposure to fuels of different volatility and ethanol content." Ex. 1010, Title, 1713–14. Clontz SAE analyzes the effect of several factors on diurnal emissions, including canister purge volume, activated carbon honeycomb configuration, and resistive heating of a honeycomb. *Id.* at 1713. Figure 3 of Clontz SAE is reproduced below.




Figure 3. Effect of Purge volume with base canister and commercially available honeycombs.

Figure 3, reproduced above, is a graph depicting the relationship between purge volume and emissions for activated carbon honeycombs of two different sizes, 29 x 100 mm and 41 x 150 mm, and a base canister.

Clontz SAE provides results for additional honeycomb configurations in Figure 4, reproduced below.




**Figure 4. Summary of emissions results obtained with alternate honeycomb configurations with 75 bed volumes of purge.**

Figure 4, reproduced above, is a bar chart illustrating the results of two-day diurnal emissions tests for four different activated carbon honeycomb configurations: Config. A (single honeycomb of 41 mm diameter x 150 mm length); Config. B (three honeycombs of 41 mm diameter x 50 mm length in series); Config. C (single honeycomb of 41 mm diameter x 200 length); and Config. D (single honeycomb of 50 mm diameter x 150 length). *Id.* at 1716. Clontz SAE explains "[t]he emissions data show that the developmental honeycomb Configurations (B-D) reduced emissions as compared to the

baseline Configuration A (41 x150). These improvements ranged from 32% to 60% depending on honeycomb geometry and size." *Id.* at 1716. Clontz SAE further discloses "[h]oneycomb Configurations C (41x200) and D (50x150) showed approximately 45% and 60% improvement as compared to the baseline Configuration A," and "[b]oth of these honeycomb configurations have more total working capacity due to their larger size as compared to the baseline honeycomb." *Id.* at 1717.

Clontz SAE also discloses the effect of resistive heating of an activated carbon honeycomb on diurnal emissions, as shown in Figure 6, reproduced below. *Id.*




**Figure 6 of Clontz SAE**

Figure 6 is a graph illustrating emissions measured with the heated activated carbon honeycomb were lower as compared to the non-heated honeycomb. *Id.* Clontz SAE explains that "[t]he improvement in performance was most dramatic at lower purge volumes," and "[r]esistively heating the honeycomb allowed emissions of less than 20 mg for all levels of purge evaluated." *Id*

*2. Analysis*

*Claim 1*

Petitioner contends claim 1 of the ’553 patent would have been obvious over the combination of Hiltzik, Clontz WIPO, and Clontz SAE. Pet. 56–88. Patent Owner contends claim 1 would not have been obvious over Petitioner’s proposed combination, generally because Hiltzik, the only reference that discloses values for effective working capacity, does not address a low purge system as required by claim limitation [F1], and Clontz WIPO and Clontz SAE do not teach lower working capacity properties as required by limitations [C] and [D]. PO Resp. 9. Patent Owner further contends a person of ordinary skill in the art would not have been motivated to combine or modify Hiltzik with Clontz WIPO and Clontz SAE as Petitioner proposes, to achieve a canister system that meets the low purge requirement of limitation [F1] while also including a subsequent adsorbent volume that meets the requirements of limitations [C] and [D]. *Id.* at 9–10. For the reasons that follow, we determine that Petitioner has not established by a preponderance of the evidence that Petitioner’s proposed combination teaches or suggests limitations [C], [D], and [F1]. Because these findings are dispositive, we focus our discussion on these limitations. To provide context, however, we initially discuss Petitioner’s contentions as to the non-dispositive limitations and general reasons to combine or modify the references, and Patent Owner’s response to those general reasons.

Petitioner contends each of Hiltzik, Clontz WIPO, and Clontz SAE teach an evaporative emission control canister system including one or more canisters. Pet. 67–69 (citing Ex. 1007, Abstract, Fig. 2; Ex. 1009, Abstract, Fig. 3; Ex. 1010, Title). Petitioner contends a person of ordinary skill in the

art would have been motivated to combine Hiltzik, Clontz WIPO, and Clontz SAE because each reference relates to a canister system having the same basic configuration, and discloses that the use of a honeycomb significantly reduces DBL emissions. *Id*. at 65. Petitioner further contends Clontz WIPO and Clontz SAE demonstrate a need to control DBL emissions in low-purge vehicles, and provide different data sets that a person of ordinary skill in the art would have consulted for low-purge emissions levels for two sizes of honeycombs, although Petitioner acknowledges neither reference discloses IAC or BWC of the honeycombs tested. *Id.* at 66. Petitioner contends a person of ordinary skill in the art would have understood that Hiltzik's nominal IAC and BWC values could be used with Clontz WIPO and Clontz SAE, in part because Clontz WIPO references Hiltzik's discussion of honeycomb properties and discloses that its honeycomb was created using the same method as Hiltzik's honeycomb. *Id.*

Petitioner contends Hiltzik discloses an initial volume of vapor adsorbent material having the properties recited in limitation [A]. Pet. 70–71 (citing Ex. 1007; Ex. 1003 ¶¶ 160–164.) Petitioner contends Hiltzik's initial adsorbent volume is a fuel-side adsorbent volume, as illustrated in side-by-side figures from Hiltzik and the '553 patent:




Pet. 68. The figure above shows Figure 2 of Hiltzik on the left and Figure 4 of the '553 patent on the right. Hiltzik's initial adsorbent volume 7 is in the same position as fuel-side adsorbent volume 201 of Figure 4 of the '553 patent. Pet. 70 (citing Ex. 1001, 4:29–34; Ex. 1007, 6:34–35). Petitioner contends that Hiltzik's Examples 1–3 include a fuel-side layer of BX 1500 pellets having an IAC of 80 g/L, which is within the claimed range for effective IAC. *Id.* (citing Ex. 1007, 6:52; Ex. 1003 ¶ 163).

Petitioner further contends Hiltzik, Clontz WIPO, and Clontz SAE teach a subsequent adsorbent volume in the form of a honeycomb monolith, and the combination of Hiltzik, Clontz WIPO, and Clontz SAE teaches the use of a subsequent adsorbent volume having the properties recited in limitation [B]. Pet. 71–72 (citing Ex. 1003 ¶¶ 166–68). Petitioner acknowledges that none of the references explicitly discloses the "effective IAC" value for its honeycomb, but contends a person of ordinary skill in the art would have been motivated by Hiltzik's teaching of nominal IAC less

than 35 g/L to use honeycomb adsorbent having effective IAC in the recited range. *Id.* at 65–66, 73–74 (citing Ex. 1003 ¶¶ 154-55, 170). Petitioner contends a person of ordinary skill in the art would have understood that Hiltzik's nominal IAC corresponds to effective IAC (as recited in claim 1) because Hiltzik's measurement of IAC does not encompass non-adsorbent empty spaces. *Id.* at 73 (citing Ex. 1003 ¶ 170).

> ***[C]*** *an effective butane working capacity (BWC) of less than 3 g/dL, and*
>
> ***[D]*** *a g-total BWC of ≤6 grams*
>
> ***[F1]*** *wherein the canister system has a two-day diurnal breathing loss (DBL) of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step.*

Petitioner contends Hiltzik teaches nominal BWC of 4g/dL for its honeycomb adsorbent (Example 2) and that "lower capacity adsorbents have BWC values preferably below 8 g/dL." Pet. 75 (citing Ex. 1007, 6:2–8, 8:49). Petitioner acknowledges that none of the references explicitly discloses the "effective BWC" value for its honeycomb, but contends a person of ordinary skill in the art would have understood the relationship of Hiltzik's nominal BWC to claim 1's effective BWC for the same reason as effective IAC, discussed above. *Id.* (citing Ex. 1003 ¶¶ 154-55, 176–77). Petitioner contends a person of ordinary skill in the art would understand that reducing effective BWC below 3 g/dL would also achieve g-total BWC ≤6 grams for the 200 ml honeycomb of Hiltzik's Example 2. Pet. 83–84.

Petitioner contends Clontz WIPO teaches that canister systems with 66 mL honeycomb adsorbents meet the performance requirement of limitation [F] when a heating element is applied to the honeycomb. Pet. 87–88 (citing Ex. 1009, Table II). Petitioner further contends Clontz SAE

confirms that heating elements drastically reduce the 2-day DBL emissions. *Id.* (citing Ex. 1010, Fig. 6). Petitioner contends a person of ordinary skill would have been motivated to apply a heating element as taught by Clontz SAE to the honeycomb adsorbent, resulting in emissions within the recited range below 20mg at no more than 100BV of purge. *Id.*

Petitioner contends a person of ordinary skill in the art would have been motivated to modify Hiltzik's system to achieve an effective BWC of less than 3 g/dL and a g-total BWC of 6g or less, as required by limitations [C] and [D], by either (1) diluting Hiltzik's honeycomb[10] or (2) including significant adsorbent-free, empty space preceding the honeycomb in the flow path between the main canister and the honeycomb adsorbent. Pet. 76, 80, 83–85. We first discuss the parties' contentions as to diluting Hiltzik's honeycomb.

*Diluting Hiltzik's honeycomb*

Petitioner contends a person of ordinary skill in the art would have been motivated to dilute Hiltzik's honeycomb because of (1) Hiltzik's teaching of using adsorbents with flatter isotherms, and using volumetric dilution (i.e., including voids that increase the percentage of volume coming from empty spaces) to flatten the isotherm; and (2) Clontz WIPO's teaching that reducing resistance of the honeycomb achieves lower emissions. *Id.* at

---

[10] Dr. Lyons explains: "[A]ctivated carbons used in automotive applications ... can be mixed with other materials and extruded to form a pellet or monolith. This mixing reduces the amount of carbon in a given volume – a process known as dilution ... inclusion of spacers and voids in the carbon bed also impacts canister performance properties including adsorption capacity. Use of spacers and voids, can be considered another form of dilution because it reduces the amount of total carbon in the bed. Ex. 1003 ¶¶ 58–59.

77–78 (citing Ex. 1003 ¶¶ 178, 179, 186; Ex. 1007, 4:61–63, 6:23–26, 7:35–37, 7:44–50; Ex. 1009 ¶ 17, Table 2). Petitioner contends a person of ordinary skill in the art would have had a reasonable expectation of success in diluting the honeycomb (by either using non-adsorbent additives in the honeycomb material, or volumetric dilution), based on the same teachings of Hiltzik and Clontz WIPO. *Id.* at 78. Petitioner further contends Park[11] is evidence of the knowledge of a person of ordinary skill in the art relating to honeycomb design and the relationship between void percentage and dilution (*id.* at 78–79 (citing Ex. 1003 ¶¶ 181–83; Ex. 1007, 7:28–40; Ex. 1009 ¶ 21; Ex. 1024, 7:15–18)), and Gadkaree[12] is evidence that honeycombs with BWC less than 3g/dL were known. *Id.* at 79 (citing Ex. 1003 ¶ 184; Ex. 1023).

Petitioner contends a person of ordinary skill in the art would have understood, from Hiltzik's teaching of nominal BWC of its honeycomb as discussed above, how to reduce g-total BWC below 6g, as required by limitation [D], because g-total BWC of an adsorbent volume is the sum of the product of nominal BWC and nominal volume for each adsorbent component in an adsorbent volume. *Id.* at 83–84 (citing Ex. 1003 ¶¶ 196–197). Petitioner explains how a person of ordinary skill would have been motivated to use the teaching of Hiltzik's Example 2 honeycomb with Clontz SAE's teachings that honeycombs with higher g-total BWC perform better at low purge, to achieve a 200-ml honeycomb having g-total BWC of 5.4g. *Id.* at 84 (citing Ex. 1003 ¶ 197; Ex. 1007, 8:21; Ex. 1010, 1717).

---

[11] U.S. Patent 5,914,294 to Park et al., issued June 22, 1999 (Ex. 1024).
[12] U.S. Patent 5,510,063 to Gadkaree et al., issued April 23, 1996 (Ex. 1023)

Petitioner further contends, as with effective BWC discussed above, that a person of ordinary skill in the art would have been motivated to combine Clontz WIPO's teaching of a smaller honeycomb to reduce g-total BWC to 2.6g. *Id.*

Patent Owner contends Petitioner's allegations as to limitations [C] and [D] fail to establish obviousness because "Petitioner has not established any basis for alleging that POSITA would have been motivated to reduce working capacity of Hiltzik's honeycomb." PO Resp. 13–14. Patent Owner refers to this as "Approach #1." *Id.* Patent Owner contends Hiltzik does not teach the desirability of diluting its adsorbent, that Clontz SAE and Clontz WIPO teach *increasing* working capacity, rather than reducing it, and that Clontz WIPO does not teach diluting a honeycomb to reduce its resistance. *Id.* at 16–17. We address each of these in turn.

Patent Owner contends Hiltzik's Examples 1–3 belie Petitioner's assertion that Hiltzik teaches desirability of diluting the vent-side adsorbent as much as possible. PO Resp. 20. Specifically, Petitioner asserts that Hiltzik presents each example as a viable option for reducing canister bleed emissions, and is silent as to whether the examples would be improved by further volumetric dilution, or whether Example 2 is preferred. *Id.* at 20–21 (citing Ex. 1007, 8:61–9:4, Table; Ex. 2022 ¶¶ 190–196). Patent Owner further contends Petitioner identifies no teaching in Hiltzik that an adsorbent volume with the flattest isotherm always results in lower emissions, and that flattening the isotherm "as much as possible" would not make sense in the context of Hiltzik because such an adsorbent would allow fuel vapors to pass through and result in increased emissions. *Id.* at 21–22 (citing Ex. 1003 ¶ 178; Ex. 1007, 5:45–55, 9:37–42, 10:36–44; Ex. 2022 ¶¶ 192, 194).

Patent Owner contends Clontz SAE's conclusion that in a low purge system "increased honeycomb working capacity" "improve[s] emissions performance" is contrary to limitations [C] and [D] and would have taught a person of ordinary skill in the art to do the opposite of what Petitioner asserts. PO Resp. 17–19 (citing Ex. 1010, 1717, 1720; Ex. 2022 ¶¶ 260–267). Patent Owner also contends Clontz SAE identifies a "strong relationship between purge volume and canister emissions" (Ex. 1010, 1716) and relies on Clontz SAE's statement that under "reduced purge volume conditions, current activated carbon canister and honeycomb configurations may not be adequate to meet" emissions requirements. *Id.* at 18 (citing Ex. 1010, 1720. Patent Owner asserts that a person of ordinary skill in the art would have understood this statement to include Hiltzik's honeycomb, because it was the most commonly-used evaporative emissions technology to satisfy regulations in 2007 (*see* Ex. 2027 ¶ 20).

Patent Owner contends Clontz WIPO would not have motivated a person of ordinary skill in the art to dilute Hiltzik's honeycomb in order to achieve lower BWC values, for several reasons. PO Resp. 22–25. Patent Owner asserts Clontz WIPO reiterates and closely follows Hiltzik's disclosure, and therefore relates to making a honeycomb as taught by Hiltzik, rather than further diluting Hiltzik's honeycomb. *Id.* at 22 (citing Ex. 1007; Ex. 1009 ¶ 17; Ex. 2022 ¶¶ 215–217). Patent Owner contends a person of ordinary skill in the art would have understood Clontz WIPO as relating to the benefits of resistively heating a honeycomb, which requires lower resistance, and that use of conductive additives would have been for the purpose of reducing resistivity, not to lower BWC. *Id.* at 23–24 (citing Ex. 1009 ¶¶ 23, 25, 26; Ex. 2022 ¶ 217–220).

Patent Owner contends Park does not support Approach #1 because its statement that a honeycomb voidage percentage of "desirably about 73.8%" was not in the context of an evaporative emissions system, such as Hiltzik, Clontz SAE, and Clontz WIPO. PO Resp. 26–27 (citing Ex. 1025, 7:15–18; Ex. 2022 ¶ 233. Rather, Patent Owner asserts, Park's honeycomb applications include air intake of a fuel injected internal combustion engine, and the exhaust air stream of a xerographic device. *Id.* at 27 (citing Ex. 1024, 4:20–44; Ex. 2022 ¶¶ 236–240). Patent Owner contends a person of ordinary skill in the art would not have understood that a voidage percentage that is desirable for those applications would have been desirable for adsorbing evaporative emissions, and further notes that the Board previously found that considerations applicable to Park's applications are different from considerations relevant to evaporative emissions. *Id.* (citing Ex. 2009, 17–18; Ex. 2010, 5–8; Ex. 2022 ¶¶ 235–240). Patent Owner further argues that Petitioner's contention of a 73.8% to 85% voidage percentage is based on an inadequately supported "obvious to try" rationale. *Id.* at 28.

In its Reply, Petitioner contends Dr. Rockstraw's deposition testimony in district court litigation involving Hiltzik is inconsistent with Patent Owner's position here, and confirms that a person of ordinary skill would have been motivated to use honeycombs with BWC below 3g/dL. Pet. Reply 2–3. Specifically, Petitioner contends Dr. Rockstraw admitted a person of ordinary skill in the art would "understand the potential desirability" of reducing BWC below 3g/dL. *Id.* (citing Ex. 1043, 91:20–92:11; Ex. 1044, 106:2–12). Petitioner further contends Dr. Rockstraw's testimony that a person of ordinary skill in the art would have been motivated to "explore all the boundaries of the system," including the entire

claimed IAC range, supports its position that a person of ordinary skill would have recognized using volumetric dilution to flatten the isotherm of a subsequent adsorbent volume would reduce DBL emissions. *Id.* at 3 (citing Ex. 1042 ¶¶ 15–20; Ex. 1043, 85:14–89:23, 92:12–100:6; Ex. 1044 93:22–94:4, 106:12–108:8, 115:5–24).

Petitioner further contends in reply that Clontz SAE would not have dissuaded a person of ordinary skill from using low-capacity honeycombs, because its experimental data does not suggest a correlation between higher volumetric BWC and lower DBL emissions. Pet. Reply 5–6 (citing Ex. 1010, 1716–1718; Ex. 1042 ¶ 34; Ex. 1045, 74:1–4). Petitioner acknowledges Clontz SAE twice mentions increasing capacity, but argues its other disclosures suggest using volumetrically diluted honeycombs. *Id.* at 6 (citing Ex. 1010, 1716–17). Petitioner also argues Clontz WIPO emphasizes the benefits of volumetrically diluting a honeycomb to flatten the isotherm, and indicates that honeycombs smaller than those in Hiltzik and Clontz SAE can be used to reduce DBL emissions to acceptable levels. *Id.* at 7 (citing Ex. 1009 ¶ 17; Ex. 1042 ¶ 37).

*Discussion*

Having reviewed the parties' arguments and evidence, we determine a preponderance of the evidence does not support Petitioner's contention that a person of ordinary skill in the art would have been motivated to dilute the honeycomb of Hiltzik's Example 2 in order to meet emissions standards at low-purge conditions in view of Clontz SAE and Clontz WIPO.

We find persuasive Patent Owner's argument that Clontz SAE teaches, contrary to Petitioner's proposed combination, that as compared to Hiltzik's honeycomb, higher working capacity honeycombs "facilitate

achievement of target emissions levels under the reduced purge conditions." Ex. 1010, 1720. Clontz SAE's Figure 3, demonstrating the relationship between purge volume and canister emissions, also teaches "the larger 41 mm x 150 mm honeycomb exhibited lower emissions levels than the 29 mm x 100 mm honeycomb at purge volumes of less than 200 bed volumes." Ex. 1010, 1716. Clontz SAE's Figure 4, illustrating emissions test results for "Alternative Honeycomb Geometries," compares the baseline Configuration A honeycomb[13] described as the 41 x150 mm "commercial part" to alternative "developmental honeycomb configurations" having larger volumes and concludes that Configurations C and D, "which have more total working capacity due to their larger size as compared to the baseline honeycomb," "showed approximately 45% and 60% improvement [in emissions reduction] as compared to the baseline Configuration A." *Id.* at 1717. The conclusion of this section of Clontz SAE states that changes to the baseline part including "increased honeycomb working capacity" will "improve emissions performance." *Id.* at 1717. Clontz SAE repeats this statement in its ultimate conclusion, which states "higher capacity honeycombs," among other factors, will "facilitate achievement of target emissions levels under the reduced purge conditions." *Id.* at 1720. These conclusions are directly contrary to Petitioner's contention that a person of ordinary skill in the art would have been motivated to reduce the capacity of

---

[13] Petitioner acknowledges that Clontz SAE's Configuration A has the same dimensions as Hiltzik's Example 2 honeycomb: 41 x 150 mm, and that Clontz SAE uses the same canister system as Hiltzik's Example 2. Pet. 59–60.

Hiltzik's Example 2 honeycomb in order to meet the emissions requirements of claim limitation [F1].

Moreover, Petitioner's argument that Clontz SAE suggests using volumetrically diluted honeycomb to meet low-purge emission standards (Pet. Reply 6 (citing Ex. 1010, 1716–1717)) is not supported by Clontz SAE. In fact, Clontz SAE never mentions dilution. The section of Clontz SAE cited by Petitioner, as discussed above, includes the evaluation of higher capacity honeycombs than Hiltzik's, and concludes that higher capacity honeycombs improve emissions performance at low purge. This is contrary to suggesting volumetric dilution of honeycomb to meet low-purge emission requirements.

Petitioner's own arguments as to Clontz SAE also partially contradict each other. Although Petitioner draws a distinction between g-total working capacity and effective or nominal BWC when arguing in its Reply that "Clontz SAE at most suggests a correlation between increased honeycomb **g-total** working capacity—not **effective** or **nominal** BWC—and reduced emissions under low purge" (Pet. Reply 6), this contradicts the Petition's statement that a person of ordinary skill in the art would understand that reducing effective BWC below 3 g/dL would also achieve g-total BWC ≤6 grams for the 200 ml honeycomb of Hiltzik's Example 2. Pet. 83–84. Indeed, the Petition also acknowledges "Clontz SAE's teachings that honeycombs with higher g-total BWC perform better at low purge." Pet. 84 (citing Ex. 1010, 1717; Ex. 1003 ¶ 197).

Clontz WIPO does not support Petitioner's argument that a person of ordinary skill in the art would have been motivated to dilute Hiltzik's honeycomb to reduce its resistance in order to achieve lower emissions. *See*

Pet. 77–78. Clontz WIPO's description of preparing the honeycomb for its Examples 1–3 (Ex. 1009 ¶¶ 17, 21–22) follows essentially the same method as Hiltzik describes for preparing its Example 2 honeycomb (Ex. 1007, 4:14–32, 5:19–21, 7:26–55) and never compares its honeycomb with Hiltzik's; both Clontz WIPO and Hiltzik state that their extrusion formulation comprises activated carbon and "the extrusion formulation ingredients partially dilute the carbon adsorbent, and in addition, the adsorbent is further diluted by the open cell structure of the extruded part." Ex. 1007, 35–47; Ex. 1009 ¶¶ 21–22. Although Clontz WIPO states "[n]onbinding electrical conductivity additives ... may be added for a dual role of adjusting the adsorption properties to flatten the equilibrium isotherm slope, plus obtaining resistivity within the desired range" (Ex. 1009 ¶ 17), context suggests that this statement does not relate to further additives, but rather to "the extrusion formulation ingredients [that] partially dilute the carbon adsorbent" already present in the honeycomb (Ex. 1009 ¶ 22). Thus, we find that a person of ordinary skill in the art would not understand that Clontz WIPO suggests further dilution of Hiltzik, as Petitioner contends,[14] but rather that Clontz WIPO teaches the use of resistive heating of the honeycomb in order to achieve lower emissions.

Clontz WIPO also does not support Petitioner's argument that a person of ordinary skill in the art would not have understood Clontz SAE (an earlier publication) as suggesting increasing honeycomb working capacity in

[14] Petitioner contradicts this contention in its Reply, by acknowledging that a person of ordinary skill in the art "would not have interpreted Clontz WIPO as suggesting any dilution-based reason for the different test results" for the two honeycombs in Table I. Pet. Reply 8.

low-purge systems. *See* Pet Reply 7. Petitioner's assertion that "Clontz WIPO does **not** suggest increasing honeycomb working capacity in low-purge systems" (*id.* (citing Ex. 1042 ¶ 37)) at best is based on Clontz WIPO's silence as to any suggestion of the impact of honeycomb working capacity. Petitioner's argument that "Clontz WIPO emphasizes the benefits of volumetrically diluting a honeycomb to flatten the isotherm" (*id.* (citing Ex. 1009 ¶ 17)), however, mischaracterizes Clontz WIPO's disclosure, which contains no such statement.

We have also considered Petitioner's argument that Dr. Rockstraw's testimony in district court litigation that a person of ordinary skill in the art would understand from Hiltzik "the potential desirability" of reducing BWC below 3g/dL (Ex. 1043, 91:20–92:11; Ex. 1044, 106:2–12) contradicts his opinion here that Hiltzik is silent on the desirability of diluting its Example 2 honeycomb. We agree with Petitioner that this is contradictory evidence, and it weighs against our finding that Hiltzik alone would not suggest reducing its effective BWC below 3g/dL or its g-total BWC below 6g. Petitioner bears the burden of proving invalidity by a preponderance of the evidence, however, and Dr. Rockstraw's opinion as to Hiltzik's teachings (which are not in the context of a low-purge system) does not overcome Clontz SAE's strong suggestion that honeycombs with higher capacity than Hiltzik's would be desirable for achieving the emissions requirements at low-purge conditions.

Therefore, we find that Petitioner has not established by a preponderance of the evidence that a person of ordinary skill would have been motivated to dilute Hiltzik's honeycomb adsorbent in order to reduce working capacity of the adsorbent as required by limitations [C] and [D]

while meeting emissions standards at low-purge conditions as required by limitation [F1].

*Including a conduit in the "subsequent adsorbent volume"*

Petitioner argues that the conduit connecting the main canister and honeycomb adsorbent in both Hiltzik and Clontz WIPO's systems is an empty space that a person of ordinary skill in the art would consider part of a "subsequent adsorbent volume" along with the honeycomb itself, and would have been motivated to include empty space between the main canister and the honeycomb adsorbent in order to achieve effective BWC below 3g/dL. Pet. 80–81. Petitioner explains its contention by reference to annotated versions of Hiltzik's Figure 2 and Clontz WIPO's Figure 3, reproduced below.




Pet. 81. In the annotated version of Hiltzik's Figure 2, above on the left, Petitioner encircles and labels the parts of Hiltzik's embodiment, including conduit 13, that purportedly correspond to the "subsequent adsorbent volume"; in the annotated version of Clontz WIPO's Figure 3, above on the

right, Petitioner encircles corresponding parts of Clontz WIPO. *Id.* For both Hiltzik and Clontz WIPO, Petitioner acknowledges they do not disclose the dimensions of the conduit, but contends a person of ordinary skill in the art would have understood the conduit's volume is significant enough to dilute the honeycomb. *Id.* at 81–82 (citing Ex. 1003 ¶¶ 187–192). Petitioner contends a person of ordinary skill in the art would have been motivated to combine the canister systems of Hiltzik and Clontz WIPO's Examples 2 and 3, to form a cylinder with nominal volume of 66 ml (as taught by Clontz WIPO) using Hiltzik's honeycomb adsorbent which would have an effective BWC less than 3 g/dL (including the conduit), because Examples 2 and 3 achieved 2-day DBL emissions of 20 mg or less at 100 BV of purge or less, and the relatively small size of Clontz WIPO's honeycomb would make it easier to fit into a vehicle's emissions control system. *Id.* at 82 (citing Ex. 1003 ¶¶ 188–194; Ex. 1009, Table II).

Petitioner also relies on Dr. Lyons's analysis of a replacement canister system for certain 2005-2008 Ford models having the main canister connected to the auxiliary canister by a 35 ml conduit. Pet. 81–82 (citing Ex. 1003 ¶¶ 189–91). Dr. Lyons testifies that a conduit of this size when combined with the honeycomb of Hiltzik's Example 2, and the nominal volume of 66 ml as taught by Examples 2 and 3 of Clontz WIPO, would achieve an effective BWC less than 3 g/dL. Ex. 1003 ¶ 191.

Patent Owner argues several reasons why Petitioner fails to show a person of ordinary skill in the art would have been motivated to modify Hiltzik by adding empty space to the "subsequent adsorbent volume" in order to achieve BWC within the claimed range. PO Resp. 30–41. Patent Owner refers to this as "Approach #2." *Id.* at 14. First, Patent Owner

contends Approach #2 fails because Petitioner incorrectly includes the conduit's volume when computing the effective volume of the adsorbent within the auxiliary canister, which is contrary to the definition of effective volume in the '553 patent. PO Resp. 32–36 (citing Ex. 1001, 6:37–42, 10:25–33, 10:47, 10:63–11:1, 16:32–59, Tables 2–5, Figs. 9, 17; Ex. 2022 ¶¶ 29–45, 251–256). According to Patent Owner, the '553 patent defines an effective volume as starting and ending with an adsorbent bed, and "never includes the conduit's volume when computing or explaining the effective volume, effective BWC, or any effective property of the adsorbent volume within the auxiliary canister." *Id.* at 36 (citing Ex. 1001, 16:32–20:12, Tables 1–5; Ex. 2022 ¶¶ 29–43, 251–256).

Patent Owner further contends a person of ordinary skill in the art would not have been motivated to use Hiltzik's honeycomb in a cylinder with nominal volume of 66 ml as taught by Examples 2 and 3 of Clontz WIPO, because it would have been contrary to Clontz SAE's teaching to use higher capacity honeycombs at low purge. PO Resp. 36–37 (citing Ex. 1003 ¶ 193; Ex. 1010, 1720; Ex. 2022 ¶ 221). Patent Owner further contends Petitioner has not shown a person of ordinary skill in the art would have been able to form Hiltzik's honeycomb into a 66 ml honeycomb, that the two different honeycombs would be compatible in a canister system, or that Clontz WIPO would have motivated a person of ordinary skill to use a 66 ml volume, because Clontz WIPO does not disclose that the 66 ml volume contributed to lower emissions levels. *Id.* at 37–38 (citing Ex. 1003 ¶ 193; Ex. 1009 ¶ 26; Ex. 2022 ¶¶ 221–222).

In its Reply, Petitioner responds that an "effective volume" in the '553 patent can be defined to begin and end at any two points along the vapor

flow path, and therefore can include a conduit between the main canister and a supplemental canister. Pet. Reply 13 (citing Ex. 1001, 5:4–48, 10:34–35; Ex. 1042 ¶ 58; Ex.1043, 9:10–10:4). Petitioner argues the "effective volume" calculations relied upon by Patent Owner are non-limiting examples (*id.* at 13–14 (citing Ex.1001, 10:63–11:8)) and the effective volume calculations in Tables 1–5 of the '553 patent confirm that the specification does not preclude the calculation of an effective volume as including a conduit. *Id.* at 14 (citing Ex. 1042 ¶ 60).

Petitioner further responds that a person of ordinary skill would have recognized from Clontz WIPO that a 66 ml honeycomb would be a standard and sufficiently effective size, for connection to a main canister via a conduit, to reduce emissions under low-purge conditions. Pet. Reply 14 (citing Ex. 1009, 12, Figs. 2–4; Ex. 1003 ¶ 202). Petitioner argues it would not have been necessary to shrink Hiltzik's honeycomb from 200 ml to 66 ml because a person of ordinary skill in the art would have recognized Clontz WIPO's honeycombs were effective in the 66 ml volume, and Petitioner relies on Mr. Williams's testimony that 66 ml honeycomb was a standard commercial size. *Id.* (citing Ex. 1045, 10:12–12:12).

*Discussion*

We are not persuaded that a preponderance of the evidence supports Petitioner's contention that a person of ordinary skill in the art would have been motivated to dilute the Clontz WIPO honeycomb using a conduit. Initially, we note that the Petition stated this challenge as a combination Hiltzik's Example 2 honeycomb adsorbent in the 66 ml canister of Clontz WIPO's Examples 2 and 3. Pet. 82. Petitioner contends in its Reply, however, that a person of ordinary skill in the art would not have needed

Hiltzik's teaching as to its honeycomb, but rather would have recognized that Clontz WIPO's smaller 66 ml honeycombs "were sufficiently effective" to reduce emissions under low-purge conditions. Pet. Reply 14 (citing Ex. 1003 ¶ 202). Accordingly, our analysis of this ground is based on the configuration of Clontz WIPO's Examples 2 and 3. Because this issue is dispositive, we need not address the parties' arguments as to the meaning of the term "effective volume."

In discussing the results presented in Table II, Clontz WIPO does not suggest that the volume of the honeycomb contributed to emissions reductions. Ex. 1009 ¶¶ 25–26. Rather, it compares the data obtained in Example 2 "without electrical current passing through the honeycomb" at 100 v/v purge, to the reduction in emissions obtained "by application of a modest electrical current through the honeycomb during the 100 v/v purge." *Id.* ¶ 25. In Example 3, it states

> Extremely low emissions of 4 mg are obtained at 75 v/v purge by an increased heating wattage to the honeycomb and by having formed a circumferential notch 8 mm deep into the skin of the honeycomb....

*Id.* ¶ 26. Thus, the relevant features of Example 2 that Clontz WIPO discusses as contributing to low emissions relate to the application of electrical current, and notably, Clontz WIPO's basis for comparison of Example 3 to Example 2 is increased heating wattage and a circumferential notch in the honeycomb. Both examples use the same 66 ml honeycomb to obtain all of the results in Table II, so there is no reason a person of ordinary skill in the art would have understood from Clontz WIPO whether or how honeycomb volume contributed to the results.

In light of Clontz WIPO's teachings, we are not persuaded by Petitioner's contention that "a person of ordinary skill in the art would have been motivated to use the smaller honeycomb of Clontz WIPO because that honeycomb achieved the best low-purge emissions of any other example in Clontz WIPO or Clontz SAE." *See* Pet. 84 (citing Ex. 1009, Table II). It does not make sense that a person of ordinary skill in the art would have expected Clontz WIPO's 66 ml honeycomb size to contribute to low emissions levels, where Clontz WIPO provides no disclosure relating to adsorbent characteristics of the honeycomb such as BWC, and distinguishes its results based on other features.

Further, as discussed above, Clontz SAE taught that for low-purge systems, higher working capacity honeycombs, as compared to Hiltzik's, were necessary. For the same reasons, Clontz SAE's teaching also does not support Petitioner's contention that a person of ordinary skill in the art would have been motivated to use Clontz WIPO's 66 ml honeycomb with a conduit in order to achieve low emissions.

We have also considered Petitioner's argument that the 66 ml honeycomb disclosed in Clontz WIPO was a commercially available, standard-size honeycomb. Pet. Reply 14 (citing Ex. 1045, 10:12–12:12). Although this evidence is a factor that could support a person of ordinary skill's choice of that honeycomb when designing a canister system to achieve low emissions, feasibility alone does not support a motivation to combine. Demonstrating a reason to combine teachings in the prior art requires showing that a modification would have been desirable, not merely possible. *Belden Inc. v. Berk-Tek LLC,* 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only could

have made but would have been motivated to make the combinations or modifications of prior art to arrive at the claimed invention."). For the reasons discussed above, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claim 1 would have been obvious.

*Independent Claims 21, 51, 55, and 64*

Patent Owner provides a table summarizing the recitation of relevant limitations of the challenged independent claims, reproduced below:

| Limitation | Cl. 1 | Cl. 21 | Cl. 51 | Cl. 55 | Cl. 64 |
|---|---|---|---|---|---|
| **[B]**: eIAC < 35 g/L | ✓ | ✓ | ✓ | ✓ | ✓ |
| **[C]**: eBWC < 3 g/dL | ✓ | | ✓ | | ✓ |
| **[D]**: g-total BWC ≤ 6 g | ✓ | ✓ | | ✓ | ✓ |
| **[F1]**: 2D DBL emissions ≤ 20 mg at ≤ 100 BV of purge | ✓ | | | ✓ | |
| **[F2]**: 2D DBL emissions ≤ 20 mg at ≤ 210 L of purge | | ✓ | | | |
| **[F3]**: 2D DBL emissions ≤ 20 mg at ≤ 100 BV or 210 L of purge | | | ✓ | | |

PO Resp. 8. The figure reproduced above is a table including a column for each independent claim 1, 21, 51, 55, and 64, and a row for each claim limitation [B], [C], [D], [F1], [F2], and [F3].

Patent Owner contends that because each of the challenged claims recite at least one of limitations [C] and [D], Petitioner can only prevail in establishing obviousness if it proves a person of ordinary skill would have been motivated to modify or combine Hiltzik, Clontz SAE, and Clontz WIPO according to Approach #1 or #2. PO Resp. 14. Petitioner does not

dispute this. *See* Pet. Reply. Therefore, because we find as discussed above that Petitioner has not made this showing by a preponderance of the evidence, we also find Petitioner has not demonstrated that claims 21, 51, 55, and 64 would have been obvious over the combination of Hiltzik, Clontz SAE, and Clontz WIPO.

*Dependent Claims*

Claims 6–10, 14–20, 22–28, 32–38, 52, 56, 57, 59, 65–72, and 76–82 each depend from claim 1, 21, 51, 55, or 64. Petitioner's arguments with respect to these dependent claims do not address the deficiency discussed above with respect to claim 1. Thus Petitioner has not demonstrated by a preponderance of the evidence that these dependent claims would have been obvious over the combination of Hiltzik, Clontz SAE, and Clontz WIPO.

## III. MOTIONS TO EXCLUDE

### A. *Petitioner's Motion to Exclude*

Petitioner filed a motion to exclude Exhibit 2080 and paragraph 39 of Exhibit 2027. Paper 57 ("Pet. Mot."). We do not discuss or cite Exhibit 2080 or paragraph 39 of Exhibit 2027 in this Decision, and consideration of them played no part in our determinations set forth herein. Because their presence in the record would not affect our analysis in this Decision, we dismiss as moot Petitioner's motion with respect to these exhibits.

### B. *Patent Owner's Motion to Exclude*

Patent Owner filed a motion to exclude Exhibits 1015–1016, 1023–1025, 1032, 1038–1039, 1042 (certain paragraphs), 1044, 1046–1049, and

1052–1054. Paper 56 ("PO Mot."). Patent Owner groups these exhibits into four categories, which we apply in discussing the motion below.

1. Patent Owner moves to exclude Exhibits 1015 and 1046 as "irrelevant determinations from other adjudicative bodies regarding different patents." PO Mot. 1. We do not discuss or cite these exhibits in this Decision, and have not considered them in reaching our decision herein. Because the presence of these exhibits in the record would not affect our analysis in this Decision, we dismiss as moot Patent Owner's motion with respect to these exhibits.

2. Patent Owner moves to exclude Exhibits 1023, 1024, 1025, 1032, 1046, 1047, an alleged Ford replacement canister, and an eBay listing for another canister in Exhibit 1042 ¶ 63, under FRE 402 on the basis that Petitioner "attempt[s] to have the Board consider many exhibits outside of the Ground to make substantive obviousness arguments to cure the defects in the combination of the three references it chose." PO Mot. 4 (citing *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1369 (Fed. Cir. 2016). We do not discuss or cite these exhibits or paragraphs in this Decision, except for Exhibits 1023 and 1024 (referred to as Gadkaree and Park, respectively *supra*), which we cite in discussing the parties' arguments. We do not discuss Exhibits 1023 and 1024 as a basis for this Decision, however, because we determine patentability based on the three references that Petitioner identified as the basis for its § 103 challenge. Therefore, because the presence of all of these exhibits in the record would not affect our analysis in this Decision, we dismiss as moot Patent Owner's motion with respect to these exhibits

3. Patent Owner moves to exclude Exhibits 1016, 1038, 1039, and 1052–1054, in addition to certain paragraphs of Exhibit 1042, because none of Petitioner's papers discuss or cite these exhibits or paragraphs. PO Mot. 6. We do not discuss or cite these exhibits or paragraphs in this Decision, and they do not form any basis for our decision herein. Because the presence of these exhibits in the record would not affect our analysis in this Decision, we dismiss as moot Patent Owner's motion with respect to these exhibits.

4. Patent Owner moves to exclude Exhibits 1048 and 1049 as having been untimely produced by Petitioner and unauthenticated under FRE 901. We do not discuss or cite these exhibits in this Decision, and they do not form any basis for our decision herein. Because the presence of these exhibits in the record would not affect our analysis in this Decision, we dismiss as moot Patent Owner's motion with respect to these exhibits.

## IV. SUMMARY

For the reasons discussed above, Petitioner has not demonstrated by a preponderance of the evidence that claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 of the '553 patent are unpatentable. Our conclusions regarding the challenged claims are summarized below:

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 | 112(b) | Indefiniteness | | 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 |
| 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 | 103(a) | Hiltzik, Clontz WIPO, and Clontz SAE | | 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 |
| **Overall Outcome** | | | | 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 |

Additionally, we dismiss as moot Petitioner's Motion to Exclude and Patent Owner's Motion to Exclude.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Petitioner has not shown claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 of the '553 patent are unpatentable by a preponderance of the evidence;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed as moot; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

Lori Gordon
Steven Peters
Joseph Eng
KING & SPALDING LLP
lgordon@kslaw.com
speters@kslaw.com
jeng@kslaw.com

Brian Eutermoser
COOLEY LLP
beutermoser@cooley.com

PATENT OWNER:

Brian Buroker
Omar Amin
GIBSON, DUNN & CRUTCHER LLP
bburoker@gibsondunn.com
oamin@gibsondunn.com

Spencer Ririe
MANGUM RIRIE LLP
spencer@mangumririe.com

US010323553B2

(12) **United States Patent**
**Hiltzik et al.**

(10) **Patent No.: US 10,323,553 B2**
(45) **Date of Patent: *Jun. 18, 2019**

(54) **EVAPORATIVE FUEL VAPOR EMISSION CONTROL SYSTEMS**

(71) Applicant: **Ingevity South Carolina, LLC**, North Charleston, SC (US)

(72) Inventors: **Laurence H. Hiltzik**, Charleston, SC (US); **Peter D. McCrae**, Covington, VA (US); **James R. Miller**, Roanoke, VA (US); **Roger S. Williams**, Daniel Island, SC (US)

(73) Assignee: **INGEVITY SOUTH CAROLINA, LLC**, North Charleston, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 155 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/676,734**

(22) Filed: **Aug. 14, 2017**

(65) **Prior Publication Data**

US 2018/0030871 A1 Feb. 1, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/434,690, filed as application No. PCT/US2013/064407 on Oct. 10, 2013, now Pat. No. 9,732,649.

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***B01D 53/04*** | (2006.01) |
| ***F02M 25/08*** | (2006.01) |
| ***F01N 3/08*** | (2006.01) |

(52) **U.S. Cl.**

CPC ....... ***F01N 3/0835*** (2013.01); ***B01D 53/0407*** (2013.01); ***B01D 53/0415*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC ............ B01D 53/0407; B01D 53/0415; B01D 2253/102; B01D 2257/70;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,844,739 | A | 10/1974 | Alfrey, Jr. |
| 4,677,086 | A | 6/1987 | McCue et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 10049537 | 4/2002 |
| EP | 2906811 | 2/1918 |

(Continued)

OTHER PUBLICATIONS

Excerpt from Automotive Manufacturing and Production, 2001.

(Continued)

*Primary Examiner* — Frank M Lawrence, Jr.

(74) *Attorney, Agent, or Firm* — Bryan D. Zerhusen, Esq.; Cantor Colburn LLP

(57) **ABSTRACT**

An evaporative emission control canister system comprises an initial adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of between 2 grams and 6 grams. The evaporative emission control canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than 210 liters of purge applied after the 40 g/hr butane loading step.

**100 Claims, 22 Drawing Sheets**



**Related U.S. Application Data**

(60) Provisional application No. 61/712,244, filed on Oct. 10, 2012.

(52) **U.S. Cl.**
CPC ......... ***F01N 3/0807*** (2013.01); ***F02M 25/089*** (2013.01); ***F02M 25/0854*** (2013.01); *B01D 2253/102* (2013.01); *B01D 2257/70* (2013.01); *B01D 2257/7022* (2013.01); *B01D 2259/402* (2013.01); *B01D 2259/404* (2013.01); *B01D 2259/406* (2013.01); *B01D 2259/41* (2013.01); *B01D 2259/4145* (2013.01); *B01D 2259/4516* (2013.01); *B01D 2259/4566* (2013.01)

(58) **Field of Classification Search**
CPC ...... B01D 2257/7022; B01D 2259/402; B01D 2259/404; B01D 2259/406; B01D 2259/41; B01D 2259/4145; B01D 2259/4516; B01D 2259/4566; F02N 3/0807; F02N 3/0835; F02M 25/0854; F02M 25/089
USPC ............ 95/146; 96/126, 121, 132, 133, 146; 123/519
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 4,869,739 | A | 9/1989 | Kanome et al. | |
| 4,893,072 | A | 1/1990 | Matsumoto | |
| 4,894,072 | A | 1/1990 | Turner et al. | |
| 5,204,310 | A | 4/1993 | Tolles et al. | |
| 5,206,207 | A | 4/1993 | Tolles | |
| 5,207,808 | A | 5/1993 | Haruta et al. | |
| 5,238,470 | A | 8/1993 | Tolles et al. | |
| 5,250,491 | A | 10/1993 | Yan | |
| 5,276,000 | A | 1/1994 | Matthews et al. | |
| 5,304,527 | A | 4/1994 | Dimitri | |
| 5,324,703 | A | 6/1994 | McCue et al. | |
| 5,337,721 | A | 8/1994 | Kasuyu et al. | |
| 5,355,861 | A | 10/1994 | Arai | |
| 5,377,644 | A | 1/1995 | Krohn | |
| 5,408,976 | A | 4/1995 | Reddy | |
| 5,416,056 | A | 5/1995 | Baker | |
| 5,456,236 | A | 10/1995 | Wakashiro et al. | |
| 5,456,237 | A | 10/1995 | Yamazaki et al. | |
| 5,460,136 | A | 10/1995 | Yamazaki et al. | |
| 5,477,836 | A | 12/1995 | Hyodo et al. | |
| 5,482,023 | A | 1/1996 | Hunt et al. | |
| 5,538,932 | A | 7/1996 | Yan et al. | |
| 5,564,398 | A | 10/1996 | Maeda et al. | |
| 5,687,697 | A | 11/1997 | Ishikawa | |
| 5,691,270 | A | 11/1997 | Miller | |
| 5,736,481 | A | 4/1998 | Miller | |
| 5,736,485 | A | 4/1998 | Miller | |
| 5,769,928 | A | 6/1998 | Leavitt et al. | |
| 5,863,858 | A | 1/1999 | Miller et al. | |
| 5,914,294 | A | 6/1999 | Park et al. | |
| 5,914,457 | A | 6/1999 | Itakura et al. | |
| 5,931,141 | A | 8/1999 | Chino | |
| 5,957,114 | A | 9/1999 | Johnson et al. | |
| 6,098,601 | A | 8/2000 | Reddy | |
| 6,136,075 | A | 10/2000 | Bragg et al. | |
| 6,171,373 | B1 | 1/2001 | Park et al. | |
| 6,215,037 | B1 | 4/2001 | Padin et al. | |
| 6,279,548 | B1 | 8/2001 | Reddy | |
| 6,284,705 | B1 | 9/2001 | Park et al. | |
| 6,488,748 | B2 | 12/2002 | Yamafuji et al. | |
| 6,537,355 | B2 | 3/2003 | Scardino et al. | |
| 6,540,815 | B1 | 4/2003 | Hiltzik | |
| 6,811,717 | B2 | 11/2004 | Iyengar et al. | |
| 6,896,852 | B1 | 5/2005 | Meiller et al. | |
| RE38,844 | E | 10/2005 | Hiltzik | |
| 7,008,470 | B2 * | 3/2006 | Makino | B01D 53/02 123/519 |
| 7,753,034 | B2 | 7/2010 | Hoke | |
| 9,005,352 | B2 * | 4/2015 | Mani | F02M 25/0854 123/519 |
| 9,732,649 | B2 * | 8/2017 | Hiltzik | B01D 53/0415 |
| 2001/0020418 | A1 | 9/2001 | Itakura | |
| 2002/0073847 | A1 | 6/2002 | Sheline et al. | |
| 2005/0132888 | A1 | 6/2005 | Wolff et al. | |
| 2005/0247202 | A1 | 11/2005 | Seki | |
| 2007/0078056 | A1 | 4/2007 | Abe | |
| 2007/0266997 | A1 | 11/2007 | Clontz | |
| 2008/0041226 | A1 | 2/2008 | Hiltzik | |
| 2010/0212496 | A1 | 8/2010 | Hanamoto | |
| 2011/0067994 | A1 | 3/2011 | Moorhead | |
| 2011/0214572 | A1 * | 9/2011 | Hasegawa | B01D 53/02 96/122 |
| 2012/0204720 | A1 | 8/2012 | Tschantz | |
| 2013/0160651 | A1 | 6/2013 | Mani | |
| 2013/0186375 | A1 | 7/2013 | Hasegawa | |
| 2013/0269521 | A1 | 10/2013 | Nishita | |
| 2014/0352542 | A1 | 12/2014 | Mani | |


FOREIGN PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| EP | 0395353 | A2 | 10/1990 |
| EP | 0899450 | | 3/1999 |
| EP | 1094032 | | 4/2001 |
| EP | 1113163 | | 7/2001 |
| EP | 1491755 | A2 | 12/2004 |
| JP | S 59226263 | | 12/1984 |
| JP | 63176650 | | 7/1988 |
| JP | H1037812 | | 2/1998 |
| JP | 10-339218 | | 12/1998 |
| JP | 2002 256989 | | 11/2002 |
| KR | 2002 012826 | | 2/2002 |
| WO | WO 1992-01585 | | 2/1992 |
| WO | WO 2001-62367 | | 8/2001 |


OTHER PUBLICATIONS


Technical drawings of canister 17098125 (1996).
Printout of website showing Delphi canister 17098125 equipping cars from model year 1999 and 2001.
Assembly Bill of Material, Jun. 18, 2013.
Material specification sheet for foam M50115, Sep. 8, 2008.
Delphi test report on M50115 foam, Feb. 25, 2013.
Konrad Dorfner "Ion Exchangers" pp. 663 & 664, Walter de Gruyter, 1991.
"Properties and Thermodynamics of adsorption of benzoic acid onto XAD-4 and a water-compatible hypercrosslinked adsorbent", Liu et al., Chinese Journal of Polymer Science vol. 21, No. 3, 2003, pp. 317-324.
"Adsorption of p-Nitrophenol on Polymeric Adsorbents" Ardelean et al., Chem Bull "Politechnica" Univ Timisoara vol. 55 (69) 2010 p. 132.
"High surface area nanoporous polymers for reversible hydrogen storage" Germain et al., Chem Mater 2006, vol. 18, pp. 4430-4435.
Perry's Chemical Engineers' Handbook, 6th Edn, 1984, pp. 11-12.
"Mesoporous high-surface-area activated carbon" Hu Z. et al., Microporous and Mesoporous Materials 43 (2001) pp. 267-275.
"Phenolic resins: chemistry, applications, standardization, safety and ecology" 2nd Edn Springer-Verlag, 2000, pp. 444-445.
Invoices of the sale of canister 18098125 in 1999 (submitted with the letter of Jan. 23, 2015).
Excerpt from the book "Surface Chemistry: Theory and Applications", 1958.
Smisek, Milan et al., "Active Carbon, Manufacture, Properties and Applications", Elsevier publishing Company, Amsterdam-London-New York, 1970, pp. 353-375.
Ross, Sydney et al., "On Physical adsorption", Interscience Publishers, New York-London-Sydney, 1964, pp. 29-78.
Hassler, John W., "Activated Carbon", Chemical publishing Company, New York, 1963, pp. 300-310.

(56) **References Cited**

OTHER PUBLICATIONS

Rouquerol, J., et al., "A critical assessment of quasi-equilibrium gas absorption techniques in volumetry, gravimetry or calorimetry", Elsevier Science Publishers B.V., Amsterdam, 1988, pp. 67-76.
ASTM (D5228-92) Test .Protocol for BWC (A9 in the notice of opposition of Jun. 26, 2013).
EPA (40CFR 86/132-96) Test Protocol for BWC (A10 in the notice of opposition of Jun. 26, 2013).
SAE Technical Paper 2001-01-0733 titled, "Impact and Control of Canister Bleed Emissions" by RS Williams and CR Clontz, (2001).
International Search Report and Written Opinion, PCT/US2014/033565 (filed Apr. 9, 2014), dated Aug. 27, 2014.
International Search Report and Written Opnion, PCT/US2013/064407 (filed Oct. 10, 2013), dated Mar. 31, 2014.
Clean Air Technology Center, et al., "Choosing an Adsorption System for VOC: Carbon, Zeolite, or Polymers", EPA Technical Bulletin, 456/F-99-004 May 1999.
"Performance of activated carbon in Evaporative Loss Control System's", Johnson, HR and Williams R.—SAE Technical Paper 902119, 1990.
Excerpt from the book "Surface Chemistry: Theory and Applications".
SAE Technical Paper 2001-010733 titled, "Impact and Control of Canister Bleed Emissions" by RS Williams and CR Clontz.
Curriculum Vitae of James Lyons, filed with Petition for Inter Partes Review of U.S. Pat. No. Re. 38,844, filed Nov. 5, 2018 (1004).
Declaration by James M. Lyons in support of Petition for Inter Partes Review of U.S. Pat. No. Re. 38,844, filed Nov. 5, 2018 (1003).
Declaration by Warren Smith in support of Petition for Inter Partes Review of U.S. Pat. No. Re. 38,844, filed Nov. 5, 2018 (1014).
EP Opposition filed Nov. 6, 2018, by BASF Corp, for EP Patent No. EP2906811.
File History for U.S. Pat. No. Re. 38,844 (Filed Oct. 21, 2003) (1002).
File History of U.S. Pat. No. 6,540,815 (Issued Apr. 1, 2003) (1006).
Gadkaree, K.P., "Carbon Honeycomb Structures for Adsorption Applications", Carbon vol. 36, No. 7-8, pp. 981-989, 1998 (1018).
Johnson, Philip, et al., Carbon Materials for Advanced Technologies, Chapter 8: Activated Carbon for Automotive Applications, Burchell, ed. (1999) (Edited by Timothy D. Burchell) (1013).
MECA, "Evaporative Emission Contol Technologies for Gasoline Powered Vehicles", Dec. 2010 (1020).
Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response, filed Nov. 5, 2018, PTAB, Case IPR2019-00202, U.S. Pat. No. Re. 38,844.
Petition for Inter Partes Review of U.S. Pat. No. Re. 38,844, filed Nov. 5, 2018.
Plot of IAC versus BWC submitted by Ingevity to the European Patent Office on Feb. 11, 2014 (1019).
SAE, "Studies on Carbon Canisters to SatisfyLEVII EVAP Regulations", Itakura, et al., SAE Technical Paper Series 2000-01-0895, Mar. 6-9, 2000 (1028).
Sae, "The Development of Real-time Evaporative Emission Test", Haskew, et al., SAE Technical Paper Series 901110, May 1-4, 1990 (1027).
U.S. Appl. No. 60/335,897, filed Nov. 21, 2001 (1007).
U.S. Appl. No. 14/434,690, filed Apr. 9, 2015, U.S. Pat. No. 9,732,649.
U.S. Appl. No. 16/057,757, filed Aug. 7, 2018, 2018-0347424-A1.
U.S. Appl. No. 16/355,220, filed Mar. 15, 2019.

* cited by examiner

FIGURE 1



FIGURE 2



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6


300
100
302
105
301
304
303
106
104
107
204
201
101
203
202
102
103

FIGURE 7


100
300
304
301
302
105
305
303
106
104
107
204
201
101
203
202
102
103

FIGURE 8



FIGURE 9



FIGURE 10



FIGURE 11



FIGURE 12



FIGURE 13



FIGURE 14



FIGURE 15



FIGURE 16



FIGURE 17



FIGURE 18



FIGURE 19



FIGURE 20



FIGURE 21



FIGURE 22



# EVAPORATIVE FUEL VAPOR EMISSION CONTROL SYSTEMS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a U.S. Continuation Patent Application of U.S. patent application Ser. No. 14/434,690, filed on Apr. 9, 2015, that has since issued as U.S. Pat. No. 9,732,649, on Aug. 15, 2017; which claims the benefit of U.S. National Entry of International Application No. PCT/US2013/064407, titled, "EVAPORATIVE FUEL VAPOR EMISSION CONTROL SYSTEMS", as filed on Oct. 10, 2013; which claims the benefit of U.S. Provisional Patent Application Ser. No. 61/712,244, filed on Oct. 10, 2012, titled, "EVAPORATIVE FUEL VAPOR EMISSION CONTROL SYSTEMS"; all which are incorporated herein by reference in their entirety for all purposes.

## TECHNICAL FIELD

The present disclosure, in various embodiments, relates generally to evaporative emission control systems. More particularly, the present disclosure relates to evaporative fuel vapor emission control systems.

## BACKGROUND

Evaporation of gasoline fuel from motor vehicle fuel systems is a major potential source of hydrocarbon air pollution. Such emissions can be controlled by the canister systems that employ activated carbon to adsorb the fuel vapor emitted from the fuel systems. Under certain modes of engine operation, the adsorbed fuel vapor is periodically removed from the activated carbon by purging the canister systems with ambient air to desorb the fuel vapor from the activated carbon. The regenerated carbon is then ready to adsorb additional fuel vapor.

An increase in environmental concerns has continued to drive strict regulations of the hydrocarbon emissions from motor vehicles even when the vehicles are not operating. When a vehicle is parked in a warm environment during the daytime heating (i.e., diurnal heating), the temperature in the fuel tank increases resulting in an increased vapor pressure in the fuel tank. Normally, to prevent the leaking of the fuel vapor from the vehicle into the atmosphere, the fuel tank is vented through a conduit to a canister containing suitable fuel adsorbent materials that can temporarily adsorb the fuel vapor. The fuel vapor from the fuel tank enters the canister through a fuel vapor inlet of the canister and diffuses into the adsorbent volume where it is adsorbed in temporary storage before being released to the atmosphere through a vent port of the canister. Once the engine is turned on, ambient air is drawn into the canister system through the vent port of the canister. The purge air flows through the adsorbent volume inside the canister and desorbs the fuel vapor adsorbed on the adsorbent volume before entering the internal combustion engine through a fuel vapor purge conduit. The purge air does not desorb the entire fuel vapor adsorbed on the adsorbent volume, resulting in a residue hydrocarbon ("heel") that may be emitted to the atmosphere. In addition, that heel in local equilibrium with the gas phase also permits fuel vapors from the fuel tank to migrate through the canister system as emissions. Such emissions typically occur when a vehicle has been parked and subjected to diurnal temperature changes over a period of several days, commonly called "diurnal breathing losses." The California Low Emission



Vehicle Regulation makes it desirable for these diurnal breathing loss (DBL) emissions from the canister system to be below 10 mg ("PZEV") for a number of vehicles beginning with the 2003 model year and below 50 mg, typically below 20 mg, ("LEV-II") for a larger number of vehicles beginning with the 2004 model year. Now the California Low Emission Vehicle Regulation (LEV-III) requires canister DBL emissions not to exceed 20 mg as per the Bleed Emissions Test Procedure (BETP) as written in the California Evaporative Emissions Standards and Test Procedures for 2001 and Subsequent Model Motor Vehicles, Mar. 22, 2012.

Several approaches have been reported to reduce the diurnal breathing loss (DBL) emissions. One approach is to significantly increase the volume of purge gas to enhance desorption of the residue hydrocarbon heel from the adsorbent volume. This approach, however, has the drawback of complicating management of the fuel/air mixture to the engine during purge step and tends to adversely affect tailpipe emissions. See U.S. Pat. No. 4,894,072.

Another approach is to design the canister to have a relatively low cross-sectional area on the vent-side of the canister, either by the redesign of existing canister dimensions or by the installation of a supplemental vent-side canister of appropriate dimensions. This approach reduces the residual hydrocarbon heel by increasing the intensity of purge air. One drawback of such approach is that the relatively low cross-sectional area imparts an excessive flow restriction to the canister. See U.S. Pat. No. 5,957,114.

Another approach for increasing the purge efficiency is to heat the purge air, or a portion of the adsorbent volume having adsorbed fuel vapor, or both. However, this approach increases the complexity of control system management and poses some safety concerns. See U.S. Pat. Nos. 6,098,601 and 6,279,548.

Another approach is to route the fuel vapor through an initial adsorbent volume and then at least one subsequent adsorbent volume prior to venting to the atmosphere, wherein the initial adsorbent volume has a higher adsorption capacity than the subsequent adsorbent volume. See U.S. Pat. No. RE38,844.

The regulations on diurnal breathing loss (DBL) emissions continue to drive new developments for improved evaporative emission control systems, especially when the level of purge air is low. Furthermore, the diurnal breathing loss (DBL) emissions may be more severe for a hybrid vehicle that includes both an internal combustion engine and an electric motor. In such hybrid vehicles, the internal combustion engine is turned off nearly half of the time during vehicle operation. Since the adsorbed fuel vapor on the adsorbents is purged only when the internal combustion engine is on, the adsorbents in the canister of a hybrid vehicle is purged with fresh air less than half of the time compared to conventional vehicles. A hybrid vehicle generates nearly the same amount of evaporative fuel vapor as the conventional vehicles. The lower purge frequency of the hybrid vehicle can be insufficient to clean the residue hydrocarbon heel from the adsorbents in the canister, resulting in high diurnal breathing loss (DBL) emissions.

Accordingly, it is desirable to have an evaporative emission control system with low diurnal breathing loss (DBL) emissions even when a low level of purge air is used, or when the adsorbents in the canister are purged less frequently such as in the case of hybrid vehicles, or both. Though a passive approach has been greatly desired, existing passive approaches still leave DBL emissions at levels

that are many times greater than the 20 mg LEV-III requirement when only a fraction of the historically available purge is now available.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has one canister;

FIG. **2** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has one canister;

FIG. **3** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has one canister;

FIG. **4** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has a main canister and a supplemental canister;

FIG. **5** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has a main canister and a supplemental canister;

FIG. **6** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has a main canister and a supplemental canister;

FIG. **7** is a cross-sectional view of the evaporative emission control canister system according to one embodiment of the disclosure, wherein the canister system has a main canister and a supplemental canister;

FIG. **8** is a simplified schematic drawing of the apparatus used for the determination of the butane adsorption capacity; and

FIGS. **9-22** are simplified schematic drawings of the evaporative emission control canister systems according to some non-limiting embodiments of present disclosure.

## DESCRIPTION

The present disclosure now will be described more fully hereinafter, but not all embodiments of the disclosure are shown. While the disclosure has been described with reference to exemplary embodiments, it will be understood by those skilled in the art that various changes may be made and equivalents may be substituted for elements thereof without departing from the scope of the disclosure. In addition, many modifications may be made to adapt a particular structure or material to the teachings of the disclosure without departing from the essential scope thereof.

The drawings accompanying the application are for illustrative purposes only. They are not intended to limit the embodiments of the present application. Additionally, the drawings are not drawn to scale. Elements common between figures may retain the same numerical designation.

In a particular embodiment, an evaporative emission control canister system includes one or more canisters. The evaporative emission control canister system comprises an initial adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of between 2 grams and 6 grams. The initial adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the initial adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor. The evaporative emission control canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.

FIG. **1-3** show non-limiting examples of some embodiments of the evaporative emission control canister system wherein an initial adsorbent volume and subsequent adsorbent volume(s) are located within a single canister. FIGS. **4-7** show non-limiting examples of the embodiments of the evaporative emission control canister system that includes more than one canister, wherein an initial adsorbent volume and at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor.

FIG. **1** illustrates one embodiment of the evaporative emission control canister system having an initial adsorbent volume and a subsequent adsorbent volume within a single canister. Canister system **100** includes a support screen **102**, a dividing wall **103**, a fuel vapor inlet **104** from a fuel tank, a vent port **105** opening to an atmosphere, a purge outlet **106** to an engine, an initial adsorbent volume **201**, and a subsequent adsorbent volume **202**.

When an engine is off, the fuel vapor from a fuel tank enters the canister system **100** through the fuel vapor inlet **104**. The fuel vapor diffuses into the initial adsorbent volume **201**, and then the subsequent adsorbent volume **202** before being released to the atmosphere through the vent port **105** of the canister system. Once the engine is turned on, ambient air is drawn into the canister system **100** through the vent port **105**. The purge air flows through the subsequent adsorbent volume **202** and then the initial adsorbent volume **201**, and desorbs the fuel vapor adsorbed on the adsorbent volumes **202**, **201** before entering an internal combustion engine through the purge outlet **106**.

The evaporative emission control canister system may include more than one subsequent adsorbent volume. By way of non-limiting example, the evaporative emission control canister system **100** may include an initial adsorbent volume **201** and three subsequent adsorbent volumes **202**, **203**, **204** within a single canister, as illustrated in FIG. **2**.

Additionally, the evaporative emission control canister system may include an empty volume within the canister. As used herein, the term "empty volume" refers to a volume not including any adsorbent. Such volume may comprise any non-adsorbent including, but not limited to, air gap, foam spacer, screen, or combinations thereof. In a non-limiting example shown in FIG. **3**, the evaporative emission control canister system **100** may include an initial adsorbent volume **201**; three subsequent adsorbent volumes **202**, **203**, **204** within a single canister; and an empty volume **205** between the subsequent adsorbent volumes **203** and **204**.

By way of non-limiting example, FIGS. **4-7** shows the embodiments of the evaporative emission control canister system wherein the canister system includes more than one canister. As illustrated in FIG. **4**, the canister system **100** includes a main canister **101**, a support screen **102**, a dividing wall **103**, a fuel vapor inlet **104** from a fuel tank, a vent port **105** opening to an atmosphere, a purge outlet **106** to an engine, an initial adsorbent volume **201** in the main canister **101**, subsequent adsorbent volumes **202**, **203**, **204** in the main canister **101**, a supplemental canister **300** that

includes a subsequent adsorbent volume **301**, and a conduit **107** connecting the main canister **101** to the supplemental canister **300**.

When the engine is off, the fuel vapor from a fuel tank enters the canister system **100** through the fuel vapor inlet **104** into the main canister **101**. The fuel vapor diffuses through the initial adsorbent volume **201** and then the subsequent adsorbent volumes (**202**, **203**, and **204**) in the main canister **101** before entering the supplemental canister **300** via the conduit **107**. The fuel vapor diffuses through the subsequent adsorbent volume **301** inside the supplemental canister **300** before being released to the atmosphere through the vent port **105** of the canister system. Once the engine is turned on, ambient air is drawn into the canister system **100** through the vent port **105**. The purge air flows through the subsequent adsorbent volume **301** in the supplemental canister **300**, the subsequent adsorbent volumes (**204**, **203**, **202**) in the main canister **101**, and then the initial adsorbent volume **201** in the main canister **101**, to desorb the fuel vapor adsorbed on the adsorbent volumes (**301**, **204**, **203**, **202**, **201**) before entering the internal combustion engine through the purge outlet **106**.

Similar to the main canister, the supplemental canister of the evaporative emission control canister system may include more than one subsequent adsorbent volume. By way of non-limiting example, the supplemental canister **300** of the evaporative emission control canister system **100** may include subsequent adsorbent volumes **301** and **302**, as illustrated in FIG. **5**.

Furthermore, the supplemental canister of the evaporative emission control canister system may include an empty volume between the subsequent adsorbent volumes. By way of non-limiting example, the supplemental canister **300** of the evaporative emission control canister system **100** may include subsequent adsorbent volumes (**301**, **302**, and **303**) and an empty volume **304** between the subsequent adsorbent volumes **302** and **303** as illustrated in FIG. **6**. In a non-limiting example shown in FIG. **7**, the supplemental canister **300** of the evaporative emission control canister system **100** may include subsequent adsorbent volumes (**301**, **302**, **303**), an empty volumes **304** between the subsequent adsorbent volumes **301** and **302**, and an empty volumes **305** between the subsequent adsorbent volumes **302** and **303**. As previously discussed, the term "empty volume" refers to a volume not including any adsorbent. Such volume may comprise any non-adsorbent including, but not limited to, air gap, foam spacer, screen, conduit, or combinations thereof.

Additionally, the evaporative emission control canister system may include an empty volume between the main canister and the supplemental canister.

When desired, the evaporative emission control canister system may include more than one supplemental canister. The evaporative emission control canister system may further include one or more empty volumes between the main canister and a first supplemental canister, between the supplement canisters, and/or at the end of the last supplemental canister. By way of non-limiting example, the evaporative emission control canister system may include a main canister, a first supplemental canister, a second supplemental canister, a third supplemental canister, an empty volume between the main canister and a first supplemental canister, an empty volume between the first and second supplemental canister, and an empty volume at the end of the third supplemental canister.

As discussed above, FIGS. **1-7** are merely exemplary embodiments of the disclosed evaporative emission control canister system, and those skilled in the art may envision additional embodiments without departing from the scope of the present disclosure.

When desired, the total adsorbent volume (i.e., the sum of the initial adsorbent volume and the subsequent adsorbent volumes) may be the same as the volume of the evaporative emission control canister system. Alternatively, the total adsorbent volume may be less than the volume of the evaporative emission control canister system.

In a particular embodiment, a method of reducing fuel vapor emissions in an evaporative emission control system comprises contacting the fuel vapor with an initial adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and with at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of between 2 grams and 6 grams. The initial adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the initial adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor. The method of reducing fuel vapor emissions has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.

The term "adsorbent component" or "adsorbent volume," as used herein, refers to an adsorbent material or adsorbent containing material along vapor flow path, and may consist of a bed of particulate material, a monolith, honeycomb, sheet or other material.

The term "nominal volume," as used herein, refers to a sum of the volumes of the adsorbent components, and does not include the volumes of gaps, voids, ducts, conduits, tubing, plenum spaces or other volumes along lengths of the vapor flow path that are devoid of adsorbent material across the plane perpendicular to vapor flow path. For example, in FIG. **1** the total nominal volume of the canister system is the sum of the volumes of adsorbent volumes **201** and **202**. For example, in FIGS. **2** and **3**, the total nominal volume of the canister system is the sum of the volumes of adsorbent volumes **201**, **202**, **203**, and **204**. In FIG. **4**, the total nominal volume of the canister system is the sum of the volumes of adsorbent volumes **201**, **202**, **203**, **204**, and **301**. In FIG. **5**, the total nominal volume of the canister system is the sum of the volumes of adsorbent volumes **201**, **202**, **203**, **204**, **301**, and **302**. In FIGS. **6** and **7**, the total nominal volume of the canister system is the sum of the volumes of adsorbent volumes **201**, **202**, **203**, **204**, **301**, **302**, and **303**.

Determination of Nominal Volume Apparent Density

The term "nominal volume apparent density," as used herein, is the mass of the representative adsorbent in the adsorbent volume divided by the nominal volume of adsorbent, where the length of the volume is defined as the in situ distance within the canister system between the perpendicular plane of the vapor flow path initially in contact with the adsorbent component and the perpendicular plan of the vapor flow path exiting the adsorbent component.

Non-limiting examples of how to calculate the nominal volume apparent density for various forms of adsorbents are described herein.

(A) Granular, Pelletized, or Spherical Adsorbents of Uniform Adsorptive Capacity Across the Length of the Adsorbent Component Flow Path

The standard method ASTM D 2854 (hereinafter "the Standard Method") may be used to determine the nominal volume apparent density of particulate adsorbents, such as granular and pelletized adsorbents of the size and shape typically used for evaporative emission control for fuel systems. The Standard Method may be used to determine the apparent density of adsorbent volume, when it provides the same apparent density value as the ratio of the mass and the nominal volume of the adsorbent bed found in the canister system. The mass of the adsorbent by the Standard Method is of the representative adsorbent used in the incremental adsorption analysis, i.e., equivalently including or excluding inert binders, fillers, and structural components within the adsorbent volume depending on what representative material is analyzed as the adsorbent sample.

Furthermore, the nominal volume apparent density of adsorbent volume may be determined using an alternative apparent density method, as defined below. The alternative method may be applied to nominal adsorbent volumes that have apparent densities that are not comparably or suitably measured by the Standard Method. Additionally, the alternative apparent density method may be applied to particulate adsorbents in lieu of the Standard Method, due to its universal applicability. The alternative method may be applied to the adsorbent volume that may contain particulate adsorbents, non-particulate adsorbents, and adsorbents of any form augmented by spacers, voids, voidage additives within a volume or sequential similar adsorbent volumes for the effect of net reduced incremental volumetric capacity.

In the alternative apparent density method, the apparent density of adsorbent volume is obtained by dividing the mass of adsorbent by the volume of adsorbent, wherein:

(1) the dry mass basis of the representative adsorbent in the adsorbent volume is measured. For example, a 0.200 g representative sample of the 25.0 g total adsorbent mass in an adsorbent volume is measured for adsorptive capacity by the McBain method. Whereas the McBain method yields an adsorption value of g-butane per g-adsorbent, the applicable mass is 25.0 g for the numerator in the apparent density of the adsorbent volume that then allows conversion of the McBain analytical value to the volumetric property of the adsorbent volume; and

(2) the volume of the adsorbent component in the denominator of the apparent density is defined as the in situ geometric volume under which the superficial vapor flow path occurs within the canister system. The length of the volume is bounded by a plane perpendicular to the superficial vapor flow entrance of the adsorbent volume in question (i.e., the point at which there is adsorbent present on the perpendicular plane) and a plane perpendicular to the superficial flow at the vapor flow exit of the adsorbent volume in question (i.e., the point at which there is no adsorbent across the plane perpendicular to vapor flow).

(B) Honeycombs, Monolith, or Foam Adsorbents

(1) Cylindrical Honeycomb Adsorbents

The apparent density of cylindrical honeycomb adsorbents may be determined according to the procedure of Purification Cellutions, LLC (Waynesboro, Ga.) SOP 500-115. The volume of adsorbent is a multiple of the cross-sectional area (A) and the length (h) of the adsorbent. The length (h) of the adsorbent is defined as the distance between the front plane of the adsorbent perpendicular to vapor or gas flow entering the adsorbent and the back plane of the adsorbent where the vapor or gas exits the adsorbent. The volume measurement is that of the nominal volume, which is also used for defining bed volume ratios for purge. In the case of a cylindrical honeycomb adsorbent of circular cross-section, the adsorbent cross-sectional area is determined by $\pi d^2/4$, where d is the average diameter measured at four points on each end of the honeycomb. The nominal adsorbent volume and the nominal volume apparent density are calculated as follows:

$$\text{Nominal Adsorbent Volume} = h \times A$$

$$\text{Nominal Volume Apparent Density} = \text{Part Mass}/(h \times A)$$

wherein "Part Mass" is the mass of the adsorbent for which a representative adsorbent sample was tested for adsorptive properties, including representative proportions of inert or adsorptive binders and fillers.

By way of non-limiting examples, FIG. **9** shows the boundary definitions for the nominal volume of a honeycomb adsorbent **109** having a cross-sectional area A. The vapor or gas flows through the honeycomb adsorbent **109** in the direction of D1 to D2. The vapor or gas enters the front plane (F) of the adsorbent **109**, flows through the length (h) of the adsorbent **109**, and exits back plane (B) of the adsorbent **109**. The nominal volume of a honeycomb adsorbent **109** equals to the cross-sectional area A×the length h. Similarly, FIG. **10** shows the boundary definitions for the nominal volume of foam adsorbent **110**.

(2) Pleated, Corrugated and Sheet Adsorbents

For pleated and corrugated adsorbents, the nominal adsorbent volume includes all the void space created by the pleats and corrugations. The volume measurement is that of the nominal volume, which is also used for defining bed volume ratios for purge. The nominal volume and the apparent density of adsorbent are calculated as follows:

$$\text{Nominal Adsorbent Volume} = h \times A$$

$$\text{Nominal Volume Apparent Density} = \text{Part Mass}/(h \times A)$$

wherein

"Part Mass" is the mass of the adsorbent for which a representative adsorbent sample was tested for adsorptive properties, including representative proportions of inert or adsorptive binders and fillers,

h is the length of adsorbent, defined as the distance between the front plane of the adsorbent perpendicular to vapor or gas flow entering the filter and the back plane of the adsorbent where the vapor or gas exits the filter, and

A is the cross-sectional area of adsorbent.

By way of non-limiting example, FIG. **11** shows the boundary definitions for the volume of a stacked corrugated sheet adsorbent monolith **111**. It is also within those skilled in the art to form such a monolith as an extruded honeycomb.

In the case of a pleated adsorbent, the adsorbent cross-sectional area is determined by L×W, where L is the distance from one edge of the adsorbent to the opposite edge of the adsorbent in direction X, and W is the distance from one edge of the adsorbent to the opposite edge of the adsorbent in direction Y.

By way of non-limiting examples, FIG. **12** shows the boundary definitions for the volume of a single pleat or corrugation **112**. FIG. **13** shows the boundary definitions for the volume of a pleated or corrugated sheet **113** with vapor flow path provided through the sheet by some form of permeability to gas flow. The face of the sheet is perpendicular to the vapor flow. In contrast, FIG. **14** shows the boundary definitions for the volume of a pleated or corru-

gated sheet **114** where its face is angled to gas flow. FIG. **15** shows the boundary definitions for the volume of an adsorbent volume **115** of parallel adsorbent sheets. FIG. **16** shows the boundary definitions for the volume of an adsorbent sleeve **116**.

Determination of Nominal Incremental Adsorption Capacity

The term "nominal incremental adsorption capacity," as used herein, refers to an adsorption capacity according to the following equation:

Nominal Incremental Adsorption Capacity=[Adsorbed Butane at 50 vol %−Adsorbed Butane at 5 vol %]×Nominal Volume Apparent Density×1000

wherein

"Adsorbed Butane at 50 vol %" is the gram mass of absorbed n-butane per gram mass of adsorbent sample at 50 vol % butane concentration;

"Adsorbed Butane at 5 vol %" is the gram mass of absorbed n-butane per gram mass of adsorbent sample at 5 vol % butane concentration; and

"Nominal Volume Apparent Density" is as defined previously.

Determination of the Nominal Volume Butane Working Capacity (BWC)

The standard method ASTM D5228 may be used to determine the nominal volume butane working capacity (BWC) of the adsorbent volumes containing particulate granular and/or pelletized adsorbents.

A modified version of ASTM D5228 method may be used to determine the nominal volume butane working capacity (BWC) of the honeycomb, monolith, and/or sheet adsorbent volumes. The modified method may also be used for particulate adsorbents, where the particulate adsorbents include fillers, voids, structural components, or additives. Furthermore, the modified method may be used where the particulate adsorbents are not compatible with the standard method ASTM D5228, e.g., a representative adsorbent sample may not be readily placed as the 16.7 mL fill in the sample tube of the test.

The modified version of ASTM D5228 method is as follows. The adsorbent sample is oven-dried for a minimum of eight hours at 110±5° C., and then placed in desiccators to cool down. The dry mass of the adsorbent sample is recorded. The mass of the empty testing assembly is determined before the adsorbent sample is assembled into a testing assembly. Then, the test assembly is installed into the a flow apparatus and loaded with n-butane gas for a minimum of 25 minutes (±0.2 min) at a butane flow rate of 500 ml/min at 25° C. and 1 atm pressure. The test assembly is then removed from the BWC test apparatus. The mass of the test assembly is measured and recorded to the nearest 0.001 grams. This n-butane loading step is repeated for successive 5 minutes flow intervals until constant mass is achieved. For example, the total butane load time for a 35 mm diameter×150 mm long honeycomb (EXAMPLE 2 Adsorbent 1) was 66 minutes. The test assembly may be a holder for a honeycomb or monolith part, for the cases where the nominal volume may be removed and tested intact. Alternatively, the nominal volume may need to be a section of the canister system, or a suitable reconstruction of the nominal volume with the contents appropriately oriented to the gas flows, as otherwise encountered in the canister system.

The test assembly is reinstalled to the test apparatus and purged with 2.00 liter/min air at 25° C. and 1 atm pressure for a set selected purge time (±0.2 min) according to the formula: Purge Time (min)=(719×Nominal Volume (cc))/(2000 (cc/min)).



The direction of the air purge flow in the BWC test is in the same direction as the purge flow to be applied in the canister system. After the purge step, the test assembly is removed from the BWC test apparatus. The mass of the test assembly is measured and recorded to the nearest 0.001 grams within 15 minutes of test completion.

The nominal volume butane working capacity (BWC) of the adsorbent sample was determined using the following equation:

$$\text{Nominal Volume } BWC \text{ (g/dL)} = \frac{\text{Amount of Butane Purged (g)}}{\text{Nominal Adsorbent Volume (dL)}}$$

wherein

"Nominal Volume Apparent Density" is as defined previously, and

Amount of Butane Purged=Mass of the test assembly after loading−Mass of the test assembly after purge.

The term "g-total BWC," as used herein, refers to g-amount of butane purged.

Determination of Effective Volumetric Properties

The effective volume of adsorbents takes into account the air gaps, voids and other volumes between the nominal volumes of adsorbents along the vapor flow path that lack adsorbent. Thus, the effective volumetric properties of adsorbent refer to the properties of the adsorbent that take into account air gaps, voids and other volumes between the nominal volumes of adsorbents that lack adsorbent along the vapor flow path.

The effective volume ($V_{eff}$) for a given length of the vapor flow path is the sum of the nominal volumes of adsorbent ($V_{nom,\,i}$) present along that vapor path length plus adsorbent-free volumes along that vapor flow path ($V_{gap,\,j}$).

$$V_{eff}=\Sigma V_{nom,i}+V_{gap,j}$$

A volumetric adsorptive properties of an effective volume ($B_{eff}$), such as incremental adsorption capacity (g/L), apparent density (g/mL) and BWC (g/dL), is the sum of each property of the individual nominal volumes to be considered as part of the effective volume ($B_{nom,\,i}$) multiplied by each individual nominal volume ($V_{nom,\,i}$), then divided by the total effective volume ($V_{eff}$):

$$B_{eff}=\Sigma(B_{nom,i}\times V_{nom,i})/V_{eff}$$

Thus, the term "effective incremental adsorption capacity" is the sum of each nominal incremental adsorption capacity multiplied by each individual nominal volume, and then divided by the total effective volume.

The term "effective butane working capacity (BWC)" is the sum of each BWC value multiplied by each individual nominal volume, and then divided by the total effective volume.

The term "effective apparent density" is the sum of each apparent density multiplied by each individual nominal volume, and then divided by the total effective volume

The term "g-total BWC of the effective volume" is the sum of the g-total BWC gram values of the nominal volumes within the effective volume.

As non-limiting examples of how to determine effective volume of adsorbents, FIG. **17** shows the effective volume for three adsorbent honeycomb nominal volumes connected in the flow path by gaps of equal cross-sectional areas, with the arrow in the direction of D1 to D2 indicating vapor flow

into the effective volume, towards the canister system vent. FIG. **18** shows three adsorbent honeycomb nominal volumes connected by conduit sections of different cross-sectional areas compared with the honeycomb cross-sectional areas. In FIGS. **17** and **18**, the honeycomb nominal volumes and the gaps appear symmetric. However, it is understood that the honeycomb nominal volumes and the gaps may have different dimensions.

In some embodiments, the volumetric adsorptive properties of the adsorbent volumes may be deceased along the vapor flow path. By way of non-limiting example, the volumetric incremental capacity and butane working capacity (BWC) of the adsorbent volumes may be decreased towards the vent direction of the canister system. The diminished volumetric adsorptive properties may be attained by modifying the properties of the separate sections of adsorbent, by varying the size of the gaps between adsorbent nominal volumes (FIG. **19**), by adjusting the dimensions of individual adsorbent nominal volumes, separately (FIGS. **20** and **21**), or by a combination thereof (FIG. **22**). By way of non-limiting examples, as shown in FIGS. **20** and **21**, the canister system (**120**, **121**) may include adsorbent volume sections "F," "M," and "B" along the flow path in the direction of D1 to D2. The effective butane working capacities (BWC) of the adsorbent volume sections may be decreased along the flow path in the direction of D1 to D2 (i.e., the effective BWC of the adsorbent volume section F>the effective BWC of the adsorbent volume section M>the effective BWC of the adsorbent volume section B). In some embodiments, the effective BWC of the adsorbent volume section M and/or section B may be less than 3 g/dL, while the effective BWC of the canister system may be more than or equal to 3 g/dl.

In a particular embodiment, the evaporative emission control system include: a fuel tank for storing fuel; an engine having an air induction system and adapted to consume the fuel; an evaporative emission control canister system comprising one or more canister(s); a fuel vapor inlet conduit from the fuel tank to the canister system; a fuel vapor purge conduit from the canister system to the air induction system of the engine; and a vent conduit for venting the canister system when the engine is off and for admission of purge air to the canister system when the engine is on. The evaporative emission control canister system is defined by a fuel vapor flow path from the fuel vapor inlet conduit to the initial adsorbent volume toward the at least one subsequent adsorbent volume and the vent conduit, and by an air flow path from the vent conduit to the at least one subsequent adsorbent volume toward the initial adsorbent volume and the fuel vapor purge conduit. The evaporative emission control canister system includes an initial adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of between 2 grams and 6 grams. The initial adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the initial adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor. The evaporative emission control canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.



The disclosed evaporative emission control system may provide low diurnal breathing loss (DBL) emissions even under a low purge condition. The evaporative emission performance of the disclosed evaporative emission control system may be within the regulation limits defined by the California Bleed Emissions Test Procedure (BETP), which is 20 mg or less, even under a low purge condition.

The term "low purge," as used herein, refers to a purge level at or below 210 liters applied after the 40 g/hr butane loading step (i.e., 100 bed volumes for a 2.1 liter adsorbent component system).

The evaporative emission control system may provide low diurnal breathing loss (DBL) emissions even when being purged at or below 210 liters applied after the 40 g/hr butane loading step. In some embodiments, the evaporative emission control system may be purged at or below 157.5 liters applied after the 40 g/hr butane loading step.

The evaporative emission control system may provide low diurnal breathing loss (DBL) emissions even when being purged at or below 100 BV (bed volumes based on a 2.1 liter nominal volume of the canister system) applied after the 40 g/hr butane loading step. In some embodiments, the evaporative emission control system may be purged at or below 75 BV (based on a 2.1 liter nominal volume of the canister system) applied after the 40 g/hr butane loading step.

In some embodiments, the evaporative emission control system may include a heat unit to further enhance the purge efficiency. By way of non-limiting example, the evaporative emission control system may include a heat unit for heating the purge air, at least one subsequent adsorbent volume, or both.

The adsorbents suitable for use in the adsorbent volumes may be derived from many different materials and in various forms. It may be a single component or a blend of different components. Furthermore, the adsorbent (either as a single component or a blend of different components) may include a volumetric diluent. Non-limiting examples of the volumetric diluents may include, but are not limited to, spacer, inert gap, foams, fibers, springs, or combinations thereof.

Any known adsorbent materials may be used including, but not limited to, activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, or combinations thereof. Activated carbon may be derived from various carbon precursors. By way of non-limiting example, the carbon precursors may be wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm, vegetables such as rice hull or straw, synthetic polymer, natural polymer, lignocellulosic material, or combinations thereof. Furthermore, activated carbon may be produced using a variety of processes including, but are not limited to, chemical activation, thermal activation, or combinations thereof.

A variety of adsorbent forms may be used. Non-limiting examples of the adsorbent forms may include granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form, structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, or combinations thereof. The adsorbent (either

as a single component or a blend of different components) may include a volumetric diluent. Non-limiting examples of the volumetric diluents may include, but are not limited to, spacer, inert gap, foams, fibers, springs, or combinations thereof. Furthermore, the adsorbents may be extruded into special thin-walled cross-sectional shapes, such as hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, or other shapes within the technical capabilities of the art. In shaping, inorganic and/or organic binders may be used.

The honeycomb adsorbents may be in any geometrical shape including, but are not limited to, round, cylindrical, or square. Furthermore, the cells of honeycomb adsorbents may be of any geometry. Honeycombs of uniform cross-sectional areas for the flow-through passages, such as square honeycombs with square cross-sectional cells or spiral wound honeycombs of corrugated form, may perform better than round honeycombs with square cross-sectional cells in a right angled matrix that provides adjacent passages with a range of cross-sectional areas and therefore passages that are not equivalently purged. Without being bound by any theory, it is believed that the more uniform cell cross-sectional areas across the honeycomb faces, the more uniform flow distribution within the part during both adsorption and purge cycles, and, therefore, lower DBL emissions from the canister system.

In some embodiments, the evaporative emission control system may further include one or more heat input unit(s) for heating one or more adsorbent volume(s) and/or one or more empty volume(s). The heat input units may include, but are not limited to, internal resistive elements, external resistive elements, or heat input units associated with the adsorbent. The heat input unit associated with the adsorbent may be an element separate from the adsorbent (i.e., non-contacted with adsorbents). Alternatively, the heat input unit associated with the adsorbent may be a substrate or layer on to which the adsorbent is attached, bonded, non-bonded, or in physical contact. The heat input unit associated with the adsorbent may be adsorbent directly heated electrically by having appropriate resistivity. The resistivity properties of the adsorbent may be modified by the addition of conductive or resistive additives and binders in the original preparation of the adsorbent and/or in the forming of the adsorbent into particulate or monolithic forms. The conductive component may be conductive adsorbents, conductive substrates, conductive additives and/or conductive binders. The conductive material may be added in adsorbent preparation, added in intermediate shaping process, and/or added in adsorbent shaping into final form. Any mode of heat input unit may be used. By way of non-limiting example, the heat input unit may include a heat transfer fluid, a heat exchanger, a heat conductive element, and positive temperature coefficient materials. The heat input unit may or may not be uniform along the heated fluid path length (i.e., provide different local intensities). Furthermore, the heat input unit may or may not be distributed for greater intensity and duration of heating at different points along the heated fluid path length.

## EXAMPLES

Determination of Incremental Adsorption Capacity

FIG. **8** shows a simplified schematic drawing of the apparatus used for the determination of the butane adsorption capacity. This is known in the field as the McBain method. The apparatus **800** includes a sample pan **801** and a spring **802** inside a sample tube **803**, a rough vacuum pump **804**, a diffusion pump **805**, a stopcock **806**, metal/O-ring vacuum valves **807-809**, a butane cylinder **810**, a pressure readout unit **811**, and at least one conduit **812** connecting the components of the apparatus **800**.

The representative adsorbent component sample ("adsorbent sample") was oven-dried for more than 3 hours at 110° C. before loading onto the sample pan **801** attached to the spring **802** inside the sample tube **803**. Then, the sample tube **803** was installed into the apparatus **800**. The adsorbent sample shall include representative amounts of any inert binders, fillers and structural components present in the nominal volume of the adsorbent component when the Apparent Density value determination equivalently includes the mass of the inert binders, fillers, and structural components in its mass numerator. Conversely, the adsorbent sample shall exclude these inert binders, fillers, and structural components when the Apparent Density value equivalently excludes the mass of the inert binders, fillers, and structural components in its numerator. The universal concept is to accurately define the adsorptive properties for butane on a volume basis within the nominal volume.

A vacuum of less than 1 torr was applied to the sample tube, and the adsorbent sample was heated at 105° C. for 1 hour. The mass of the adsorbent sample was then determined by the extension amount of the spring using a cathetometer. After that, the sample tube was immersed in a temperature-controlled water bath at 25° C. Air was pumped out of the sample tube until the pressure inside the sample tube was $10^{-4}$ torr. n-Butane was introduced into the sample tube until equilibrium was reached at a selected pressure. The tests were performed for two data sets of four selected equilibrium pressures each, taken about 38 torr and taken about 380 torr. The concentration of n-butane was based on the equilibrium pressure inside the sample tube. After each test at the selected equilibrium pressure, the mass of the adsorbent sample was measured based on the extension amount of the spring using cathetometer. The increased mass of the adsorbent sample was the amount of n-butane adsorbed by the adsorbent sample. The mass of n-butane absorbed (in gram) per the mass of the adsorbent sample (in gram) was determined for each test at different n-butane equilibrium pressures and plotted in a graph as a function of the concentration of n-butane (in % volume). A 5 vol % n-butane concentration (in volume) at one atmosphere is provided by the equilibrium pressure inside the sample tube of 38 torr. A 50 vol % n-butane concentration at one atmosphere is provided by the equilibrium pressure inside the sample tube of 380 torr. Because equilibration at precisely 38 torr and 380 torr may not be readily obtained, the mass of adsorbed n-butane per mass of the adsorbent sample at 5 vol % n-butane concentration and at 50 vol % n-butane concentration were interpolated from the graph using the data points collected about the target 38 and 380 torr pressures.

Alternatively, Micromeritics (such as Micromeritics ASAP 2020) may be used for determining the incremental butane adsorption capacity instead of the McBain method.

Determination of Diurnal Breathing Loss (DBL) Emissions

The evaporative emission control systems of EXAMPLES 1-13 (identified below) were assembled with the selected amounts and types of adsorbents as shown in TABLES 1-3.

Each example was uniformly preconditioned (aged) by repetitive cycling of gasoline vapor adsorption using certified TF-1 fuel (9 RVP, 10 vol % ethanol) and 300 nominal bed volumes of dry air purge at 22.7 LPM based on the main canister (e.g., 630 liters for a 2.1 L main canister and 450 liters for a 1.5 L main canister). The gasoline vapor load rate was 40 g/hr and the hydrocarbon composition was 50 vol %,

generated by heating two liters of gasoline to about 36° C. and bubbling air through at 200 ml/min. The two-liter aliquot of fuel was replaced automatically with fresh gasoline every two hours until 5000 ppm breakthrough was detected by a FID (flame ionization detector). A minimum of 25 aging cycles were used on a virgin canister. The aging cycles were followed by a single butane adsorption/air purge step. This step was to load butane at 40 g/hour at a 50 vol % concentration in air at one atm to 5000 ppm breakthrough, soak for one hour, then purge with dry air for 21 minutes with a total purge volume attained by selecting the appropriate constant air purge rate for that period. The canister was then soaked with the ports sealed for 24 hour at 20° C.

The DBL emissions were subsequently generated by attaching the tank port of the example to a fuel tank filled 40 vol % (based on its rated volume) with CARB Phase II fuel (7 RVP, 0% ethanol). Prior to attachment, the filled fuel tank had been stabilized at 18.3° C. for 24 hours while venting. The tank and the example were then temperature-cycled per CARB's two-day temperature profile, each day from 18.3° C. to 40.6° C. over 11 hours, then back down to 18.3° C. over 13 hours. Emission samples were collected from the example vent at 5.5 hours and 11 hours during the heat-up stage into Kynar bags. The Kynar bags were filled with nitrogen to a known total volume based on pressure and then evacuated into a FID to determine hydrocarbon concentration. The FID was calibrated with a 5000 ppm butane standard. From the Kynar bag volume, the emissions concentration, and assuming an ideal gas, the mass of emissions (as butane) was calculated. For each day, the mass of emissions at 5.5 hours and 11 hours were added. Following CARB's protocol the day with the highest total emissions was reported as "2-day emissions." In all cases, the highest emissions were on Day 2. This procedure is generally described in SAE Technical Paper 2001-01-0733, titled "Impact and Control of Canister Bleed Emissions," by R. S. Williams and C. R. Clontz, and in CARB's LEV III BETP procedure (section D.12 in California Evaporative Emissions Standards and Test Procedures for 2001 and Subsequent Model Motor Vehicles, Mar. 22, 2012).

For EXAMPLES 1-4, 13 and EXAMPLES 7-8, a 68 L fuel tank and a 2.1 liter main canister (TABLE 1, Main Canister Type #1) was used as a main canister having fuel-source side volumes (i.e., an initial adsorbent volume) filled with 1.8 liters of NUCHAR® BAX 1500 activated carbon adsorbent and a vent-side volume filled with 0.3 liters of NUCHAR® BAX LBE activated carbon adsorbent. The volumes were configured such that there was a 1500 ml fuel-source side chamber and a 600 ml vent-side chamber, where the fuel-source chamber had a cross sectional area (CSA) that was 2.5 times the vent-side CSA. The BAX 1500 activated carbon filled the fuel source chamber (similar to volumes **201** plus **202** in FIGS. **2**-**7**) and 300 mL of the immediate downstream volume in the vent-side chamber (similar to volume **203** in FIGS. **2**-**7**). The 300 mL of the BAX LBE activated carbon filled the remaining volume of the vent-side chamber (similar to volume **204** in FIG. **7**). NUCHAR® BAX 1500 activated and NUCHAR® BAX LBE activated carbon are wood-based activated carbon products, commercially available from MeadWestvaco Corporation, having an incremental adsorption capacity at 25° C. of 80 grams n-butane/L and 24 grams n-butane/L respectively, between vapor concentration of 5 vol % and 50 vol % n-butane ("Nominal Incremental Capacity" in TABLE 1). For the post-butane loading air purge step, each canister system in EXAMPLES 1-4, 13 and EXAMPLES 7-8 was purged with 157.5 liters of purge air at a purge rate of 7.5 lpm. In terms of bed volume ratios of purge volume divided by the total nominal volume of the canister systems, the purge applied was between 66.0 and 75.0 bed volumes (BV).

For EXAMPLES 5-6 and 9-12, a 45 L fuel tank and a 1.5 liter main canister (TABLE 1, Main Canister Type #2) was used as a main canister having fuel-source side volumes (i.e., an initial adsorbent volume) filled with 1.2 liters of NUCHAR® BAX 1100 activated carbon adsorbent and a vent-side volume filled with 0.3 liters of NUCHAR® BAX LBE activated carbon adsorbent. The volumes were configured such that there was a 1000 ml fuel-source side chamber and a 500 ml vent-side chamber, where the fuel-source chamber had a cross sectional area (CSA) that was 2.0 times the vent-side CSA. The BAX 1100 activated carbon filled the fuel source chamber (similar to volumes **201** plus **202** in FIGS. **2**-**7**) and 200 mL of the immediate downstream volume in the vent-side chamber (similar to volume **203** in FIGS. **2**-**7**). The 300 mL of the BAX LBE activated carbon filled the remaining volume of the vent-side chamber (similar to volume **204** in FIG. **7**). NUCHAR® BAX 1100 activated is a wood-based activated carbon product, commercially available from MeadWestvaco Corporation, having an incremental adsorption capacity at 25° C. of 52 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane. During the post-butane loading air purge step, each canister system example was purged with either 100 or 150 liters of purge air at a purge rate of 4.76 or 7.14 lpm, respectively. In terms of bed volume ratios of purge volume divided by the total nominal volume of the canister systems, the purge applied was between 55.9 and 91.2 BV.

EXAMPLES 1-13 each included none, one, or two additional vent-side adsorbent volumes in-series. The first supplemental canister downstream along the vapor flow path from the main canister (if present) was noted as "Adsorbent 1" and a second in-series supplemental canister (if present) downstream along the vapor flow path from Adsorbent 1 was noted as "Adsorbent 2." One type of additional vent-side adsorbent (similar to supplemental canister **300** in FIG. **4**) was described as "35×150," which was a 35 mm diameter×150 mm long, 200 cells per square inch (cpsi) cylindrical carbon honeycomb. The accounting of the effective volume for the "35×150" adsorbent was the same boundaries as shown in FIG. **9**, that is, the effective volume was bounded by the vapor entrance and exit faces of the honeycomb, and equal to its nominal volume. The second type of additional vent-side adsorbent (similar to supplemental canister **300** in FIG. **7**) was described as "3-35×50," which was three 35 mm diameter×50 mm long, 200 cpsi cylindrical carbon honeycombs, including two 35 mm diameter×7 mm thick foam spacers. Each foam spacer created a 7 mL voidage gap between each sequential 50 mm long honeycomb length, similar to gaps **304** and **305** in FIG. **7**. The accounting of the effective volume was the same boundaries as shown in FIG. **17**, that is, the effective volume was bounded by the vapor entrance face of the first of the three honeycombs and exit faces of the third of the three honeycombs, and equal to the nominal volumes of the three honeycombs plus the volumes of the 7-mm thick spacers. The nominal incremental adsorption capacity at 25° C. of n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane was shown as the "Nominal Incremental Capacity." When based on the effective volume, the incremental adsorption capacity at 25° C. of n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane was shown as the "Effective Incremental Capacity." The two-day DBL emissions were reported as the "2-day DBL Emis-

sions" in units of mg. The reported results were often the average of several replicates of the BETP in order to verify findings.

The evaporative emission control canister system of EXAMPLES 1-4, 13 and EXAMPLES 7-8 each included an initial adsorbent volume of BAX 1500 activated carbon adsorbent having a nominal incremental adsorption capacity at 25° C. of 80 g n-butane/L (i.e., more than 35 g/L) between vapor concentration of 5 vol % and 50 vol % n-butane, and a subsequent adsorbent volume of BAX LBE activated carbon adsorbent having a nominal incremental adsorption capacity at 25° C. of 24 g/L (less than 35 g/L) between vapor concentration of 5 vol % and 50 vol % n-butane (less than 35 g/L). This is main canister type #1 in TABLE 1.

EXAMPLE 1 was the evaporative emission control canister system disclosed in the U.S. Pat. No. RE38,844. As shown in TABLE 2, the evaporative emission control canister system of EXAMPLE 1 provided a 2-day DBL Emissions of 215 mg under a low purge condition of 75 bed volume (BV) of purge air after butane loading (i.e., 157.5 liters). These 2-day DBL Emissions were more than an order of magnitude above the 20 mg regulation limit under the California Bleed Emissions Test Procedure (BETP). Thus, the 20 mg regulation limits under the California Bleed Emissions Test Procedure (BETP) could not be achieved by the evaporative emission control canister system disclosed in the U.S. Pat. No. RE38,844.

For EXAMPLE 2, an additional vent-side adsorbent volume (Adsorbent 1) was added to EXAMPLE 1 in the form of an activated carbon honeycomb ("35×150") having an effective incremental adsorption capacity at 25° C. of 16 g/L (less than 35 g/L) between vapor concentration of 5 vol % and 50 vol % n-butane (less than 35 g/L), an effective BWC of 4.2 g/dL and a g-total BWC of 6.1 g. As shown in TABLE 2, the 2-day DBL Emissions for EXAMPLE 2 with a low purge level of 157.5 liters (applied after butane loading) was 74 mg, which was still above the 20 mg regulation limit under the California Bleed Emissions Test Procedure (BETP). Thus, at the purge level of 157.5 liters applied after butane loading, the evaporative emission control canister system of the U.S. Pat. No. RE38,844 still could not satisfy the 20 mg regulation limit under BETP even when it was used in combination with the additional vent-side adsorbent volume (Adsorbent 1).

For EXAMPLE 3, a second additional vent-side adsorbent volume in the form of a activated carbon honeycomb (Adsorbent 2) of the same type and properties as Adsorbent 1 ("35×150") was added to the canister system of EXAMPLE 2. Surprisingly, as shown in TABLE 2, there was only a marginal reduction in the 2-day DBL emissions from the additional vent-side adsorbent volume in EXAMPLE 3, to 70 mg and still above the 20 mg regulation limit under the California Bleed Emissions Test Procedure (BETP).

EXAMPLE 4 was a variation of EXAMPLE 3 in that the activated carbon honeycombs were each divided in to three 50 mm long section with narrow spacers in between. For EXAMPLE 4, the spacers reduced the effective incremental capacities of Adsorbents 1 and 2 to 14.6 g/L and reduced the effective BWC to 3.9 g/dL, but, by definition, kept the g-total BWC the same, at 6.1 g. As shown in TABLE 2, the 2-day DBL emissions of EXAMPLE 4 remained high at 52 mg and were still above the 20 mg regulation limits under the California Bleed Emissions Test Procedure (BETP).

In EXAMPLE 13, Adsorbent 2 was honeycombs divided into two 50 mm long sections with a narrow spacer in between. The effective incremental capacity was 6.1 g/L and the effective BWC was 1.6 g/dL. By definition, the g-total BWC was 1.6 g. As shown in TABLE 2, the 2-day DBL emissions of EXAMPLE 13 remained high at 35 mg and were still above the 20 mg regulation limits under the California Bleed Emissions Test Procedure (BETP).

For EXAMPLE 7, Adsorbent 2 had an effective incremental capacity of 9.8 g/L, an effective BWC of 2.6 g/dL and a g-total BWC of 4.0 g. For EXAMPLE 8, Adsorbent 2 had an effective incremental capacity of 10.7 g/L, an effective BWC of 2.8 g/dL and a g-total BWC of 4.4 g. As shown in TABLE 2, with 157.5 liters of purge, the canister systems of EXAMPLES 7 and 8 provided the 2-day DBL Emissions of 10.3 g/dl and 13 g/dl, respectively. Thus, the canister systems of EXAMPLES 7 and 8 had the 2-day DBL Emissions well below the BETP requirement of less than 20 mg for low purge conditions of 157.5 liters (66.0 BV).

The evaporative emission control canister system of EXAMPLES 5, 6 and 9-12 were based on the main canister type #2 in TABLE 1.

EXAMPLE 12 was the evaporative emission control canister system similar to those disclosed in the U.S. Pat. No. RE38,844. As shown in TABLE 3, the evaporative emission control canister system of EXAMPLE 12 did not include any additional adsorbent volume on the vent side. EXAMPLE 12 provided 2-day DBL Emissions of 175 mg under a low purge condition of 100 bed volume (BV) of purge air after butane loading (i.e., 150 liters), which was about nine time higher than the 20 mg regulation limit under the California Bleed Emissions Test Procedure (BETP). This confirmed that the evaporative emission control canister system similar to those disclosed in the U.S. Pat. No. RE38,844 was not able to achieve the 2-day DBL Emissions requirements under the BETP (i.e., less than 20 mg) when low purge was used.

In EXAMPLE 5, a low volume of purge after butane loading 150 liters was applied, or 91.2 BV for the 1.5 L nominal volume of the canister system that included an additional vent-side adsorbent volume of a "35×150" activated carbon honeycomb as Adsorbent 1. As shown in TABLE 3, the 2-day DBL emissions were high at 57 mg and above the 20 mg regulation limit under the California Bleed Emissions Test Procedure (BETP).

For EXAMPLE 6, the purge applied was reduced to 100 liters, or 55.9 BV for the main canister type #2 that included the same additional vent-side adsorbent volumes as EXAMPLE 4. As shown in TABLE 3, the 2-Day DBL emissions were high at 80 mg and above the 20 mg regulation limits under the California Bleed Emissions Test Procedure (BETP).

The canister systems of EXAMPLES 9, 10 and 11 each included an initial adsorbent volume of NUCHAR® BAX 1100 activated carbon adsorbent having an incremental adsorption capacity at 25° C. of 52 g n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane (i.e., more than 35 g/L) as part of the main canister type #2, and at least one subsequent adsorbent volume ("Adsorbent 2" in TABLE 3) having an effective incremental adsorption capacity at 25° C. butane adsorption capacity of less than 35 g/L between vapor concentration of 5 vol % and 50 vol % n-butane and a g-total BWC of between 2 and 6 g.

Adsorbent 2 in EXAMPLE 9 had an effective incremental capacity of 11.7 g/L, an effective BWC of 3.1 g/dL (greater than 3 g/dL) and a g-total BWC of 4.8 g. As shown in TABLE 3, the 2-day DBL emissions for EXAMPLE 9 under the low purge of 100 liters (i.e., 55.9 BV) were 51 mg and well above the BETP requirement of less than 20 mg.

In contrast, Adsorbent 2 in EXAMPLE 10 had an effective incremental capacity of 9.8 g/L, an effective BWC of 2.6 g/dL (less than 3 g/dL) and a g-total BWC of 4.0 g. As shown in TABLE 3, the 2-day DBL emissions under the low purge of 100 liters, equal to 55.9 BV, were 13.0 mg and within the BETP requirement of less than 20 mg.

Likewise, Adsorbent 2 in EXAMPLE 11 had an effective incremental capacity of 5.9 g/L, an effective BWC of 1.6 g/dL (less than 3 g/dL) and a g-total BWC of 2.4 g. As shown in TABLE 3, the 2-day DBL emissions under the low purge of 150 liters, equal to 83.9 BV, were 7.3 mg and within the BETP requirement of less than 20 mg.

TABLE 4 and TABLE 5 summarized the conditions of the canister systems of EXAMPLES 1-13, and their measured 2-day DBL emissions. The canister systems of EXAMPLES 7, 8, 10 and 11 provided the 2-day DBL emissions of less than 20 mg, as required under the California Bleed Emissions Test Procedure (BETP). The requirement not to exceed 20 mg for BETP under low purge was met by satisfying a window of adsorptive properties by a vent-side volume, where the window was an effective BWC of less than 3 g/dL and a g-total BWC of between 2 g and 6 g. Thus, the means to achieve the BETP emissions requirement under low purge conditions was more than only a reduction in the working capacity or incremental capacity across the vapor flow path of the canister system and specifically of the vent-side adsorbent volume to a prescribed level, but to additionally have sufficient gram working capacity in that vent-side volume to restrain the emissions.

While the present disclosure is susceptible to various modifications and alternative forms, specific embodiments have been shown by way of example in the drawings and have been described in detail herein. However, the present disclosure is not intended to be limited to the particular forms disclosed. Rather, the present disclosure is to cover all modifications, equivalents, and alternatives falling within the scope of the present disclosure as defined by the following appended claims and their legal equivalents.

TABLE 1

| | Main Canister Type | |
|---|---|---|
| | #1 | #2 |
| Fuel Side Nominal Volume (mL) | 1800 | 1200 |
| Adsorbent Type | BAX 1500 | BAX 1100 |
| Nominal Incremental Capacity (g/L) | 80 | 52 |
| Nominal Apparent Density (g/mL) | 0.284 | 0.358 |
| Vent Side Nominal Volume (mL) | 300 | 300 |
| Adsorbent Type | BAX LBE | BAX LBE |
| Nominal Incremental Capacity (g/L) | 24 | 24 |
| Nominal Apparent Density (g/mL) | 0.383 | 0.383 |
| Fuel Tank Size (rated L) | 68 | 45 |

TABLE 2

| | EXAMPLE | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 13 | 7 | 8 |
| Main Canister Type | #1 | #1 | #1 | #1 | #1 | #1 | #1 |
| Additional Vent Side Adsorbents Volumes: | | | | | | | |
| Adsorbent 1 Nominal Volume (mL) | None | 144 | 144 | 144 | 144 | 144 | 144 |
| Adsorbent 1 Type | None | "35 × 150" | "35 × 150" | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" |
| Adsorbent 1 Effective Volume (mL) | None | 144 | 144 | 158 | 158 | 158 | 158 |
| Nominal Incremental Capacity (g/L) | — | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| Effective Incremental Capacity (g/L) | — | 16.0 | 16.0 | 14.6 | 14.6 | 14.6 | 14.6 |
| Nominal Apparent Density (g/mL) | — | 0.377 | 0.377 | 0.377 | 0.377 | 0.377 | 0.377 |
| Effective Apparent Density (g/mL) | — | 0.377 | 0.377 | 0.345 | 0.345 | 0.345 | 0.345 |
| Nominal BWC (g/dL) | — | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Effective BWC (g/dL) | — | 4.2 | 4.2 | 3.8 | 3.8 | 3.8 | 3.8 |
| g-Total BWC (g) | — | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 |
| Adsorbent 2 Nominal Volume (mL) | None | None | 144 | 144 | 96 | 144 | 144 |
| Adsorbent 2 Type | None | None | "35 × 150" | "3-35 × 50" | "2-35 × 50" | "3-35 × 50" | "3-35 × 50" |
| Adsorbent 2 Effective Volume (mL) | None | None | 144 | 158 | 103 | 158 | 158 |
| Nominal Incremental Capacity (g/L) | — | — | 16.0 | 16.0 | 6.5 | 10.7 | 11.7 |
| Effective Incremental Capacity (g/L) | — | — | 16.0 | 14.6 | 6.1 | 9.8 | 10.7 |
| Nominal Apparent Density (g/mL) | — | — | 0.377 | 0.377 | 0.559 | 0.493 | 0.487 |
| Effective Apparent Density (g/mL) | — | — | 0.377 | 0.345 | 0.522 | 0.451 | 0.446 |
| Nominal BWC (g/dL) | — | — | 4.2 | 4.2 | 1.7 | 2.8 | 3.1 |
| Effective BWC (g/dL) | — | — | 4.2 | 3.8 | 1.6 | 2.6 | 2.8 |
| g-Total BWC (g) | — | — | 6.1 | 6.1 | 1.6 | 4.0 | 4.4 |
| Total Nominal Volume of Canister System (L) | 2.10 | 2.24 | 2.39 | 2.39 | 2.34 | 2.39 | 2.39 |
| Purge Applied After the 40 g/hr Butane Loading Step, liters | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 |
| Purge Applied After the 40 g/hr Butane Loading Step, BV | 75.0 | 70.2 | 66.0 | 66.0 | 67.3 | 66.0 | 66.0 |
| 2-Day DBL Emissions, mg | 215 | 74 | 70 | 52 | 35 | 10.3 | 13 |

TABLE 3

| | EXAMPLE | | | | | |
|---|---|---|---|---|---|---|
| | 12 | 5 | 6 | 9 | 10 | 11 |
| Main Canister Type | #2 | #2 | #2 | #2 | #2 | #2 |
| Additional Vent Side Adsorbents Volumes: | | | | | | |
| Adsorbent 1 Nominal Volume (mL) | None | 144 | 144 | 144 | 144 | 144 |
| Adsorbent 1 Type | None | "35 × 150" | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" |
| Adsorbent 1 Effective Volume (mL) | None | 144 | 158 | 158 | 158 | 158 |
| Nominal Incremental Capacity (g/L) | — | 16.0 | 16.0 | 16.0 | 16.0 | 16.0 |
| Effective Incremental Capacity (g/L) | — | 16.0 | 14.6 | 14.6 | 14.6 | 14.6 |
| Nominal Apparent Density (g/mL) | — | 0.377 | 0.377 | 0.377 | 0.377 | 0.377 |
| Effective Apparent Density (g/mL) | — | 0.377 | 0.345 | 0.345 | 0.345 | 0.345 |
| Nominal BWC (g/dL) | — | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Effective BWC (g/dL) | — | 4.2 | 3.8 | 3.8 | 3.8 | 3.8 |
| g-Total BWC (g) | — | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 |
| Adsorbent 2 Nominal Volume (mL) | None | None | 144 | 144 | 144 | 144 |
| Adsorbent 2 Type | None | None | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" | "3-35 × 50" |
| Adsorbent 2 Effective Volume (mL) | None | None | 158 | 158 | 158 | 158 |
| Nominal Incremental Capacity (g/L) | — | — | 16.0 | 12.8 | 10.7 | 6.5 |
| Effective Incremental Capacity (g/L) | — | — | 14.6 | 11.7 | 9.8 | 5.9 |
| Nominal Apparent Density (g/mL) | — | — | 0.377 | 0.438 | 0.493 | 0.558 |
| Effective Apparent Density (g/mL) | — | — | 0.345 | 0.399 | 0.451 | 0.511 |
| Nominal BWC (g/dL) | — | — | 4.2 | 3.4 | 2.8 | 1.7 |
| Effective BWC (g/dL) | — | — | 3.8 | 3.1 | 2.6 | 1.6 |
| g-Total BWC (g) | — | — | 6.1 | 4.8 | 4.0 | 2.4 |
| Total Nominal Volume of Canister System (L) | 1.50 | 1.64 | 1.79 | 1.79 | 1.79 | 1.79 |
| Purge Applied After the 40 g/hr Butane Loading Step, liters | 150 | 150 | 100 | 100 | 100 | 150 |
| Purge Applied After the 40 g/hr Butane Loading Step, BV | 100 | 91.2 | 55.9 | 55.9 | 55.9 | 83.9 |
| 2-Day DBL Emissions, mg | 175 | 57 | 80 | 51 | 13 | 7.3 |

TABLE 4

| | Main Canister Type #1 | | | | | | |
|---|---|---|---|---|---|---|---|
| | EX. 1 | EX. 2 | EX. 3 | EX. 4 | EX. 13 | EX. 7 | EX. 8 |
| Fuel side | | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | 80 | 80 | 80 | 80 | 80 | 80 | 80 |
| Vent Side | | | | | | | |
| Adsorbent Volume #0 | | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | 24 | 24 | 24 | 24 | 24 | 24 | 24 |
| Effective BWC, g/dL | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 |
| g-Total BWC, g | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 |
| Adsorbent Volume #1 | | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | N/A | 16.0 | 16.0 | 16.0 | 14.6 | 14.6 | 14.6 |
| Effective BWC, g/dL | N/A | 4.2 | 4.2 | 4.2 | 4.2 | 3.8 | 3.8 |
| g-Total BWC, g | N/A | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 |
| Adsorbent Volume #2 | | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | N/A | N/A | 16.0 | 14.6 | 6.1 | 7.3 | 8.0 |
| Effective BWC, g/dL | N/A | N/A | 4.2 | 3.8 | 1.6 | 2.6 | 2.8 |
| g-Total BWC, g | N/A | N/A | 6.1 | 6.1 | 1.6 | 4.0 | 4.4 |
| 2-Day DBL Emission, mg | 215 | 74 | 70 | 52 | 35 | 10.3 | 13 |

TABLE 5

| | Main Canister Type #2 | | | | | |
|---|---|---|---|---|---|---|
| | EX. 12 | EX. 5 | EX. 6 | EX. 9 | EX. 10 | EX. 11 |
| Fuel side | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | 52 | 52 | 52 | 52 | 52 | 52 |
| Vent Side | | | | | | |
| Adsorbent Volume #0 | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | 24 | 24 | 24 | 24 | 24 | 24 |
| Effective BWC, g/dL | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 | 6.3 |
| g-Total BWC, g | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 | 18.9 |

TABLE 5-continued

| | Main Canister Type #2 | | | | | |
|---|---|---|---|---|---|---|
| | EX. 12 | EX. 5 | EX. 6 | EX. 9 | EX. 10 | EX. 11 |
| Adsorbent Volume #1 | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | N/A | 16.0 | 14.6 | 14.6 | 14.6 | 14.6 |
| Effective BWC, g/dL | N/A | 4.2 | 3.8 | 3.8 | 3.8 | 3.8 |
| g-Total BWC, g | N/A | 6.1 | 6.1 | 6.1 | 6.1 | 6.1 |
| Adsorbent Volume #2 | | | | | | |
| Effective Incremental Adsorption Capacity, g/L | N/A | N/A | 14.6 | 11.7 | 7.3 | 2.7 |
| Effective BWC, g/dL | N/A | N/A | 3.8 | 3.1 | 2.6 | 1.6 |
| g-Total BWC, g | N/A | N/A | 6.1 | 4.8 | 4.0 | 2.4 |
| 2-Day DBL Emission, mg | 175 | 57 | 80 | 51 | 13 | 7.3 |

What is claimed is:

**1**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor, and wherein the canister system has a two-day diurnal breathing loss (DBL) of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step.

**2**. The canister system of claim **1**, wherein the two-day diurnal breathing loss (DBL) emissions of no more than 20 mg are determined by the 2012 California Bleed Emissions Test Procedure (BETP).

**3**. The canister system of claim **1** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**4**. The canister system of claim **1**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤24 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**5**. The canister system of claim **1**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤16 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**6**. The canister system of claim **1**, further comprising at least one additional subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**7**. The canister system of claim **6**, wherein the at least one additional subsequent adsorbent volume has a lower effective incremental adsorption capacity relative to the subsequent adsorbent volume that precedes it in the flow path from fuel-side to vent-side.

**8**. The canister system of claim **6**, wherein each additional subsequent adsorbent volume has a lower effective incremental adsorption capacity than any preceding subsequent adsorbent volume.

**9**. The canister system of claim **6**, wherein each additional subsequent adsorbent volume has an effective butane working capacity (BWC) of less than 3 g/dL, a gram-total BWC of ≤6 g or both.

**10**. The canister system of claim **9**, wherein each additional subsequent adsorbent volume has a lower gram-total BWC relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**11**. The canister system of claim **1**, wherein the system further includes at least one heat input unit for heating one or more adsorbent volumes.

**12**. The canister system of claim **11**, wherein the heat input unit include at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**13**. The canister system of claim **11**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**14**. The canister system of claim **1**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, and combinations thereof.

**15**. The canister system of claim **14**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, and combinations thereof.

**16**. The canister system of claim **15** wherein the activated carbon is derived from a material including a member selected from the group consisting of wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm, vegetables, synthetic polymer, natural polymer, lignocellulosic material, and combinations thereof.

**17**. The canister system of claim **16** wherein a form of adsorbent in the fuel-side adsorbent volume, the at least one subsequent adsorbent volume, or both includes a member selected from the group consisting of granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form,

structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, and combinations thereof.

**18**. The canister system of any of claim **1**, wherein the at least one subsequent adsorbent volume includes a volumetric diluent.

**19**. The canister system of claim **18**, wherein the volumetric diluent includes a member selected from the group consisting of inert spacer particles, trapped air spaces, foams, fibers, screens, and combinations thereof.

**20**. The canister system of claim **18**, wherein the volumetric diluent includes an adsorbent material formed into a high voidage shape selected from the group consisting of stars, hollow tubes, asterisks, spirals, cylinders, configured ribbons, honeycombs, monoliths, and combinations thereof.

**21**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor, and

wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.

**22**. The canister system of claim **21**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of 24 or less grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**23**. The canister system of claim **21**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of 16 or less grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**24**. The canister system of claim **21**, further comprising at least one additional subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**25**. The canister system of claim **24**, wherein the at least one additional subsequent adsorbent volume has a lower effective incremental adsorption capacity relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**26**. The canister system of claim **24**, wherein each additional subsequent adsorbent volume has a lower effective incremental adsorption capacity than any preceding subsequent adsorbent volume.

**27**. The canister system of claim **24**, wherein each additional subsequent adsorbent volume has a gram-total BWC of from 2 g to 6 g.

**28**. The canister system of claim **24**, wherein each additional subsequent adsorbent volume has a lower gram-total BWC relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.



**29**. The canister system of claim **21**, wherein the system further includes at least one heat input unit for heating one or more adsorbent volumes.

**30**. The canister system of claim **29**, wherein the heat input unit include at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**31**. The canister system of claim **29**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**32**. The canister system of claim **21**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, and combinations thereof.

**33**. The canister system of claim **32**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, and combinations thereof.

**34**. The canister system of claim **33**, wherein the activated carbon is derived from a material including a member selected from the group consisting of wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm, vegetables, synthetic polymer, natural polymer, lignocellulosic material, and combinations thereof.

**35**. The canister system of claim **21**, wherein a form of adsorbent in the fuel-side adsorbent volume, the at least one subsequent adsorbent volume, or both includes a member selected from the group consisting of granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form, structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, and combinations thereof.

**36**. The canister system of claim **21**, wherein the at least one subsequent adsorbent volume includes a volumetric diluent.

**37**. The canister system of claim **36**, wherein the volumetric diluent includes a member selected from the group consisting of inert spacer particles, trapped air spaces, foams, fibers, screens, and combinations thereof.

**38**. The canister system of claim **36**, wherein the volumetric diluent includes an adsorbent material formed into a high voidage shape selected from the group consisting of stars, hollow tubes, asterisks, spirals, cylinders, configured ribbons, honeycombs, monoliths, and combinations thereof.

**39**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane;

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective

butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams; and

a heat input unit for heating one or more adsorbent volumes,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor,

wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of no more than 20 mg at no more than about 210 liters of purge applied after the 40 g/hr butane loading step.

**40**. The canister system of claim **39**, further comprising at least one additional subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**41**. The canister system of claim **40**, wherein the at least one additional subsequent adsorbent volume has a lower effective incremental adsorption capacity relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**42**. The canister system of claim **40**, wherein each additional subsequent adsorbent volume has a lower effective incremental adsorption capacity than any preceding subsequent adsorbent volume.

**43**. The canister system of claim **40**, wherein each additional subsequent adsorbent volume has a gram-total BWC of between 2 grams and 6 grams.

**44**. The canister system of claim **40**, wherein each additional subsequent adsorbent volume has a lower gram-total BWC relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**45**. The canister system of claim **39**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, and combinations thereof.

**46**. The canister system of claim **45**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, and combinations thereof.

**47**. The canister system of claim **46**, wherein the activated carbon is derived from a material including a member selected from the group consisting of wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm, vegetables, synthetic polymer, natural polymer, lignocellulosic material, and combinations thereof.

**48**. The canister system of claim **39**, wherein a form of adsorbent in the fuel-side adsorbent volume, the at least one subsequent adsorbent volume, or both includes a member selected from the group consisting of granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form, structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, and combinations thereof.



**49**. The canister system of claim **39**, wherein the at least one subsequent adsorbent volume includes a volumetric diluent.

**50**. The canister system of claim **49**, wherein the volumetric diluent includes an adsorbent material formed into a high voidage shape selected from the group consisting of stars, hollow tubes, asterisks, spirals, cylinders, configured ribbons, honeycombs, monoliths, and combinations thereof.

**51**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and an effective butane working capacity (BWC) of less than 3 g/dL,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor,

wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of at least one of: (i) no more than 20 mg at no more than 210 liters of purge applied after a 40 g/hr butane loading step, or (ii) no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**52**. The canister system of claim **51** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**53**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane;

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and an effective butane working capacity (BWC) of less than 3 g/dL; and

a heat input unit for heating one or more adsorbent volumes,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor,

wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of at least one of: (i) no more than 20 mg at no more than 210 liters of purge applied after a 40 g/hr butane loading step, or (ii) no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**54**. The canister system of claim **53** wherein the at least one subsequent adsorbent volume has a g-total BWC of ≤6 g.

**55**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor,

wherein the two-day DBL is no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**56**. The canister system of claim **55** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**57**. The canister system of claim **55** wherein the at least one subsequent adsorbent volume has a an effective butane working capacity (BWC) of less than 3 g/dL.

**58**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL and a g-total BWC of ≤6 grams; and

a heat input unit for heating one or more adsorbent volumes,

wherein the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located within a single canister, or the fuel-side adsorbent volume and the at least one subsequent adsorbent volume are located in separate canisters that are connected to permit sequential contact by fuel vapor,

wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of at least one of: (i) no more than 20 mg at no more than 210 liters of purge applied after a 40 g/hr butane loading step, or (ii) no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**59**. The canister system of claim **55** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**60**. The canister system of claim **58**, wherein the heat input unit includes at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**61**. The canister system of claim **60**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**62**. The canister system of claim **53**, wherein the heat input unit includes at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**63**. The canister system of claim **53**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**64**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor.

**65**. The canister system of claim **64**, wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of at least one of: (i) no more than 20 mg at no more than 210 liters of purge applied after a 40 g/hr butane loading step, or (ii) no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**66**. The canister system of claim **64** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**67**. The canister system of claim **64**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤24 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**68**. The canister system of claim **64**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤16 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**69**. The canister system of claim **64**, further comprising at least one additional subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**70**. The canister system of claim **69**, wherein the at least one additional subsequent adsorbent volume has a lower effective incremental adsorption capacity relative to the subsequent adsorbent volume that precedes it in the flow path from fuel-side to vent-side.

**71**. The canister system of claim **69**, wherein each additional subsequent adsorbent volume has a lower effective incremental adsorption capacity than any preceding subsequent adsorbent volume.

**72**. The canister system of claim **71**, wherein each additional subsequent adsorbent volume has a lower gram-total BWC relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**73**. The canister system of claim **64**, wherein the system further includes at least one heat input unit for heating one or more adsorbent volumes.

**74**. The canister system of claim **73**, wherein the heat input unit include at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**75**. The canister system of claim **73**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**76**. The canister system of claim **64**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, and combinations thereof.

**77**. The canister system of claim **76**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, and combinations thereof.

**78**. The canister system of claim **77** wherein the activated carbon is derived from a material including a member selected from the group consisting of wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm, vegetables, synthetic polymer, natural polymer, lignocellulosic material, and combinations thereof.

**79**. The canister system of claim **78** wherein a form of adsorbent in the fuel-side adsorbent volume, the at least one subsequent adsorbent volume, or both includes a member selected from the group consisting of granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form, structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, and combinations thereof.

**80**. The canister system of any of claim **64**, wherein the at least one subsequent adsorbent volume includes a volumetric diluent.

**81**. The canister system of claim **80**, wherein the volumetric diluent includes a member selected from the group consisting of inert spacer particles, trapped air spaces, foams, fibers, screens, and combinations thereof.

**82**. The canister system of claim **80**, wherein the volumetric diluent includes an adsorbent material formed into a high voidage shape selected from the group consisting of stars, hollow tubes, asterisks, spirals, cylinders, configured ribbons, honeycombs, monoliths, and combinations thereof.

**83**. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane;

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams; and

a heat input unit for heating one or more adsorbent volumes,

wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor.

**84**. The canister system of claim **83**, wherein the canister system has a two-day diurnal breathing loss (DBL) emissions of at least one of: (i) no more than 20 mg at no more than 210 liters of purge applied after a 40 g/hr butane loading step, or (ii) no more than 20 mg at no more than 100 bed volumes (BV) of purge applied after a 40 g/hr butane loading step.

**85**. The canister system of claim **83** wherein the at least one subsequent adsorbent volume has a g-total BWC of between 2 g and 6 g.

**86**. The canister system of claim **83**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤24 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**87**. The canister system of claim **83**, wherein the at least one subsequent adsorbent volume has an effective incremental adsorption capacity at 25° C. of ≤16 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**88**. The canister system of claim **83**, further comprising at least one additional subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane.

**89**. The canister system of claim **88**, wherein the at least one additional subsequent adsorbent volume has a lower effective incremental adsorption capacity relative to the subsequent adsorbent volume that precedes it in the flow path from fuel-side to vent-side.

**90**. The canister system of claim **88**, wherein each additional subsequent adsorbent volume has a lower effective incremental adsorption capacity than any preceding subsequent adsorbent volume.

**91**. The canister system of claim **90**, wherein each additional subsequent adsorbent volume has a lower gram-total BWC relative to the subsequent adsorbent volume that precedes it in the flow path from fuel side to vent side.

**92**. The canister system of claim **83**, wherein the heat input unit include at least one of an internal resistive element, external resistive element, or heat input unit associated with the adsorbent.

**93**. The canister system of claim **83**, wherein the heat input unit includes at least one of a heat transfer fluid, a heat exchanger, a heat conductive element, or a positive temperature coefficient material.

**94**. The canister system of claim **83**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, zeolites, clays, porous polymers, porous alumina, porous silica, molecular sieves, kaolin, titania, ceria, and combinations thereof.

**95**. The canister system of claim **94**, wherein the fuel-side adsorbent volume, subsequent volume or both includes an adsorbent selected from the group consisting of activated carbon, carbon charcoal, and combinations thereof.

**96**. The canister system of claim **95** wherein the activated carbon is derived from a material including a member selected from the group consisting of wood, wood dust, wood flour, cotton linters, peat, coal, coconut, lignite, carbohydrates, petroleum pitch, petroleum coke, coal tar pitch, fruit pits, fruit stones, nut shells, nut pits, sawdust, palm,

vegetables, synthetic polymer, natural polymer, lignocellulosic material, and combinations thereof.

**97**. The canister system of claim **96** wherein a form of adsorbent in the fuel-side adsorbent volume, the at least one subsequent adsorbent volume, or both includes a member selected from the group consisting of granular, pellet, spherical, honeycomb, monolith, pelletized cylindrical, particulate media of uniform shape, particulate media of non-uniform shape, structured media of extruded form, structured media of wound form, structured media of folded form, structured media of pleated form, structured media of corrugated form, structured media of poured form, structured media of bonded form, non-wovens, wovens, sheet, paper, foam, hollow-cylinder, star, twisted spiral, asterisk, configured ribbons, and combinations thereof.

**98**. The canister system of any of claim **83**, wherein the at least one subsequent adsorbent volume includes a volumetric diluent.

**99**. The canister system of claim **98**, wherein the volumetric diluent includes a member selected from the group consisting of inert spacer particles, trapped air spaces, foams, fibers, screens, and combinations thereof.

**100**. The canister system of claim **98**, wherein the volumetric diluent includes an adsorbent material formed into a high voidage shape selected from the group consisting of stars, hollow tubes, asterisks, spirals, cylinders, configured ribbons, honeycombs, monoliths, and combinations thereof.

* * * * *