No. 22-1129

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**BASF CORPORATION,**

*Appellant*,

v.

**INGEVITY SOUTH CAROLINA, LLC,**

*Appellee*.

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board, No. PGR2020-00037

---

# RESPONSE BRIEF FOR APPELLEE

---

Katherine Q. Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Nathaniel R. Scharn
Brian Yang
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
(949) 451-3800

Brian M. Buroker
*Principal Attorney*
Vladimir J. Semendyai
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
BBuroker@gibsondunn.com

*Counsel for Appellee Ingevity South Carolina, LLC*

## REPRESENTATIVE CLAIM

## U.S. Patent No. 10, 323,553 (Claim No. 1)

1. An evaporative emission control canister system, including one or more canisters and comprising:

a fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane; and

at least one subsequent adsorbent volume having an effective incremental adsorption capacity at 25° C. of less than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, an effective butane working capacity (BWC) of less than 3 g/dL, and a g-total BWC of ≤6 grams,

wherein the fuel-side adsorbent volume having an effective incremental adsorption capacity at 25° C. of greater than 35 grams n-butane/L between vapor concentration of 5 vol % and 50 vol % n-butane, and the at least one subsequent adsorbent volume are located within a single canister, or in separate canisters that are connected to permit sequential contact by fuel vapor, and wherein the canister system has a two-day diurnal breathing loss (DBL) of no more than 20 mg at no more than 100 BV of purge applied after a 40 g/hr butane loading step.

## CERTIFICATE OF INTEREST

Counsel for Appellee Ingevity South Carolina, LLC certifies the following:

1. The full name of every entity represented by me is:

   Ingevity South Carolina, LLC

2. The parties named in the caption are the real parties in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of Appellee are as follows:

   Ingevity Corporation

4. The names of all law firms and the partners or associates that appeared for Appellee in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   GIBSON, DUNN & CRUTCHER LLP: David Glandorf

   Formerly of GIBSON, DUNN & CRUTCHER LLP: Omar Amin

   MANGUM RIRIE LLP: Spencer Ririe

5. There are no other pending cases that may affect or be affected by this appeal.

6. There are no organizational victims or bankruptcy case debtors or trustees in this appeal.

Dated: September 21, 2022

*/s/ Brian M. Buroker*

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
BBuroker@gibsondunn.com

# TABLE OF CONTENTS

Page

INTRODUCTION ... 1

STATEMENT OF JURISDICTION ... 3

STATEMENT OF THE ISSUES ... 3

STATEMENT OF THE CASE ... 4

- I. The Challenged Claims of the ’553 Patent Provide an Innovative Solution to the Problem of Fuel Vapor Canister Emissions at Low-Purge Conditions. ... 4
- II. Those Skilled In The Art Knew How To Measure Adsorption Capacity. ... 11
- III. Procedural History ... 13

SUMMARY OF ARGUMENT ... 15

ARGUMENT ... 17

- I. Standard of Review ... 17
- II. The Board Correctly Determined the Challenged Claims Are Not Indefinite Because the Scope of the IAC Limitation Is Defined with Reasonable Certainty. ... 19
  - A. The Challenged Claims Are Not Indefinite Under This Court’s Precedent Because They Identify Exactly What to Measure: Adsorption Capacity. ... 20
  - B. Substantial Evidence Supports the Board’s Well-Reasoned Factual Findings Under Either Party’s Construction of the Law. ... 30
- III. The ’553 Patent Was a Nonobvious Solution for Meeting Emissions Standards in Vehicles with Low- or Infrequent-Purge for Their Fuel Vapor Canisters. ... 39
  - A. The Board Offered a Reasoned (and Correct) Explanation for Its Rejection of BASF’s Argument Related to Modifying Hiltzik’s Vent-Side Adsorbent to Meet the Effective BWC and g-Total BWC Limitations. ... 42

B. BASF's Arguments Disagreeing With The Board's Findings Related to Clontz SAE and Clontz WIPO Do Not Demonstrate a Lack of Substantial Evidence or a Violation of the APA. ......52

IV. BASF Fails to Provide Evidence Concerning Its Reformulated Product Sufficient to Establish Standing ............................................58

CONCLUSION ..........................................................................................63

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................................................................50

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017) ....................................................................18

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....................................................................18

*In re Certain Multi-Stage Fuel Vapor Canister Sys. & Activated Carbon Components Thereof*,
Inv. No. 337-TA-1140, 2020 WL 1026313 (ITC Jan. 28, 2020) .......................35

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)........................................................................................18

*In re Cree, Inc.*,
818 F.3d 694 (Fed. Cir. 2016) ....................................................................2, 41

*In re Dillon*,
919 F.2d 688 (Fed. Cir. 1990) ....................................................................39, 53

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
803 F.3d 620 (Fed. Cir. 2015) ....................................................................24, 25

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
809 F.3d 1223 (Fed. Cir. 2015) ....................................................................35

*Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ....................................................................48

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
796 F.3d 1312 (Fed. Cir. 2015) ............................................................19, 20, 21

*In re Ethicon, Inc.*,
844 F.3d 1344 (Fed. Cir. 2017) ....................................................................50

*FanDuel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020) ..................................................................42, 50

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ....................................................................17

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
983 F.3d 1334 (Fed. Cir. 2020) ....................................................................42

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
655 F.3d 1291 (Fed. Cir. 2011) ....................................................................51

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) ........................................................................56

*In re Hedges*,
783 F.2d 1038 (Fed. Cir. 1986) ..........................................................40, 49, 51

*Heidelberger Druckmaschinen AG v. Hantscho Com. Prods., Inc.*,
21 F.3d 1068 (Fed. Cir. 1994) ......................................................................50

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ....................................................................18

*Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003) ..................................................24, 26, 27, 29

*Hyundai Elecs. Indus. Co. v. ITC*,
899 F.2d 1204 (Fed. Cir. 1990) ....................................................................17

*HZNP Meds. LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ................................................................24, 27

*Ingevity Corp. v. BASF Corp.*,
No. 1:18-cv-01391-RGA (D. Del.)......................................................48, 60, 61

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
456 U.S. 844 (1982)........................................................................................49

*JTEKT Corp. v. GKN Auto. LTD.*,
898 F.3d 1217 (Fed. Cir. 2018) ....................................................................62

*In re Kaslow*,
707 F.2d 1366 (Fed. Cir. 1983) ................................................................39, 53

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) ....................................................................40

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................................................51

*Merck & Co. v. Biocroft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989) ......................................................................57

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....................42

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....................19, 20, 23

*Novartis AG v. Torrent Pharms. Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017)....................18, 36, 38

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011)....................42

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016)....................36, 38

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003)....................50

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)....................50

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
875 F.3d 1369 (Fed. Cir. 2017)....................29

*QuikTrip W., Inc. v. Weigel Stores, Inc.*,
984 F.3d 1031 (Fed. Cir. 2021)....................18, 36

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................58

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
977 F.3d 1232 (Fed. Cir. 2020)....................17

*Synopsys, Inc. v. Mentor Graphics Corp.*,
814 F.3d 1309 (Fed. Cir. 2016)....................20

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
743 F.3d 1359 (Fed. Cir. 2014)....................21, 22

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)....................24, 26

*Yeda Rsch. v. Mylan Pharms. Inc.*,
906 F.3d 1031 (Fed. Cir. 2018)....................56

**Statutes**

5 U.S.C. § 706 ..... 17
35 U.S.C. § 103 ..... 14
35 U.S.C. § 112(b) ..... 14
35 U.S.C. § 271(f) ..... 59

**Other Authority**

About NIST, https://www.nist.gov/about-nist
(last updated Jan. 11, 2022) ..... 34

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellee Ingevity South Carolina, LLC is not aware of any related cases.

## INTRODUCTION

The decision of the Patent Trial and Appeal Board ("the Board") upholding the challenged claims of U.S. Patent No. 10,323,553 ("the '553 Patent") should be affirmed because the Board properly rejected BASF's indefiniteness and obviousness challenges. The Court need not reach those issues, however, because BASF lacks standing to bring this appeal.

***BASF failed to show indefiniteness.*** BASF misconstrues this Court's law of indefiniteness. But even if BASF's reinterpretation of the law were correct, substantial evidence supports the Board's conclusion that the challenged claims are not indefinite because they are directed to an absolute physical property of an adsorbent material—adsorption capacity—that does not vary with the accuracy of measurement. The Board carefully evaluated all record evidence, including peer-reviewed scientific literature, *both* parties' exhibits, and the testimony of BASF's own expert. The Board found the weight of this evidence contradicted BASF's arguments and demonstrated no "fundamentally different measurements of adsorption capacity" between the two known measurement techniques. Appx0029. Instead, as the Board correctly explained and this Court's precedent supports, any difference in the accuracy of measurement is a question of infringement, not indefiniteness. The Board's definiteness conclusion is based on factual determinations that are supported by substantial evidence. BASF's argument on

appeal that the Board was arbitrary and capricious is refuted by the Board's clear and reasoned explanation in its decision.

***BASF failed to show obviousness.*** After reviewing the prior art in BASF's proposed obviousness ground and considering both parties' arguments and evidence, the Board correctly concluded that BASF failed to demonstrate obviousness by a preponderance of the evidence. The Board rejected BASF's sole obviousness ground based on a factual determination that the prior art BASF included in the ground in fact teaches away from the solution claimed in the '553 Patent. Appx0047–0052. The finding of a teaching away is amply supported by substantial evidence, and the Board's clearly explained reasoning again contradicts BASF's charge it was arbitrary and capricious.

BASF's argument on appeal amounts to a mere disagreement with the Board's well-reasoned factual conclusions concerning the prior art and the motivations of a person of ordinary skill in the art ("POSITA"). BASF cites no evidence *compelling* a different conclusion when weighed against the extensive evidence that supports the Board's conclusions, and the Board's "decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016). This Court should therefore affirm.

***BASF has no Article III standing.*** The Court, however, need not reach the merits because BASF lacks standing to appeal. Ingevity has never accused BASF of infringing the challenged patent and BASF has presented no evidence of activities in the United States that present a concrete risk of suit. Thus, this Court should dismiss BASF's appeal for lack of standing.

## STATEMENT OF JURISDICTION

Ingevity disagrees with BASF's jurisdictional statement. The Court lacks subject matter jurisdiction because BASF has no Article III standing to appeal, as explained below.

## STATEMENT OF THE ISSUES

1. Whether the Board properly rejected BASF's indefiniteness ground, based on a careful evaluation of all record evidence, including objective, peer-reviewed literature, both parties' exhibits, and the testimony of BASF's own expert.

2. Whether the Board properly rejected BASF's obviousness ground, including because the prior art on which BASF relied teaches away from the modifications proposed by BASF.

3. Whether BASF failed to establish that it has Article III standing to bring this appeal because it provided no evidence of concrete plans to engage in potentially infringing activity in the United States.

## STATEMENT OF THE CASE

### I. The Challenged Claims of the ’553 Patent Provide an Innovative Solution to the Problem of Fuel Vapor Canister Emissions at Low-Purge Conditions.

The challenged claims of the ’553 Patent relate to evaporative fuel vapor emissions control systems, such as fuel vapor canisters. Appx0076. Fuel vapor canisters operate, fundamentally, by trapping fuel as it evaporates from the vehicle’s gas tank, using beds of adsorbents to which the fuel vapor sticks (“adsorbs”). Appx0101 (’553 Patent), 1:29–38. As fuel turns into vapor in the gas tank, instead of being released directly into the atmosphere, it wafts into the canister. Appx0103, 5:4–23. As the vapor passes through, it sticks to the adsorbents (typically activated carbon) along the way, such that very little vapor remains by the time it reaches the outlet to the atmosphere. Appx0103, 5:4–23; Appx0101, 1:31–33. When the vehicle is operating, fuel vapor may be purged (or unstuck) from the adsorbent volume in the canister using air that is drawn through the fuel vapor canister and into the engine, to be burned as fuel. Appx0101, 1:55–58. The purge air may not “desorb the entire fuel vapor adsorbed on the adsorbent volume,” however, “resulting in a residue hydrocarbon (‘heel’).” Appx0101, 1:58–61. Thus, if fresh air is not drawn into the canister regularly to continually purge the canister, that “heel” residue may desorb and be released into the atmosphere in a process referred to as “diurnal breathing losses” (“DBL”). Appx0101, 1:61–67.

Because purge air is important to control DBL emissions, hybrid vehicles created challenges for evaporative emissions systems. Their internal combustion engines are turned off "nearly half of the time," resulting in "the adsorbents in the canister of a hybrid vehicle [being] purged with fresh air less than half of the time compared to conventional vehicles." Appx0101, 2:37–42, 2:49–55. Thus, there is an increased risk of DBL emissions for low-purge vehicles.

Many working in the field were not focused on problems specific to low-purge vehicles, or pursued solutions such as changing the geometry or resistive heating of the subsequent adsorbent volumes, generally seeking instead to *increase* adsorptive capacity (to trap more fuel vapor) to solve for DBL emissions. Going against the prevailing teachings in the field that adsorbents should have more adsorptive capacity and higher working capacity, the inventors of the '553 Patent discovered that using adsorbent volumes with *lower* adsorptive and desorptive properties (compared to conventional adsorbents) for at least one of the adsorbent volumes in the canister—a "subsequent adsorbent volume"—could significantly reduce evaporative emissions for low-purge vehicles. Figure 4 of the '553 Patent depicts a fuel vapor canister with this subsequent adsorbent volume (301 in the annotated figure) (Appx0082; Appx0102–0103, 4:61–5:3):

## Adsorption




## Purge



The challenged claims define the relatively low desorption characteristics for the subsequent adsorbent volume using various combinations of (1) a low effective butane working capacity ("BWC") (less than 3g/dL), (2) a low g-total BWC (6g/dL or less), or (3) specified low emissions (two-day emissions of 20mg or less) under specified low volumes of purge air.[1] Appx0112, 23:18–40. The prior art included in BASF's grounds fails to disclose these limitations individually and certainly not in the claimed combinations.

**Hiltzik.** For example, before the '553 Patent, U.S. Patent No. RE38,844 ("Hiltzik") provided a solution for reducing bleed emissions from fuel vapor canisters using multiple stages of adsorbent volumes, but was directed to vehicles with standard amounts of purge, not low-purge vehicles. Hiltzik has two common inventors with the '553 Patent (Laurence Hiltzik and Roger Williams) and was developed by one of Ingevity's corporate predecessors, MeadWestvaco. Hiltzik defines the adsorptive properties of its adsorbent volumes in terms of incremental adsorption capacity ("IAC") between 5 and 50 volume % of butane—that is, the difference (or increment) between an adsorbent's capacity to adsorb butane at 5

---

[1] Both effective BWC and g-total BWC are related to the amount of butane purged from an adsorbent. Appx0105 ('553 Patent), 9:43–10:3, 10:10–24. Effective BWC relates to the total butane desorbed, divided by the "effective" adsorbent volume (which includes adsorbents and intervening air gaps between those adsorbents); g-total BWC is the total desorbed butane for an effective volume. Appx0105, 10:53–62.

volume % versus 50 volume %. Appx2213, 7:6–8:59. Hiltzik identifies as a solution to the bleed emissions problem using at least one adsorbent volume with an IAC > 35 g n-butane/L followed by at least one subsequent adsorbent volume with an IAC < 35 g n-butane/L. Appx2214, 10:36–44.

Hiltzik discloses three examples of adsorbent volumes with relatively low IACs: Example 1, "Microsphere Filler Pellets" with an IAC of 24; Example 2, a "carbon-containing honeycomb" with an IAC of 16; and Example 3, "Special Precursor Pellets" with an IAC of 18. Appx2213, 7:6–8:59. Hiltzik discloses testing these solutions for vehicles with relatively high volumes of purge air (400 bed volumes and 150 bed volumes), and the solutions proved effective for those vehicles. Appx2213, 8:52–55. As described in the '553 Patent, however, when later tested under low-purge conditions, canister configurations using subsequent adsorbents similar to Hiltzik's Example 2 honeycomb resulted in emissions nearly triple ('553 Patent Example 5) or more than triple ('553 Patent Example 2) the limit for the targeted regulatory standard. Appx0109, 17:28–44, 18:36–43; Appx0111, Table 4.

Thus, although Hiltzik provides a solution for curbing DBL emissions at the normal purge levels to which it was directed, the disclosed approaches "still [left] DBL emissions at levels that are many times greater" than the regulatory requirement for low-purge vehicles. Appx0101–0102, 2:66–3:3. Even after Hiltzik, those working in the field, including those at Ingevity's predecessor

Westvaco/MeadWestvaco, still needed a solution to address DBL emissions regulations for low-purge vehicles.

**<u>Clontz SAE.</u>**[2] For example, Clontz SAE, a technical paper published in 2007 by four scientists at MeadWestvaco Corp., including '553 Patent inventor Roger Williams, studied the effect of purge volume, geometry, resistive heating, and ethanol fuel blends on the effectiveness of activated carbon honeycombs in fuel vapor canister systems. Appx2265–2266. The authors of Clontz SAE concluded that "[h]igher capacity honeycombs" would be one of the "[i]mprovements over the current honeycomb technology" that would "facilitate achievement of target emissions levels under the reduced purge conditions." Appx2272; Appx0051. To increase the capacity of a honeycomb, one could either make the honeycomb larger while keeping the adsorptive/desorptive properties approximately the same on a volumetric basis, increase the adsorptive capacity / desorption properties of the honeycomb, or both. *See* Appx4938, Appx4940–4941 (Rockstraw Decl.) ¶¶201, 204–205). Clontz SAE discloses that the larger honeycombs—the 41x200mm and 50x150mm honeycombs—performed the best under simulated low-purge conditions. Appx2268; Appx4938. Thus, even after Hiltzik disclosed using a relatively low-IAC subsequent adsorbent volume, those innovating in the field

---

[2] Appx2265–2273 (Reid Clontz, et al., *Effects of Low-Purge Vehicle Applications and Ethanol-Containing Fuels on Evaporative Emissions Canister Performance*, SAE International (2007)).

(including the leading engineers in the field at MeadWestvaco) believed a solution for low-purge vehicles required *increasing* working capacity of the adsorbents.[3] Appx2272, Appx2246.

**Clontz WIPO.**[4] Similarly, Clontz WIPO, published in 2009, names five MeadWestvaco inventors, including Hiltzik inventors Don Tolles and Roger Williams. Appx2239 (Clontz WIPO). Clontz WIPO discloses reducing "emissions from evaporative emissions canisters by the use of resistively heated, adsorbent honeycomb and monolith scrubbers on the atmosphere vent of the canister." Appx2246, Summary. Heating of the canister is intended to increase the amount of fuel vapor desorbed, and therefore, compensate for reduced purge air volume. Thus, the authors of Clontz WIPO focused on an active resistive heating solution.

As the '553 Patent later explains, "[t]hough a passive approach has been greatly desired, existing passive approaches still leave DBL emissions at levels that are many times greater than" what is required under the regulatory standard "when

---

[3] BASF also discussed a reference not part of its grounds—Evaporative Emission Control Technologies for Gasoline Powered Vehicles, Manufacturers of Emission Controls Association (2010) ("MECA"). MECA need not be considered as a result, but even it states that in applications that "result in less available purge air to clean the carbon canister," "canister designs for these applications use a third, smaller chamber" "filled with a *high capacity* carbon." Appx2233 (emphasis added).

[4] Appx2239–2264 (International Patent Publication No. WO 2009/061533).

only a fraction of the historically available purge is now available." Appx0101–0102, 2:66–3:3. The inventors of the '553 Patent were the first to discover that reducing the working capacity to the levels defined in the claims could offer such a passive solution to meet emissions for vehicles that generated limited purge air.[5]

## II. Those Skilled In The Art Knew How To Measure Adsorption Capacity.

In addition to the limitations discussed above, the challenged claims define the claimed adsorbent volumes in part by their effective IAC, which refers to the difference—or increment—in adsorption capacity between different fuel vapor concentrations.[6] Appx0105 ('553 Patent), 9:6–25.

"Adsorption capacity" is a well-known concept in the chemical arts and refers to the capacity of an adsorbent to adsorb. Appx4862 (Rockstraw Decl.) ¶64. It is a fundamental property of an adsorbent, and it is well understood in the field that, "for a given absorb*ent*, its capacity to adsorb is a function of (1) the identity of the [thing being adsorbed, or] adsorb*ate*, (2) the adsorbate's concentration, and (3) the temperature of the adsorbent-adsorbate system," and "specifying these three in turn

---

[5] In claims BASF does not challenge, the inventors also contemplated combining resistive heating with their discovery related to reduced working capacity. *See, e.g.*, Appx0113–0114 ('553 Patent), 26:58–27:15.

[6] The '553 Patent differentiates between effective IAC, which takes into account air gaps between adsorbent volumes being considered in the measurement of IAC, and nominal IAC, which does not. Appx0105, 10:25–52.

specifies the adsorbent's capacity to adsorb the identified adsorbate." Appx4858, Appx4862 (Rockstraw Decl.) ¶¶55, 64. Calculating IAC is, thus, a matter of subtraction using this well-known concept. For example, if at 25° C an adsorbent's adsorption capacity at 5 volume % n-butane is 25 g/L and at 50 volume % n-butane is 41 g/L, the IAC is 16 g/L (41 – 25 = 16).

There are two well-known methods to measure adsorption capacity: The gravimetric method and the volumetric (or manometric) method. *See* Appx4867 (Rockstraw Decl.) ¶74; Appx4139. The gravimetric technique may be implemented with an instrument known as the "McBain instrument," sometimes referred to as the "McBain method." Appx4869–4871 (Rockstraw Decl.) ¶¶78–79; Appx0107 ('553 Patent), 13:63–64. The volumetric technique may be implemented using commercially available instruments, including a Micromeritics ASAP 2020. *See* Appx4874 (Rockstraw Decl.) ¶85; Appx0107 ('553 Patent), 14:52–54.

Both techniques measure the same thing: The adsorption capacity of an adsorbent, which is a fundamental property. Appx4862 (Rockstraw Decl.) ¶63; Appx5751 at 40:10–19. A POSITA would have understood the gravimetric and volumetric methods yield consistent measurements of adsorption capacity if performed using accurate instruments and correct experimental protocols, Appx4866–4867 (Rockstraw Decl.) ¶73; Appx5140 (Zielinski Dep. Tr.) at 52:11–53:7—as both parties' extensive evidence amply demonstrates, s*ee* Appx4875–4894

(Rockstraw Decl.) ¶¶87–118 (citing Appx4157; Appx2503; Appx6019; Appx6094; Appx2310).

For example, peer reviewed literature reported "similar results" and "excellent agreement" between the measurements obtained with the two types of methods. Appx0029. Dr. Zielinski, who oversaw the testing BASF commissioned for this dispute, agreed, testifying that "if [he] measured adsorption capacity on different instruments in [his] laboratory, [he] would expect to receive comparable data" if "[m]easured under the same conditions." Appx5140 (Zielinski Dep. Tr.) at 53:2–7; *see also* Appx0030; Appx5140–5141, Appx5144–5145, Appx5162 (Zielinski Dep. Tr.) at 52:11–53:7, 54:13–22, 69:12–70:3, 139:8–19.

### III. Procedural History

On March 3, 2020, BASF filed two concurrent Petitions requesting post-grant review of claims 1–10, 14–28, 32–38, 51, 52, 55–57, 59, 64–72, and 76–82 (the "challenged claims") of the '553 Patent. One of the petitions raised grounds of enablement and written description, and the other grounds of indefiniteness and obviousness. Appx0121–0122; Appx0134. BASF ranked its petition with enablement and written description grounds higher, Appx0122, but the Board denied institution on those grounds, only instituting on BASF's second petition.

In the instituted petition (Appx0459–0460), BASF argued that the challenged claims were unpatentable on two grounds: first, "[t]he term 'effective incremental

adsorption capacity' render[ed] the challenged claims indefinite under 35 U.S.C. § 112(b)" because, according to BASF, a POSITA would not have known whether to use the gravimetric method or volumetric method to measure IAC and could have had inconsistent results depending on the method used, and second, "[t]he combination of Hiltzik, Clontz WIPO, and Clontz SAE render[ed] the challenged claims obvious under 35 U.S.C. § 103." Appx0134.

The Board issued a Final Written Decision on September 9, 2021, explaining its determination that BASF failed to show any of the challenged claims to be unpatentable. Appx0061–0062. The Board rejected BASF's indefiniteness ground, correctly concluding BASF "ha[d] not shown by a preponderance of the evidence that the gravimetric and volumetric methods provide fundamentally different measurements of adsorption capacity." Appx0029. Ingevity's essentially unrebutted evidence, on the other hand, showed a POSITA understood the two techniques both measure adsorption capacity (and thus IAC). Appx0030.

The Board also correctly concluded BASF had not demonstrated by a preponderance of the evidence that any of the challenged claims would have been obvious over the combination of Hiltzik, Clontz SAE, and Clontz WIPO, Appx0038, Appx0058–0059, primarily because "a preponderance of the evidence [did] not support [BASF's] contention that a person of ordinary skill in the art would have been motivated to dilute the honeycomb of Hiltzik's Example 2 in order to meet

emissions standards at low-purge conditions in view of Clontz SAE and Clontz WIPO," Appx0047.

BASF appealed from the Board's Final Written Decision on November 5, 2021. Appx1655–1656. Ingevity moved to dismiss BASF's appeal for lack of standing because BASF provided no evidence of activities in the United States (a necessary predicate for infringement) and failed to provide competent evidence identifying concrete business plans for BASF's product that BASF alleges would be the subject of an infringement suit. *See* ECF 9. The Court "deem[ed] it the better course for the parties to address the standing issue in their merits briefs," and on that basis denied Ingevity's motion without prejudice. Order, ECF 20, 1–2 (Apr. 13, 2022).

## SUMMARY OF ARGUMENT

**I.** The Board correctly determined the challenged claims are not indefinite. The scope of the challenged element—effective IAC—is defined with reasonable certainty. This Court's precedent makes clear that, where a POSITA knows what property is being measured, the possibility of multiple measurement techniques does not render the claim indefinite. The cases BASF cites do not hold otherwise. Instead, they address claims that are unclear about *what* is actually being measured. In any case, under either party's construct of the law, substantial evidence supports the Board's conclusion that the two methods BASF identified for measuring

adsorption capacity measure the same property and yield consistent results. Minor variations attributable to instrument inaccuracies and imperfect testing conditions do not render a claim directed to an absolute property indefinite. Because the Board clearly articulated its reasoning and adequately addressed the relevant evidence, the decision is not arbitrary and capricious.

**II.** The Board's conclusion that BASF failed to show the challenged claims were obvious over Hiltzik in view of Clontz SAE and Clontz WIPO also was not arbitrary and capricious. Substantial evidence supports the Board's correct conclusion that the prior art did not motivate a POSITA to reduce the effective BWC or g-total BWC of the activated carbon honeycomb disclosed in Hiltzik. To the contrary, Clontz SAE teaches that, to meet the challenges posed by low and reduced purge environments, higher working capacity honeycombs (those with greater BWC and/or g-total BWC values) offered a better solution. Clontz SAE also did not suggest adding further dilution to Hiltzik's already-diluted activated carbon honeycomb. The Board's factual findings on the effective BWC and g-total BWC elements are dispositive of BASF's obviousness challenge. In any event, BASF's arguments directed to the additional "performance limitations" of the challenged claims also fail because the Board's findings are supported by substantial evidence. The Board appropriately considered the supporting and purportedly contradictory evidence, as explained in detail in its Final Written Decision. Thus, the Board's

conclusion that BASF failed to demonstrate the obviousness of the challenged claims is supported by substantial evidence and is not arbitrary and capricious.

**III.** Finally, this Court should not reach the merits of this appeal because it lacks subject-matter jurisdiction to do so. BASF failed to present evidence that it has launched or even has concrete plans to launch an infringing product that would give rise to jurisdiction in the United States for an infringement suit. There is, therefore, no case or controversy sufficient to satisfy Article III.

## ARGUMENT

### I. Standard of Review

Under the Administrative Procedure Act ("APA"), the Board's Final Written Decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law … or unsupported by substantial evidence." *St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1237–38 (Fed. Cir. 2020) (cleaned up) (quoting 5 U.S.C. § 706). "[T]he 'arbitrary, capricious'" standard applies when the "'substantial evidence' test … is deemed inapplicable" and "is generally considered to be the most deferential of the APA standards of review." *In re Gartside*, 203 F.3d 1305, 1312–13 (Fed. Cir. 2000). The "touchstone" of the "arbitrary, capricious" standard "is rationality." *Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed. Cir. 1990).

The Board is "not obliged to discuss every piece of evidence" raised before it for its decision to comply with the APA. *QuikTrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 1036 (Fed. Cir. 2021). Although the Board's refusal to consider evidence bearing on the issue before it may be arbitrary and capricious, *see Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (en banc), "failure to explicitly discuss every issue or every piece of evidence does not alone establish that the tribunal did not consider it," *Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017).

Indefiniteness and obviousness are questions of law based on underlying facts. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). The Board's legal determinations are reviewed de novo, but the Board's factual findings underlying those determinations are reviewed for substantial evidence. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330 (Fed. Cir. 2019). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support the finding." *Id.* "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. The Board Correctly Determined the Challenged Claims Are Not Indefinite Because the Scope of the IAC Limitation Is Defined with Reasonable Certainty.

BASF challenges the Board's conclusion that the claims are not indefinite, contending (1) BASF offered evidence that two techniques may be used to determine a claimed property, effective IAC, and may yield different results, Blue Br. 31–32; and (2) the Board ignored BASF's proffered evidence purportedly supporting its arguments and therefore violated the APA, and the Board's findings are arbitrary and capricious and are not supported by substantial evidence, *id.* at 37–43. BASF is wrong on both counts.

As an initial matter, BASF misinterprets this Court's precedent on indefiniteness: the law does not hold that multiple methods of measuring the same property render a claim indefinite if the results may be somewhat inconsistent. The law requires "only that one skilled in the art must be able to understand *which*" properties "are relevant to the claims and *how* those" properties "can be measured." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014)). Here, there is no doubt about *what* must be measured. In any event, even if BASF's construction were the law (it is not), the Board's conclusion that the challenged claims are not indefinite is still correct because the Board found that the two techniques for measuring the claimed adsorption capacity disclosed in the '553

Patent did not "provide fundamentally different measurements." Appx0029. The Board's decision easily satisfies the APA, providing clear reasoning based on substantial evidence, including peer-reviewed scientific literature, *both* parties' exhibits, and the testimony adduced in the case. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 814 F.3d 1309, 1322 (Fed. Cir. 2016).

### A. The Challenged Claims Are Not Indefinite Under This Court's Precedent Because They Identify Exactly What to Measure: Adsorption Capacity.

#### 1. A Patent Claim Must Identify to a POSITA Only What Must Be Measured.

Section 112 requires a claim to "inform, with *reasonable certainty*, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901 (emphasis added). In the context of claims requiring measurement of a property, Section 112 requires "only that one skilled in the art must be able to understand *which*" properties "are relevant to the claims and *how* those" properties "can be measured." *Ethicon*, 796 F.3d at 1319 (citing *Nautilus*, 572 U.S. at 901). The challenged claims meet this standard because they indisputably identify exactly *what* to measure—adsorption capacity—and the '553 Patent discloses two exemplary techniques for *how* to measure that adsorption capacity.

This Court has explicitly rejected the proposition BASF urges, namely that a claim is indefinite if a claimed property may be measured using different methods yielding inconsistent results. In *Ethicon*, for example, the district court held a claim

requiring measurement of clamping pressure indefinite in part because "four different methods to measure clamping force" existed that "appeared to yield different force measurements." 796 F.3d at 1319. This Court reversed, holding the claim not indefinite because a POSITA would have known which property to measure and how. *Id.* The Court explained that "while the actual tested clamping force measurements *may have varied slightly* between [the four different measurement] methods, this was simply due to natural variances in real-world testing conditions." *Id.* at 1320 (emphasis added).

This Court reached a similar conclusion in *Takeda Pharmaceutical Co. v. Zydus Pharmaceuticals USA, Inc.*, 743 F.3d 1359 (Fed. Cir. 2014) (a pre-*Nautilus* case). The claim at issue required "an average particle diameter" of claimed granules "of 400 µm or less." *Id.* at 1364–65. Appellant there made the exact same argument BASF makes—the claim "is indefinite because it does not specify the method of measurement that should be used to determine average particle diameter," "several methods" existed "that could potentially be used to take that measurement," "and the same sample could be either infringing or non-infringing depending on the measurement technique used." *Id.* at 1366; *cf.* Blue Br. 34. The Court rejected the argument, recognizing "that different measurement techniques could indeed produce different results" due to "the difficulty in measuring the average diameter of particles that are not perfect spheres." 743 F.3d at 1366. But the Court explained that both

measurement techniques were "equally viable method[s]" and there was "no evidence that the differences between these techniques are in fact significant." *Id.* at 1366–67. Rather, the evidence showed that "there is a high degree of correlation for the results," which were "substantially similar." *Id.* at 1367 (cleaned up).

The same is true here. The '553 Patent expressly discloses both the McBain (gravimetric) and ASAP 2020 (volumetric) measurement techniques, and there is no dispute both are viable measurement methods. Appx0107 ('553 Patent), 13:60–64; 14:52–54. Moreover, the Board found both parties' evidence showed "similar results" and "excellent agreement" between the two measurement techniques, these "techniques … were well established in the art as comparable methods of measuring adsorption capacity," and any slight variation in the results was "not … significant" to a POSITA. Appx0029–0030.

Just like in *Takeda*, any discrepancy in the accuracy of the two methods is due to the real-world difficulties of measuring—as BASF's own evidence shows. *See* Appx6231–6232 (Ex. 2085 (redacted Guo Memorandum)) (explaining that whereas ASAP 2020 is automatic and simpler to use, Ingevity's specific McBain device was an old handmade device that involves "a relatively complicated manual control procedure" that is "labor-intensive and time-consuming," with its "accuracy …

heavily depend[ent] on the judgment of the operator");[7] *see also* Appx4917–4923 (Rockstraw Decl.) ¶¶162–168, 170 (Dr. Rockstraw explaining the same). Indeed, before the Board, BASF never directly contradicted Ingevity's showing that variances were "attributable to" real-world difficulties, such as "instrument inaccuracies and experimental error[s]." Appx0028; Appx1118 (arguing only that the McBain device is less precise than the ASAP 2020 device).

Section 112 requires "*reasonable* certainty," not exact certainty. *Nautilus*, 572 U.S. at 910 (emphasis added). The claims here provide much more. As Dr. Zielinski (whom BASF hired to conduct the Intertek study) admitted, the results "would … be 'superimposable' under ideal conditions"—i.e., when both methods are executed perfectly. Appx0030; Appx5144–5145 (Zielinski Dep. Tr.) at 69:12–70:18. Even if practitioners may make real-world instrumental or experimental measurement errors and some instruments may be more (or less) accurate, that does not make the *claims* indefinite or render adsorption capacity—which is an absolute property of the adsorbent being measured—incapable of measurement. Appx0030–0031 (finding "gravimetric and volumetric measurement techniques" are "well established in the art as comparable methods" and thus are "not a basis for determining claim indefiniteness").

---

[7] The Board's decision cites the unredacted version of the Guo Memorandum. Appx0028 (citing Ex. 1041, Appx3033–3048).

### 2. BASF Fundamentally Misinterprets the Cases on Which It Relies.

In support of its flawed indefiniteness argument, BASF contends that this case "is on all fours," Blue Br. 33, with *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620 (Fed. Cir. 2015), and *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015), and is similar to *Honeywell International, Inc. v. ITC*, 341 F.3d 1332 (Fed. Cir. 2003), and *HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680 (Fed. Cir. 2019). But BASF is wrong, because all four cases BASF cites dealt with claims that failed to identify *what* to measure. Here, *what* to measure is clear—adsorption capacity at the parameters specified in the claim. Therefore, none of those four cases support BASF's indefiniteness argument.

BASF argues *Dow* and *Teva* compel a finding of indefiniteness because "[t]he '553 patent explicitly teaches two different approaches to measuring" IAC (a single physical characteristic), these "different measurement methods produced disparate results," and the '553 Patent "provided no guidance on which method to use." Blue Br. 33, 36. But that is not what *Dow* or *Teva* held.

The claims in *Dow* were not held indefinite because multiple methods existed to measure a *single* physical characteristic, but rather because they did not specify which of *several different* physical characteristics to measure and each of multiple methods *measured a different physical characteristic*. *Dow* involved claims that

required calculation of the slope of a curved line (the "slope of strain hardening"). 803 F.3d at 631–33. But a curved line "does not have a single slope." *Id.* at 632. Critically, each of *Dow*'s four "slope" measurement methods measured the slope using *different* data points of the curve's final "strain hardening region," *id.* at 633, and thus provided different calculated slope values, *id.* Specifically, the Court explained in *Dow* that (1) the "10% secant tangent method" measured the slope of "a line … drawn between … the failure point and … 10% before the failure point"; (2) the "final slope method" measured "the slope of a tensile curve just prior to break"; (3) the "most linear method" measured the slope between "two points in the most linear part of the" curve; and (4) the inventor's measurement method used "a linear regression" algorithm to measure slopes of "subsets of fifty data points" taken from "1,500 data points" along the curve. *Id.* (cleaned up).[8] Thus, the Court held the claims invalid because they failed to explain *what* must be measured, and a POSITA would not know which of these characteristics (different slopes between different points along the curve) to measure. *Id.* at 634–35.

---

[8] BASF argued incorrectly below that there was no ambiguity in *Dow* concerning what to measure, Appx1115, relying on the Court's description in *Dow* of that appellant's argument that the different measurement "methods 'all typically occur at the same place—at the end of the curve,'" 803 F.3d at 633 (citation omitted). But the Court made clear in *Dow* that each measurement method measured different slopes of different portions of the curve, *id.*—i.e., the methods measured four different properties, not a single property (adsorption capacity), as the claims require in this case.

Similarly, the claims in *Teva* were held indefinite because they did not specify which of *several different* properties to measure—not because a *single* property could be measured using multiple methods. The claims required measuring "molecular weight," but did not identify which of three different types of "molecular weight" identified in the specification ("peak average molecular weight," "number average molecular weight," and "weight average molecular weight") to measure. 789 F.3d at 1338. Importantly, each type had a "different value[]" and each was "calculated in a different manner." *Id.*; *see id.* at 1341. The Court held the claims indefinite because they "recite[d] 'molecular weight' without specifying the *meaning* of that term" and the term had no "plain meaning to one of skill in the art," so the patent "offer[ed] no guidance on which measure of 'molecular weight' the claims cover." *Id.* at 1341, 1345 (emphasis added). Thus, just as in *Dow*, the Court held that the claims in *Teva* did not specify *what* must be measured.

*Honeywell* fails to support BASF's argument for the same reason. The claims in *Honeywell* required measuring "the melting point elevation ('MPE')" of a prepared sample of a claimed compound. 341 F.3d at 1335. However, there were "four sample preparation methods" known in the art that produced *four different types of samples*, each different sample resulted in a different MPE value, and the patent did not specify which method to use. *Id.* at 1336. The Court observed that the MPE values between different types of samples "can vary greatly." *Id.*

Accordingly, the Court held the claims were indefinite because "[w]ithout any reference to a sample preparation method, there are at least two possible constructions of the [MPE] term," *id.* at 1339, and the claims provided no "guidance as to what" a POSITA "would interpret the claim to require," *id.* at 1340. Again, the claims failed to specify *what* (i.e., which sample produced by which preparation method) to measure.

The claims in *HZNP* also did not explain what to measure. Those claims required measuring "better drying time," but the patent "failed to inform as to the appropriate time frame under which to evaluate" whether the drying time was better. 940 F.3d at 697. Moreover, the two disclosed measurement methods showed significantly diverging results—after thirty minutes, one method resulted in the claimed formulation being "almost completely dry," whereas the other showed no drying at all. *Id.* The Court held the claim indefinite because the two measurement methods provided no "consistent results upon which a POSITA would be able to evaluate 'better drying time.'" *Id.* at 698. Thus, the claims failed to specify at *what* time to measure "better drying time."

The claims here are fundamentally different from the ones considered by the Court in the cases BASF cites. Unlike the multiple slopes of the curved line at issue in *Dow*, the multiple types of molecular weight in *Teva*, the multiple preparation methods and samples in *Honeywell*, and the multiple timeframes for evaluating

better drying time in *HZNP*, the claims at issue here state precisely what must be measured: "incremental adsorption capacity" (IAC). And the claims specify IAC is the difference in adsorption capacity of n-butane between 5 and 50 volume % of butane at 25° C. Appx0112 ('553 Patent), 23:20–29; Appx0020–0021.

BASF's expert agreed in related litigation that "in theory," "'adsorption capacity' is a physical property with a single value for a given set of conditions." Appx6041 (Lyons Expert Rpt.) ¶54; *see also* Appx5845–5846 (Lyons Dep. Tr.) at 121:24–122:6. He also agreed adsorption capacity is a physical property that is defined by the identity of the adsorbate (the thing adsorbed), the adsorbate's concentration, and the temperature at which adsorption occurs. *See* Appx5751 (Lyons Dep. Tr.) at 38:13–39:15, 40:10–41:18; Appx2050–2051 (Lyons Decl.) ¶107. Ingevity's expert agreed as well. *See* Appx4864 (Rockstraw Decl.) ¶68.[9]

Other record evidence is in accord. For example, peer-reviewed literature in the field similarly shows adsorption capacity refers to a single thing for a given set of conditions and is not affected by the choice of a measurement method. *See* Appx4864–4866 (Rockstraw Decl.) ¶¶69–71; Appx0030 (citing Appx4875–4877,

---

[9] Ingevity's expert, Dr. Rockstraw, has conducted extensive research on activated carbon emission control systems and has taught graduate-level courses on adsorption theory for about 25 years. *See* Appx4836–4840 (Rockstraw Decl.) ¶¶8–17. By contrast, BASF's expert, Mr. Lyons, does not hold a doctorate degree, *see* Appx2125, and has never measured adsorption capacity prior to his work with BASF in litigation against Ingevity, *see* Appx5752 (Lyons Dep. Tr.) at 43:3–24.

Appx4894–4897 (Rockstraw Decl.) ¶¶88–91, 119–127). And unlike in *Honeywell*, the choice of sample preparation method here has no effect on the true value of the adsorption capacity (but can impact the *accuracy* of measurement). Appx4864–4866, Appx4903–4910 (Rockstraw Decl.) ¶¶68–72, 136–148; *cf. Honeywell*, 341 F.3d at 1340.

Under a proper reading of *Dow*, *Teva*, *Honeywell*, and *HZNP*, therefore, BASF's argument falls apart. Unlike the multiple claimed properties in those cases, adsorption capacity (and IAC) is a fixed property that does not change based on the measurement technique. It is like the width of this page—the parties might dispute whether a ruler or a micrometer is better suited to measure the width because of the difference in accuracy, but that does not make the page's width indefinite. Instead, as the Board correctly recognized, any differences in the *accuracy* of measurement—i.e., "the proper application of the test methodology in the circumstances of an individual case"—"are disputes about whether there is infringement, not disputes about whether the patent claims are indefinite." Appx0030–0031 (quoting *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1377 (Fed. Cir. 2017)).

A POSITA reading the '553 Patent would know exactly what to measure because it is undisputed that the challenged claims specify all three conditions necessary to determine the claimed adsorption capacity: The adsorbate (n-butane),

the adsorbate concentrations (5 and 50 vol%), and the temperature (25° C). Under a proper application of this Court's precedent, therefore, the claims are not indefinite.

### B. Substantial Evidence Supports the Board's Well-Reasoned Factual Findings Under Either Party's Construction of the Law.

Setting aside BASF's misinterpretation of the law, the Board's decision should be affirmed under either party's view of the law. The Board correctly found both parties' evidence (including peer-reviewed scientific literature) demonstrates that the two methods for measuring adsorption capacity do not result in substantially different results and any minor deviation in accuracy was immaterial to a POSITA. *See* Appx0029–0030. Those factual findings are supported by substantial evidence, and the Board did not refuse to consider evidence bearing on the issue before it, including BASF's made-for-litigation testing data. Appx0029–0030. The Court should therefore affirm the Board's conclusion based on this reasoned fact finding.

#### 1. Substantial Evidence Supports the Board's Finding That the Measurement Techniques Do Not Yield Substantially Different Results.

BASF's argument that substantial evidence does not support the Board's finding should be rejected. The Board explained that "peer-reviewed scientific literature" demonstrated the two measurement techniques at issue here—gravimetric and volumetric—yielded substantially the same results and "were viewed as

compatible with each other" for purposes of measuring adsorption capacity as recited in the challenged claims. Appx0029. The Board expressly cited three peer-reviewed publications (Anson, Zielinski, and Belmabkhout), finding they all reported "similar results" and "excellent agreement" between the measurements obtained with the two types of methods. Appx0029. The Board also found that one of these peer-reviewed articles (which reported "excellent agreement" between the two measurement techniques) was authored by Dr. Zielinski—the same person who oversaw the testing BASF commissioned for these proceedings to attempt to show the techniques yield different results. Appx0029–0030.

Dr. Zielinski (again, the expert BASF hired to perform its testing) corroborated the statements in his paper with sworn testimony, which the Board relied on, that he "expect[ed]" the "gravimetric [McBain] or volumetric [ASAP 2020] technique to yield the same results, or be 'superimposable' under ideal conditions, because they represent '*the same experimental measured quantities*.'" Appx0030 (quoting and citing Appx5140–5141, Appx5144–5145, Appx5162 (Zielinski Dep. Tr.) at 52:11–53:7, 54:13–22, 69:12–70:3, 139:8–19) (emphasis added). Indeed, Dr. Zielinski also testified that "if [he] measured adsorption capacity on different instruments in [his] laboratory, [he] would expect to receive comparable data" if "[m]easured under the same conditions." Appx5140 (Zielinski Dep. Tr.) at 53:2–7.

BASF asked the Board to ignore this peer-reviewed scientific evidence because it concerns adsorption capacity of vapors other than n-butane (such as, for example, hydrogen, nitrogen, and methane). *See* Appx0030. The Board considered and correctly rejected that argument because BASF "d[id] not direct [the Board] to sufficient evidence showing a reason why measurements of n-butane's adsorption capacity would have been subject to different measurement inconsistencies." Appx0030. Indeed, BASF's reply directed the Board to *no evidence* suggesting measurements perform differently for n-butane, or otherwise demonstrating the materiality of the vapor being measured. Appx1119–1120. BASF repeats this unsupported argument here. Blue Br. 40–41.

The Board acknowledged BASF's argument that the scientific evidence showed a possibility of a slight variation in the results obtained by the two measurement techniques (approximately 3%). Appx0030. But the Board explained these articles teach a POSITA "would not have seen such a deviation as significant." Appx0030 (quoting Appx2512[10] ("'[W]e have not observed important discrepancies' between gravimetric and volumetric measurements")); *see* Appx2511 (observing a "average deviation" of "3%"). Indeed, the cited article—BASF's own exhibit—reported that "both methods"—gravimetric and volumetric—"give similar

[10] The Board cited page 849 of Exhibit 1021 (Belmabkhout), but the quoted language appears on page 857.

results" and there is a "good adequacy between the two techniques" if strict "experimental procedure" is followed. Appx2511. Thus, substantial evidence supports the Board's finding that minor deviations in accuracy of measuring an absolute property—adsorption capacity—were not significant to a POSITA.

BASF again points to this insignificant 3% deviation on appeal (Blue Br. 41), but its argument remains flawed for the same reasons—such a small deviation is not significant to a POSITA and the two measurement techniques "yield the same results" if proper experimental protocols are followed, Appx0030. Moreover, BASF admits that any minor deviations in accuracy between the two methods is insignificant to the question of whether the challenged claims are definite because such deviations may not even affect the calculation of the claimed *IAC* (i.e., the difference in adsorption capacity between 5 and 50 volume %). Blue Br. 33 (BASF admitting that even in its commissioned-for-litigation Intertek study, "[t]he discrepancy nearly 'canceled out' for one of the two samples" when calculating IAC (quoting Appx2059)); *see also* Appx2059 (Lyons Decl.) ¶125 (observing that as a result, "the effective IAC varied by only about 1%").

Other record evidence supports the Board's factual findings that the two measurement techniques yield substantially identical results. The Board observed that Ingevity's expert, Dr. Rockstraw, pointed to "numerous additional texts and standards" published before the '553 Patent's filing date "that confirm" substantially

identical results between the two methods "when proper experimental protocols are followed and the instruments' accuracy and precision are taken into consideration." Appx0030 (citing Appx4875–4877, Appx4894–4897 (Rockstraw Decl.) ¶¶88–91, 119–127). For example, the Board cited Dr. Rockstraw's discussion of a publication by the National Institute for Standards and Technology ("NIST")—the U.S. agency responsible for "advancing measurement science, standards, and technology"[11]—describing a state-of-the-art laboratory with gravimetric and volumetric measuring instruments, which NIST uses "'to cross check results'"—meaning POSITAs expect that both types of instruments are measuring the same thing and "provide consistent measurements." Appx4895 (Rockstraw Decl.) ¶121 (quoting Appx6094–6095) (emphasis omitted). The Board also relied on Dr. Rockstraw's opinion that "off-the-shelf instruments for measuring adsorption capacity" (such as the ASAP 2020) and "statistical analysis and basic scientific practices for identifying true values from the basis of measured values" were available before the '553 Patent's priority date. Appx4876–4877 (Rockstraw Decl.) ¶¶89, 91.

The Board found these "numerous additional texts and standards" disclosing substantial similarity between gravimetric and volumetric measuring techniques were "essentially unrebutted by" BASF. Appx0030. Indeed, BASF's reply never

[11] About NIST, https://www.nist.gov/about-nist (last updated Jan. 11, 2022).

addressed any of these additional publications and standards. Appx1119–1120 (discussing only Exhibits 2007 (Anson), 2069 (Zielinski), and 1021 (Belmabkhout)).

There is no basis for BASF's argument that this wealth of evidence—which BASF calls "limited," Blue Br. 40—supporting the Board's finding does not amount to substantial evidence.[12] What BASF really argues is that *its* interpretation of what this peer-reviewed scientific evidence discloses to a POSITA should prevail over the Board's. But that is a factual question the Board already resolved against BASF. *See Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 809 F.3d 1223, 1225 (Fed. Cir. 2015) (Moore, J., concurring in the denial of the petition for rehearing en banc) (in an indefiniteness analysis, "[a] question about the state of the knowledge of a skilled artisan is a question of fact"). The Board's factual findings are supported by substantial evidence and BASF's mere disagreement with those findings is no reason for the Court to disturb them.

#### 2. The Board's Evaluation of the Evidence Was Not Arbitrary or Capricious.

The Board also did not refuse to consider evidence bearing on the issue before it. It is axiomatic that under the APA, the Board need not "discuss every piece of

---

[12] Indeed, BASF also previously lost this argument before the International Trade Commission with respect to Hiltzik, *see In re Certain Multi-Stage Fuel Vapor Canister Sys. & Activated Carbon Components Thereof*, Inv. No. 337-TA-1140, 2020 WL 1026313, at *42–46 (ITC Jan. 28, 2020) (Initial Determination).

evidence" presented by the parties. *QuikTrip*, 984 F.3d at 1036; *see Novartis*, 853 F.3d at 1328 (collecting cases). This Court "do[es] not require perfect explanations" from the Board and "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382–83 (Fed. Cir. 2016) (cleaned up).

The Board's path here is clear. The Board explained both parties' arguments and evidence, *see* Appx0027–0029, and then "[u]pon review of" those "arguments and evidence," Appx0029, the Board concluded that BASF failed to show that the claims were indefinite, Appx0030–0031. The Board "cited to the relevant pages," *Novartis*, 853 F.3d at 1328, of BASF's briefing and its evidence, *see* Appx0027–0029, and explained why it did not agree with that evidence or BASF's arguments, *see* Appx0030.

Indeed, the Board referenced BASF's arguments about Dr. Guo's memorandum and the BASF-commissioned Intertek study "over[seen]" by Dr. Zielinski, Appx0028–0029, and cited that study and Dr. Zielinski's testimony in its analysis, Appx0029–0030. The Board also discussed and rejected BASF's argument that "a 3% deviation" between gravimetric and volumetric methods was significant, explaining that BASF's own Exhibit 1021 (Belmabkhout) contradicted its argument. Appx0030. Thus, there is "no reason to assume the Board failed to consider" BASF's arguments or evidence, *Novartis*, 853 F.3d at 1328—the Board expressly

considered and discussed them, and so its decision could not have been arbitrary or capricious.

BASF attempts to inflate the Board's statement that it "need not address [BASF's] allegations as to the measurement differences reported by Intertek in Exhibit 1020," Appx0031, into a purported refusal to consider relevant evidence, Blue Br. 37–38, but BASF misunderstands the Board's analysis. The Board stated it "need not address [BASF's] *allegations*," Appx0031 (emphasis added)—i.e., BASF's characterizations—not its *evidence*. Nonetheless, the Board *did* consider BASF's arguments—then cited BASF's evidence (including the Intertek study, Dr. Guo's memorandum, and BASF's Exhibit 1021 (Belmabkhout)) and explained why that evidence fell short of demonstrating indefiniteness. Appx0027–0031. That is all the APA requires.

More importantly, the Board *accepted* that BASF's evidence (and Ingevity's evidence) showed some "measurement differences" and "deviation" in the accuracy between the two methods. Appx0030–0031. But the Board found that evidence "not persuasive" because differences in the *accuracy* of measurement are relevant to infringement, not definiteness, and the Board concluded such differences were not even "significant" to a POSITA. Appx0030–0031.

Once the Board concluded that minor inaccuracies between the two methods were not relevant to determining indefiniteness because the two methods "were well

established in the art as *comparable* methods of measuring adsorption capacity," Appx0030–0031 (emphasis added), there was no reason for it to further discuss cumulative evidence demonstrating similar minor inaccuracies, which would simply be consistent with its findings. This is particularly so because the Intertek study and Dr. Guo's memorandum do not show that the gravimetric and volumetric methods measure different characteristics (as required by *Dow*, *Teva*, *Honeywell*, and *HZNP*)—which *would* have been relevant to the question of indefiniteness. But the Board's decision not to "address" (i.e., explicitly discuss) BASF's cumulative evidence or arguments does not mean that the Board did not consider them—indeed, the Board expressly cited them. *See* Appx0027–0030; *Novartis*, 853 F.3d at 1328 ("[F]ailure to explicitly discuss every issue or every piece of evidence does not alone establish that the tribunal did not consider it").

Because the Board considered all evidence before it, cited in its decision all relevant evidence proffered by both parties, and provided a detailed explanation of its reasoning, its "path may reasonably be discerned." *NuVasive*, 842 F.3d at 1382–83. The APA requires no more, and for the reasons discussed above, this Court should affirm the Board's conclusion that the challenged claims are not indefinite.

## III. The ’553 Patent Was a Nonobvious Solution for Meeting Emissions Standards in Vehicles with Low- or Infrequent-Purge for Their Fuel Vapor Canisters.

BASF’s challenge to the Board’s nonobviousness decision improperly asks this Court to reevaluate evidence the Board considered and rejected and to substitute its judgment for the Board’s. BASF’s arguments lack merit because the Board’s factual findings and conclusions were supported by substantial evidence (indeed, overwhelming evidence) and there is no basis for BASF’s argument the Board’s decision was arbitrary and capricious.

The challenged claims include two sets of key limitations important on appeal: vent-side working capacity limitations (effective BWC of less than 3g/dL and g-total BWC of 6g or less) and low-purge performance limitations (two-day emissions of 20mg or less under specified low volumes of purge air).[13] BASF attempts to divorce these limitations, presenting its argument in two parts. First, BASF contends Hiltzik *alone* renders obvious the capacity limitations and argues the Board erred by rejecting BASF’s suggestion to consider Hiltzik in isolation and find a POSITA would have reduced Hiltzik’s disclosed effective BWC and g-total BWC to the limits

---

[13] Each challenged claim includes at least two and in many cases all three of these elements, and BASF did not raise separate challenges for different claims. *In re Kaslow*, 707 F.2d 1366, 1376 (Fed. Cir. 1983) (“Since the claims are not separately argued, they all stand or fall together.”); *In re Dillon*, 919 F.2d 688, 692 (Fed. Cir. 1990) (this Court does not “review claims that an applicant has not separately argued at the Board level, because, *inter alia*, we lack the benefit of the Board’s reasoned decision on the separate patentability of those claims”).

recited in the challenged claims. Blue Br. 44–51. BASF then separately turns to the other references included in the obviousness ground, arguing they teach the low-purge performance limitations and it was error for the Board to conclude the prior art teaches away from the claimed combination. *Id.* at 51–60.

BASF's contention the Board erred by rejecting an argument about what Hiltzik *alone* would teach fails in the first instance because BASF never presented a ground based on Hiltzik alone. Importantly, Hiltzik does not concern low-purge systems, and BASF concedes the low-purge performance limitation is "missing from Hiltzik." Blue Br. 51. BASF therefore *combined* Hiltzik with Clontz SAE and Clontz WIPO for its sole obviousness ground. Thus, contrary to BASF's urging, it would have been error for the Board to consider Hiltzik alone. *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336–37 (Fed. Cir. 2020) ("The Board does not enjoy a license to depart from the petition and institute a *different* inter partes review of [its] own design." (cleaned up)).

Presented with the proposed combination, the Board correctly evaluated "the prior art as a whole," *In re Hedges*, 783 F.2d 1038, 1041 (Fed. Cir. 1986), and found the art BASF relied on for the low-purge limitations actually teaches away from reducing the capacity of Hiltzik's honeycomb to meet the challenges posed by low-purge vehicles. The Board found the prior art was "directly contrary to [BASF's] contention that a [POSITA] would have been motivated to reduce the capacity of

Hiltzik's Example 2 honeycomb in order to meet the emissions requirements of [the low-purge performance] claim limitation." Appx0048–0049.

After closely examining each reference together with the related testimony and documentary evidence BASF supplied, the Board properly concluded: (1) Clontz SAE teaches precisely the opposite modification BASF urged, because Clontz SAE concluded *increasing* working capacity for a low-purge environment was necessary (achieved by increasing effective BWC and/or increasing g-total BWC) and (2) even considered on its own, Hiltzik did not provide a motivation to reduce effective BWC below 3g/dL and/or g-total BWC to 6g or lower for its vent-side adsorbent volumes.[14] Appx0047–0052, Appx0057.

The Board's conclusions are supported by overwhelming evidence—far more than is needed to meet the unexacting substantial evidence standard. *In re Cree*, 818 F.3d at 701 (Even where two "inconsistent conclusions may reasonably be drawn from the evidence in record, [the Board]'s decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence."). Moreover, the Board identified a "rational connection between the facts found and the choice made," such that the decision is not arbitrary and capricious.

[14] The Board also correctly found that Clontz WIPO, discussed in Section III.B, did not provide a motivation for a POSITA to reduce the effective BWC below 3g/dL and the g-total BWC to 6g or lower for Hiltzik's vent-side adsorbent volumes.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### A. The Board Offered a Reasoned (and Correct) Explanation for Its Rejection of BASF's Argument Related to Modifying Hiltzik's Vent-Side Adsorbent to Meet the Effective BWC and g-Total BWC Limitations.

The Board considered BASF's arguments and evidence, but concluded BASF failed to meet its burden to show a POSITA would have been motivated to modify the prior art to arrive at the claimed invention. The Court may not "reweigh [this] evidence on appeal," *In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011), but that is exactly what BASF asks this Court to do.

#### 1. Substantial Evidence Supports the Board's Finding Clontz SAE Teaches Away from the Claimed Solution.

Substantial evidence supports the Board's finding Clontz SAE teaches away from diluting Hiltzik's honeycomb to meet the claimed working capacity limitations in a low-purge environment, and this finding is rationally tied to that evidence. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1345 (Fed. Cir. 2020) ("[F]actual questions here include whether a prior art reference teaches away."); *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1343 (Fed. Cir. 2020) ("[T]he scope and content of the prior art" and "motivations to modify or combine prior art" are factual determinations reviewed for substantial evidence).

In particular, the Board found that Clontz SAE teaches that, "as compared to Hiltzik's honeycomb, ***higher*** working capacity honeycombs 'facilitate achievement of target emissions levels under the reduced purge conditions.'" Appx0047–0048 (emphasis added) (quoting Appx2272 (Clontz SAE, 1720)). The Board further found "Clontz SAE's Figure 3[] demonstrat[es] the relationship between purge volume and canister emissions, [and] teaches 'the larger 41 mm x 150 mm honeycomb exhibited lower emissions levels than the 29 mm x 100 mm honeycomb at purge volumes of less than 200 bed volumes.'" Appx0048 (quoting Appx2268 (Clontz SAE, 1716)). The Board also found Clontz SAE teaches larger "honeycomb configurations have more total working capacity," here g-total BWC, "due to their larger size." Appx0037 (quoting Appx2269 (Clontz SAE)); *accord* Appx0043 (Board recognizing g-total BWC's relationship to volume of the adsorbent); Appx0021 (same). That is, according to Clontz SAE's Figure 3, larger honeycombs

with higher working capacities performed better for lower purge environments, and thus motivated *higher* BWC.[15] Appx0047–0048.

The Board also pointed to Clontz SAE's Figure 4, which provides "emissions test results for 'Alternative Honeycomb Geometries,' [and] compares the baseline Configuration A honeycomb," which BASF acknowledged "has the same dimensions as Hiltzik's Example 2 honeycomb," to "Configurations C and D, 'which have ***more total working capacity*** due to their larger size as compared to the baseline honeycomb." Appx0048 & n.13 (emphasis added) (quoting Appx2269 (Clontz SAE, 1717)). The Board then found Clontz SAE teaches the Configuration C and D honeycombs—ones with *more* total working capacity—"showed approximately 45% and 60% improvement [in emissions reduction] as compared to the baseline" honeycomb with the same dimensions as the Hiltzik honeycomb. Appx0048 (quoting Appx2269 (Clontz SAE, 1717)). The Board likewise found Clontz SAE "repeats this statement in its ultimate conclusion, which states 'higher

[15] BASF argues Clontz SAE's teachings to increase working capacity are related to increasing the honeycomb size, not the adsorption characteristics of honeycombs. Blue Br. 55. As the Board found, however, BASF's "own arguments as to Clontz SAE … partially contradict[ed] each other," as BASF argued in its Reply that Clontz SAE's teachings to increase working capacity related only to g-total BWC, not "effective or nominal BWC," but in its Petition had argued that POSITA would consider the two properties in tandem, such that a POSITA "would understand that reducing effective BWC below 3 g/dL would also achieve g-total BWC ≤ 6 grams" for a honeycomb like the one used in Hiltzik. Appx0049 (emphasis omitted) (citing Appx0215, Appx1099).

capacity honeycombs,' among other factors, will 'facilitate achievement of target emissions levels under the reduced purge conditions.'" Appx0048 (quoting Appx2272 (Clontz SAE, 1720)).

Substantial evidence thus plainly supports—indeed, proves correct—the Board's conclusion that Clontz SAE's teachings "are directly contrary to [BASF's] contention that a person of ordinary skill in the art would have been motivated to reduce the capacity of Hiltzik's Example 2 honeycomb." Appx0048–0049; Appx4937–4944 (Rockstraw Decl.) ¶¶200–210.

The Board also addressed BASF's purported contrary evidence. BASF argued Clontz SAE suggests using a volumetrically diluted honeycomb to meet low-purge emission standards. Appx0049 (citing Appx1099 (BASF Reply, 6)). But as the Board correctly observed, "Clontz SAE never mentions dilution," and further dilution was not offered as a possible solution to the low-purge problem addressed in Clontz SAE. Appx0049. Instead, Clontz SAE pointed to, among other properties, *increased* working capacity as a solution. Appx0049.

Thus, Clontz SAE provides substantial evidence supporting the Board's finding the reference teaches away from the solution claimed in the '553 Patent.

### 2. Substantial Evidence Supports the Board's Finding Hiltzik Would Not Have Motivated a POSITA to Further Dilute Its Adsorbents.

Although the Board correctly considered Hiltzik in the context of the prior art as a whole—including as part of the combination identified in BASF's grounds—even if it could be considered alone, the Board's conclusion Hiltzik did not motivate a POSITA to reduce the effective BWC of its Example 2 honeycomb below 3g/dL and/or the g-total BWC to 6g or lower is supported by substantial evidence. Appx0051. Hiltzik presents each of its three examples as viable options for reducing bleed emissions, and is silent about whether further dilution may lead to better results. Appx2213–2214 (Hiltzik), 8:61–9:4; *see* Appx0044. Hiltzik does not state Example 2 is preferred, or teach reducing adsorptive properties by as much as possible is the best solution, let alone in low-purge systems. *See* Appx2213–2214 (Hiltzik), 8:5–9:4, Table; *see* Appx0044.

Both Clontz WIPO and Clontz SAE, published after Hiltzik, bear this out. Importantly, the authors of Clontz WIPO and Clontz SAE partially overlap with Hiltzik's inventors, and all three references relate to efforts by the same company—MeadWestvaco—in the fuel vapor canister emissions space. Appx2205 (Hiltzik); Appx2239 (Clontz WIPO); Appx2265 (Clontz SAE). These extraordinarily skilled artisans working at the industry-leading supplier of fuel vapor canister adsorbents had subjective reasons to rely on the teachings from these three references. Yet,

despite partly sharing authorship with Hiltzik's inventors, neither Clontz WIPO nor Clontz SAE suggests further reducing either the effective BWC or g-total BWC (or even IAC) of Hiltzik's Example 2 honeycomb or other vent-side adsorbents as a possible solution to the unique challenges in low-purge environments—they teach the opposite. *See generally* Appx2239–2264 (Clontz WIPO); Appx2265–2273 (Clontz SAE). That is because such modifications simply were not obvious to a POSITA. Indeed, as BASF conceded, neither Clontz WIPO nor Clontz SAE disclose the IAC or BWC of the honeycombs tested (Appx0039), demonstrating that, even after Hiltzik described its invention, POSITAs were not focused on these characteristics while searching for a solution to the low-purge problem.

The Board's findings are supported by substantial evidence, and the Board did not fail to consider any evidence allegedly contradicting its conclusions. Rather, the Board considered, weighed, and made factual findings regarding the evidence that both supported and arguably detracted from its conclusion. For example, BASF argues (as it did below) the Board's conclusion that Hiltzik does not motivate dilution of its Example 2 honeycomb is at odds with the testimony of Dr. Rockstraw, who testified in district court litigation a POSITA "would understand from Hiltzik

'the potential desirability' of reducing BWC below 3 g/dL."[16] Appx0051; Blue Br. 47–49. BASF wrongly asserts the Board discounted this testimony "without explanation," Blue Br. 25, but the Board carefully considered it and even "agree[d]" with BASF it was "contradictory evidence" that "weighs against our finding that Hiltzik alone would not suggest reducing its effective BWC below 3g/dL or its g-total BWC below 6g," Appx0051.

Nonetheless, the Board then fulfilled its responsibilities as the fact-finder by weighing *all* of the evidence and concluding that "Dr. Rockstraw's opinion as to Hiltzik's teachings (which are *not in the context of a low-purge system*) does not overcome Clontz SAE's strong suggestion that honeycombs with higher capacity than Hiltzik's would be desirable for achieving the emissions requirements *at low-purge conditions*." Appx0051 (emphases added); *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1358–59 (Fed. Cir. 2018) ("The [Board] is entitled to

---

[16] Dr. Rockstraw's deposition testimony arose in the context of BASF's § 112 challenges to Hiltzik in district court litigation and was unrelated to solutions for low or reduced purge environments. *See* Appx0051. For low-purge vehicles, however, Dr. Rockstraw was unequivocal that the prior art does not motivate further dilution of a honeycomb, but rather teaches increasing working capacity as a solution. Appx4937–4944 (Rockstraw Decl.) ¶¶200–210. Indeed, directly contradicting its current argument, BASF argued in district court that Hiltzik "fails to teach persons of ordinary skill in the art how to make and/or use adsorbent materials having an IAC … lower than 16 g/L," which BASF states equates to a BWC of 4 g/dL. Appx6106, ¶303; Blue Br. 16; *accord* Joint Claim Construction Brief at 6, *Ingevity Corp. v. BASF Corp.*, No. 1:18-cv-01391-RGA (D. Del. June 22, 2020), ECF 313 (BASF arguing "there is no dispute that [Hiltzik] does not teach a subsequent [i.e., vent-side] adsorbent volume with a BWC less than 3 g/dL.").

weigh" the evidence, including testimony, and this Court "will not find legal error based upon an isolated statement stripped from its context" (cleaned up)); *Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1342 n.6 (Fed. Cir. 2018) (sustaining the Board's finding where expert "testified … a POSITA would have modified [the prior art] to achieve the claimed invention" but "the Board discounted his testimony as being inconsistent with [the prior art]'s teachings").

Thus, the Board correctly evaluated "the prior art as a whole," *In re Hedges*, 783 F.2d at 1041, and found Clontz SAE—which was authored after Hiltzik, sponsored by the same company as Hiltzik, and included a Hiltzik inventor as author—persuasively demonstrated a POSITA would not have been motivated to dilute Hiltzik's honeycomb for low-purge systems, but would have understood from the prior art as a whole that "honeycombs with higher capacity than Hiltzik's would be desirable for achieving the emissions requirements at low-purge conditions," Appx0051; *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982) ("Determining the weight and credibility of the evidence is the special province of

the trier of fact."); *FanDuel*, 966 F.3d at 1344 ("[I]t remains the Board's essential function to make factual findings based on its view of the record.").[17]

BASF's argument that the teachings in Hiltzik and Dr. Rockstraw's testimony show modifying Hiltzik to use a lower capacity honeycomb was "a matter of routine experimentation" to find "an optimum value," Blue Br. 47–50, lacks merit and fails to demonstrate the Board's findings lack substantial evidence support.

BASF wrongly relies on *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003), *In re Ethicon, Inc.*, 844 F.3d 1344 (Fed. Cir. 2017), *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007), and *In re Applied Materials, Inc.*, 692 F.3d 1289 (Fed. Cir. 2012), to argue a "*prima facie*" obviousness case "exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." Blue Br. 49–50 (cleaned up). BASF's reliance on these cases is misplaced because it overlooks that Hiltzik is not related to low-purge systems and does not suggest further dilution to achieve better results *under low purge*. Moreover, BASF's argument is premised on its contention it would be obvious to try all working capacities within the range

---

[17] BASF suggests modifying Hiltzik's honeycomb would be obvious because "that is exactly what" the '553 Patent did. Blue Br. 48–49. But "[t]he motivation to combine references [cannot] come from the invention itself." *Heidelberger Druckmaschinen AG v. Hantscho Com. Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994). And in any event, the Clontz references show that an overlapping group of extraordinarily skilled artisans tried numerous other solutions before discovering the invention of the challenged claims. *See supra* Statement of the Case § I.

disclosed by Hiltzik, which is contrary to Federal Circuit precedent. "To establish *prima facie* obviousness, there must be adequate support in the prior art for the change in structure." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1304 (Fed. Cir. 2011) (cleaned up). There must be "a reason that would have prompted a [POSITA] to combine the elements in the way the claimed new invention does." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).

In *Genetics*, this Court held a patent for a recombinant protein claiming a range of amino acid deletions did not render obvious a patent for a recombinant protein claiming a narrower range of amino acid deletions subsumed within the range claimed by the older patent. 655 F.3d at 1306. The Court explained "the typical desire of scientists to find an optimum value within a narrow disclosed range" did not apply where the field's understanding was that the narrower range was unlikely to be optimum. *Id.*

Likewise here, a POSITA would have believed the lower claimed BWC ranges would not be optimum because, as discussed above, neither Hiltzik nor the Clontz references provide a motivation to dilute the Honeycomb of Example 2 for low-purge systems and, as the Board found, Clontz SAE would have motivated a POSITA to *increase* working capacity of the fuel-side honeycomb—not lower it. The Board committed no error by considering "the prior art as a whole," *Hedges*, 783 F.2d at 1041, and finding it contradicted BASF's arguments.

Thus, the Board's conclusion is supported by substantial evidence and is not arbitrary and capricious.

### B. BASF's Arguments Disagreeing With The Board's Findings Related to Clontz SAE and Clontz WIPO Do Not Demonstrate a Lack of Substantial Evidence or a Violation of the APA.

BASF disputes the Board's findings that Clontz SAE and Clontz WIPO would not have motivated a POSITA to dilute Hiltzik's honeycomb to meet low-purge challenges, but none of BASF's arguments demonstrates a lack of substantial evidence support for the Board's conclusions or a violation of the APA. Blue Br. 51–60. BASF raises five scattershot arguments challenging the Board's findings, but each fails.

*First*, BASF argues the Board "misconstrued Clontz SAE's teaching, which was directed to '[i]ncreased *honeycomb* working capacity,'" which is "the equivalent of *g-total* BWC, rather than BWC," and relates to "using larger honeycombs, not varying the inherent BWC property of those honeycombs." Blue Br. 54. BASF's argument misses the mark in the first instance because all but one of the challenged claims require *lowering g-total BWC*—so BASF's concession Clontz SAE teaches *increasing* g-total BWC is an admission the reference teaches away from the

claims.[18] Moreover, a POSITA would recognize that one could increase working capacity by making the honeycomb larger while keeping the adsorptive capacity approximately the same on a volumetric basis (increasing g-total BWC), increasing the adsorptive capacity of the honeycomb (increasing effective BWC), or both. *See* Appx4938, Appx4940–4941 (Rockstraw Decl.) ¶¶201, 204–205. Here, the Board plainly understood Clontz SAE's teachings (including the correlation of working capacity to honeycomb size) and committed no error. Appx0048 (citing Appx2268–2269 (Clontz SAE, 1716–17)).

*Second*, BASF argues that Clontz SAE's teaching away should be discounted because "Clontz SAE did not draw any firm conclusions about the importance of '[i]ncreased honeycomb working capacity'—*i.e.*, higher *g-total* BWC." Blue Br. 56. BASF cites no authority to support this point because a teaching need not be disclosed with a particular degree of certainty for a fact-finder to consider it. The Board did its duty as fact-finder to evaluate and assign weight to Clontz SAE's teaching, which the Board appropriately recognized was one possible modification "among other factors," and concluded that this teaching would not motivate a

---

[18] BASF did not make a separate argument for claim 51, the only claim that does not require lower g-total BWC. Because BASF argued the challenged claims together, it may not for the first time on appeal raise a separate challenge to certain claims. *Kaslow*, 707 F.2d at 1376; *Dillon*, 919 F.2d at 692.

POSITA to modify Hiltzik's Example 2 honeycomb as BASF argued. Appx0047–0048.

*Third*, BASF argues (for the first time on appeal) that, despite Clontz SAE's plain statement that "'increased honeycomb working capacity' will 'improve emissions performance,'" Appx0048 (quoting Appx2269 (Clontz SAE, 1717)), Clontz SAE does not actually teach away from the claimed *lower* working capacity, or g-total BWC, because a POSITA could have used multiple honeycombs of different adsorption capacities. As the Board recognized, however, Clontz SAE discusses "changes to the baseline part" to "improve emissions performance," Appx0048 (quoting Appx2269 (Clontz SAE, 1717)), and BASF does not identify any teachings from Clontz SAE that would have motivated a POSITA to include a lower BWC honeycomb in series with a higher BWC honeycomb, *see* Blue Br. 56–57. To the contrary, Clontz SAE does not discuss the BWC of the three 41x50mm honeycombs used in series (test configuration B in Table 3), and Table 2 indicates the authors used three identical honeycombs. *See* Appx2268.

*Fourth*, BASF argues "Clontz SAE did not contradict or undermine Hiltzik's teachings about the advantages of lower-BWC honeycombs for reducing DBL emissions." Blue Br. 57. As discussed above, however, the Board's finding to the contrary was based on substantial evidence. *See supra* Argument § III.A. BASF's

request for this Court to make a new, different factual finding, and to substitute its finding for the Board's would violate the APA.

In support of this argument, BASF also wrongly asserts "[t]he Board incorrectly stated that Clontz WIPO teaches *only* 'the use of resistive heating of the honeycomb.'" Blue Br. 57 (quoting Appx0050). BASF is wrong. The Board recognized the very teaching BASF contends the Board "ignore[d]," *id.*—that Clontz WIPO teaches that "[n]onbinding electrical conductivity additives … may be added for a *dual role* of adjusting the adsorption properties to flatten the equilibrium isotherm slope, plus obtaining resistivity within the desired range," Appx0050 (alterations in original; emphasis added). But the Board found that "context suggests that this statement does not relate to further additives, but rather to 'the extrusion formulation ingredients [that] partially dilute the carbon adsorbent' ***already present*** in the honeycomb." Appx0050 (alteration in original; emphasis added) (quoting Appx2246–2247, Appx2249 (Clontz WIPO) ¶¶17, 22); Appx4945–4946 (Rockstraw Decl.) ¶216.

Thus, the Board found that Clontz WIPO did not suggest *further* diluting a honeycomb, but rather pointed out that otherwise useful ingredients (such as conductivity additives) may be used to achieve the existing level of dilution. This is similar to instructions on a box of pancake mix teaching that you can use one cup of

water or one cup of milk to make the batter. It is not an instruction to add milk on top of water to give the pancakes a diluted consistency.

BASF also faults the Board for not citing in its analysis an industry publication, MECA, arguing that the Board's alleged "failure to consider MECA—evidence that detracted from its conclusion—was error." Blue Br. 59. But BASF chose not to include MECA in its obviousness ground and it was not part of the instituted grounds. Moreover, instead of detracting from the Board's conclusion, MECA undercuts BASF's argument. Rather than teaching existing honeycombs should be further diluted, MECA instead states that the honeycomb housing "is filled with a *high capacity* carbon that is often extruded into a honeycomb shape to maximize geometric surface area while minimizing flow restriction." Appx2233 (emphasis added); Appx4940–4941 (Rockstraw Decl.) ¶205. Thus, the Board cannot be faulted for declining to cite it in its analysis. *Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018) ("[F]ailure to explicitly discuss every fleeting reference or minor argument does not alone establish that the Board did not consider it.").

*Fifth*, BASF argues Clontz SAE's teaching away should be disregarded because when "a claimed method 'is usable and has been used,' a teaching-away argument does not refute obviousness, even if a reference suggests that the method is inferior." Blue Br. 59 (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994);

*Merck & Co. v. Biocroft Labs., Inc.*, 874 F.2d 804, 707–08 (Fed. Cir. 1989)). BASF relies primarily on Figure 6 of Clontz SAE for its argument a honeycomb allegedly equivalent to Hiltzik's—that is, with an effective BWC of 4g/dL and a g-total BWC of 8g—could meet the performance limitation. Blue Br. 52–53. But even accepting for the sake of argument that the Figure 6 honeycomb is equivalent to Hiltzik's, BASF fails to explain why the use of a honeycomb with *higher* working capacity than that required by the challenged claims alongside Clontz SAE's explicit recommendation to use an *even higher* working capacity to meet the low-purge problem would have motivated a POSITA to do the opposite—lower the working capacity of Hiltzik's honeycomb. Thus, BASF's argument fails because its references do not show that the invention meeting each element of the claims of the '553 Patent was usable and had been used, but instead at best describe using other methods with higher effective BWC and g-total BWC—which, like Hiltzik's Example 2 honeycomb, are not within the scope of the challenged claims.

In sum, substantial evidence supports the Board's finding that a POSITA would not have been motivated to dilute the honeycomb of Hiltzik to meet the performance limitations, and the Court should decline BASF's invitation to substitute its fact findings for the Board's.

## IV. BASF Fails to Provide Evidence Concerning Its Reformulated Product Sufficient to Establish Standing.

BASF has the burden to establish it has standing to pursue this appeal. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016). It has failed to meet that burden. Even accepting BASF's allegation that its reformulated EvapTrap XC product could meet the technical limitations of the '553 Patent claims if used in a fuel vapor canister with other products from third parties, Blue Br. 63, BASF failed to meet its burden to show a concrete risk of activities that could give rise to an infringement suit. In particular, BASF provided no evidence of a likely infringing act in the United States (a necessary predicate for infringement), and fails to provide competent evidence identifying concrete business plans for the reformulated product that could lead to a likely infringing act in the United States.

Ingevity showed BASF failed to produce evidence that it has committed or will commit acts *in the United States* that could give rise to an infringement suit based on BASF's reformulated EvapTrap XC. *See, e.g.*, ECF 9-1 (Mot. to Dismiss) 3, 8, 12; ECF 19-1 (Reply) 3–7. That was for good reason: all of the evidence in the record establishes that, unlike with BASF's discontinued EvapTrap XC formulation, the relevant acts pertaining to the reformulated EvapTrap XC are likely to be performed *outside* the United States. For the '553 Patent to be infringed, BASF's reformulated EvapTrap XC would need to be incorporated into a fuel vapor canister in the United States or would need to be supplied from the United States

and otherwise comport with the requirements of 35 U.S.C. § 271(f)(1) or (f)(2) in such a way that the fuel vapor canister containing it meets all elements of at least one claim. *See, e.g.*, Appx0112, 23:18–40. Yet despite being challenged to show relevant activities in the United States (or concrete plans for such activities), BASF remains conspicuously silent as to where any purported acts—such as testing, manufacturing, or selling of the reformulated EvapTrap XC—have occurred or would occur and whether any involve a fuel vapor canister. *See* ECF 15-2 (Moonjely Decl.) ¶¶29–30.

Although BASF relies on Ingevity's prior allegations of infringement of a different patent (Hiltzik) against the old EvapTrap formulation, those allegations cannot be relied on to show a concrete risk of an infringement suit against the reformulated EvapTrap XC. Notably, the old EvapTrap product used carbon supplied by EnerG2, an American company with offices and laboratories in Washington and a production site in Oregon.[19]

In contrast, BASF's evidence presents no basis to conclude the reformulated EvapTrap XC product will involve actionable activities in the United States. BASF's new carbon supplier (Haycarb) is a Sri Lankan company with no

---

[19] ECF 19-2 (Buroker Decl. Ex. A) at 2.

manufacturing facilities in the United States,[20] and BASF planned to manufacture EvapTrap XC in China. ECF 19-2 (Buroker Decl. Ex. C) at 1007:9–24 (Trial Vol. IV, *Ingevity Corp. v. BASF Corp.*, No. 1:18-cv-01391-RGA (D. Del.), ECF 568). BASF failed to connect any part of its manufacturing to the United States, which is telling.

The only discussion of the United States is a cursory statement in the Moonjely Declaration that "[s]everal customers have expressed interest in purchasing EvapTrap XC with Haycarb carbon, including for vehicle platforms in the United States." ECF 15-2 (Moonjely Decl.) ¶29. But that statement is too vague to establish a sufficiently concrete likelihood of activity in the United States that could give rise to an infringement suit.

Importantly, Mr. Moonjely fails to identify with specificity even one vehicle platform sold in the United States for which an automaker has plans to incorporate EvapTrap XC into an infringing fuel vapor canister, whether such a fuel vapor canister would meet any of the other requirements of the challenged claims, including any of the performance limitations recited in most of the claims. The Moonjely Declaration therefore fails to provide evidence of any sufficiently concrete

---

[20] Haycarb has manufacturing facilities in Sri Lanka, Thailand, and Indonesia, and appears to have no U.S. presence beyond "Haycarb USA, Inc.," Haycarb's "US marketing subsidiary." ECF 19-2 (Buroker Decl. Ex. B) at 1–4.

plans by an automaker or other prospective customer to actually use EvapTrap XC in the United States in an infringing manner.

Moreover, the process of validating a new product for use on vehicle platforms and then certifying that product for production is a several-years-long process with no guaranteed outcome. Ingevity's senior technical director testified that even for an established supplier like Ingevity, "it can take up to four years" to get a new part on a vehicle. ECF 19-2 (Buroker Decl. Ex. C) at 1022:13–18. Indeed, even BASF's own business development manager testified that initial validation testing typically takes "[a]bout a year" and platform-specific testing "eighteen to twenty-four months." ECF 19-2 (Buroker Decl. Ex. D) at 564:8–565:4 (Trial Vol. III, *Ingevity Corp. v. BASF Corp.*, No. 1:18-cv-01391-RGA (D. Del.), ECF 567). All of that testing could take place outside of the United States, and BASF provides no evidence to the contrary. Thus, BASF's allegation of "interest" from unspecified customers for unspecified vehicles does not provide evidence its reformulated product is likely to be included in a completed, infringing fuel vapor canister in the United States at any point in the near future. To the extent BASF knows the timeline for such activities, it had the burden to establish it. BASF's failure to do so demonstrates that its plans are speculative at best and likely will occur (if at all) many years into the future.

BASF's evidence falls far short of proving BASF has any "concrete plans for future activity that creates a substantial risk of future infringement or [would] likely cause [Ingevity] to assert a claim of infringement," as must be shown to establish standing. *JTEKT Corp. v. GKN Auto. LTD.*, 898 F.3d 1217, 1221 (Fed. Cir. 2018). Accordingly, BASF fails to carry its burden to establish standing.

## CONCLUSION

The Court should dismiss this appeal for lack of standing or, alternatively, should affirm the decision of the Board determining no challenged claims unpatentable.

Dated: September 21, 2022

Respectfully submitted,

*/s/ Brian M. Buroker*

Brian M. Buroker
*Principal Attorney*
Vladimir J. Semendyai
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
BBuroker@gibsondunn.com

Katherine Q. Dominguez
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Nathaniel R. Scharn
Brian Yang
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
(949) 451-3800

*Counsel for Appellee Ingevity South Carolina, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2022, I caused to be served a copy of the foregoing motion on all counsel of record via this Court's CM/ECF system.

Dated: September 21, 2022

*/s/ Brian M. Buroker*

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
BBuroker@gibsondunn.com

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because it contains 13,930 words, excluding the parts of the brief exempted by Federal Circuit Rule 32(b)(2) and Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated: September 21, 2022

*/s/ Brian M. Buroker*

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
BBuroker@gibsondunn.com