**No. 22-1129**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BASF CORPORATION,

*Appellant,*

v.

INGEVITY SOUTH CAROLINA, LLC,

*Appellee.*

On Appeal from the Patent Trial and Appeal Board
of the United States Patent and Trademark Office
No. PGR2020-00037 (U.S. Patent No. 10,323,553 B2)

**CORRECTED NONCONFIDENTIAL VERSION**

# REPLY BRIEF OF BASF CORPORATION


Brian Eutermoser
Mikaela Stone
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
beutermoser@kslaw.com
mikaela.stone@kslaw.com

Paul Alessio Mezzina
*Counsel of Record*
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com
jmitchell@kslaw.com

*Counsel for Appellant BASF Corporation*


October 20, 2022

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant certifies the following:

1. The full name of the party represented by me: BASF Corporation.

2. The names of the real parties in interest represented by me: N/A.

3. Parent corporations and publicly held companies that own 10% or more of stock in the party: BASF USA Holding LLC, BASF Nederland BV, and BASF SE.

4. The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

    - King & Spalding LLP
    - Cooley LLP
    - Lori A. Gordon
    - Steven Peters
    - Joseph Eng

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: N/A.

6. The organizational victims and bankruptcy cases applicable to this appeal: N/A.

Date: October 20, 2022

*<u>/s/ Paul Alessio Mezzina</u>*
Paul Alessio Mezzina

*Counsel for Appellant*
*BASF Corporation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iv

CONFIDENTIAL MATERIAL OMITTED .......... vi

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. The Board's rejection of the indefiniteness ground was arbitrary and capricious .......... 3

  A. Ingevity's argument that measurement discrepancies are irrelevant so long as the claims identify a "physical property" is contrary to precedent .......... 4

  B. Ingevity fails to show that the Board's decision was not arbitrary and capricious. .......... 11

II. The Board's rejection of the obviousness ground was arbitrary and capricious. .......... 19

  A. Ingevity fails to show that Hiltzik did not render the vent-side working capacity limitations obvious .......... 20

  B. Ingevity does not dispute that the Clontz references showed that Hiltzik's adsorbents could easily meet the low-purge performance standard. .......... 26

III. BASF has appellate standing. .......... 34

CONCLUSION .......... 36

# TABLE OF AUTHORITIES

## Cases

*Adidas AG v. Nike, Inc.*,
963 F.3d 1355 (Fed. Cir. 2020)....................35

*Amerigen Pharms., Ltd. v. UCB Pharma GmbH*,
913 F.3d 1076 (Fed. Cir. 2019)....................35

*Applications in Internet Time, LLC v. RPX Corp.*,
897 F.3d 1336 (Fed. Cir. 2018)....................13, 15

*Aqua Prods., Inc. v. Matal*,
872 F.3d 1290 (Fed. Cir. 2017)....................12

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
803 F.3d 620 (Fed. Cir. 2015)....................5, 9

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
796 F.3d 1312 (Fed. Cir. 2015)....................6, 7, 8

*Genentech, Inc. v. Hospira, Inc.*,
946 F.3d 1333 (Fed. Cir. 2020)....................24

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
655 F.3d 1291 (Fed. Cir. 2011)....................25, 26

*Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*,
814 F. App'x 592 (Fed. Cir. 2020) ....................21

*Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003)....................5, 9

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019)....................5, 9

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012)....................24

*In re Certain Multi-Stage Fuel Vapor Canister Sys. & Activated Carbon Components Thereof*,
2020 WL 1700337 (U.S.I.T.C. Apr. 7, 2020) .......... 19

*In re Ethicon, Inc.*,
844 F.3d 1344 (Fed. Cir. 2017) .......... 24

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) .......... 2, 28

*In re Inland Steel Co.*,
265 F.3d 1354(Fed. Cir. 2001) .......... 27

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003) .......... 20, 24, 25

*Merck & Co. v. Biocraft Labs., Inc.*,
874 F.2d 804 (Fed. Cir. 1989) .......... 28

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) .......... 19

*Persion Pharm. LLC v. Alvogen Malta Operations Ltd.*,
945 F.3d 1184 (Fed. Cir. 2019) .......... 28

*Provisur Techs., Inc. v. Weber, Inc.*,
— F.4th —, 2022 WL 4474941 (Fed. Cir. Sept. 27, 2022) .......... 14

*Realtime Data, LLC v. Iancu*,
912 F.3d 1368 (Fed. Cir. 2019) .......... 21, 22

*Software Rights Archive, LLC v. Facebook, Inc.*,
659 F. App'x 627 (Fed. Cir. 2016) .......... 21

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*,
743 F.3d 1359 (Fed. Cir. 2014) .......... 6, 7, 8

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) .......... 5, 9

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) .......... 5

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from this brief consists of information relating to the IAC-measurement findings of Ingevity researcher Dr. Yanping Guo, which are subject to Patent Trial & Appeal Board's Order Granting the Motion for Entry of Protective Order 37 C.F.R. § 42.54, No. PGR2020-00037 (July 29, 2020) (paper 12).

## INTRODUCTION

Ingevity uses straw-man versions of BASF's arguments and an eccentric view of this Court's precedents to argue that the '553 patent is not indefinite and obvious. The Court should reject those arguments.

***First***, as to indefiniteness, Ingevity reinvents circuit law, arguing that so long as two methods are designed to measure the same underlying physical property, any inconsistency between their results—no matter how large—cannot render a claim indefinite. The law is otherwise: Where a claim permits two methods of measurement whose results vary such that a skilled artisan cannot know whether a product infringes, it is indefinite. Here, BASF produced significant evidence that the gravimetric and manometric methods of determining IAC produce inconsistent results. Even Ingevity's own researcher considered the [RESULT] between the methods [DESCRIPTOR] especially in the '553 patent's "critical range." Appx3037; Appx3039; Appx6234; Appx6236. Yet the Board expressly and improperly refused to consider that evidence. And the evidence the Board did consider did not support its conclusion.

***Second***, as to obviousness, Ingevity does not dispute either that its earlier Hiltzik patent taught and claimed the entire range of vent-side

adsorbents claimed in the ’553 patent, or that the Clontz references demonstrated that those adsorbents could easily meet the ’553 patent’s low-purge performance limitation. Instead, Ingevity insists that the Clontz references would not have motivated a skilled artisan to “modify” Hiltzik for use in low-purge systems. But no “modification” was necessary, because Hiltzik *already claimed* the adsorbents at issue, and routine experimentation within a known range does not yield a patentable invention. Even if Clontz SAE suggested that higher-capacity adsorbents *might* perform better at low purge, that would not negate its teaching that lower-capacity adsorbents could *also* meet the low-purge performance limitation. “A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.” *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

***Finally***, Ingevity all but abandons its standing challenge, casting aside its meritless argument that BASF’s in-house counsel is an improper declarant and instead complaining that Ingevity’s standing challenge failed to prompt BASF to hand over the identities of its customers who want to use BASF’s EvapTrap XC product in the U.S. market—

competitive intelligence of the very type Ingevity has been found liable for misusing in the past. Ingevity can point to no authority requiring such specific disclosures.

BASF has appellate standing. The challenged claims are indefinite, and they are obvious over Hiltzik and the Clontz references. The Board's contrary conclusion was error and should be reversed.

## ARGUMENT

### I. The Board's rejection of the indefiniteness ground was arbitrary and capricious.

As BASF explained (at 30–37), the '553 patent endorses two different methods of measuring "incremental adsorption capacity," and those two methods yield results that are often significantly different. As a result of that discrepancy, a skilled artisan cannot be reasonably sure of the challenged claims' scope so as to avoid infringement. That renders the claims indefinite. The Board's contrary conclusion—reached while expressly refusing to consider BASF's evidence—was arbitrary and capricious. *See* Blue Br. 37–43. Ingevity's arguments fail to show otherwise. Its attempt to reinvent this Court's well-established indefiniteness standard is nothing but a semantic game. It is a game, moreover, that the '553 patent would lose: the manometric and

gravimetric techniques measure *different* physical properties. And Ingevity's claim that the Board actually did consider BASF's evidence while stating the opposite is wishful thinking.

### A. Ingevity's argument that measurement discrepancies are irrelevant so long as the claims identify a "physical property" is contrary to precedent.

Ingevity's main response to BASF's indefiniteness argument is to invent a new standard not found in this Court's cases. Ingevity contends that so long as a patent claim identifies some underlying "physical property" to measure, the claim is not indefinite even if the "claimed property may be measured using different methods yielding inconsistent results." Red Br. 1, 20. According to Ingevity, the claims here escape indefiniteness because they specify "*what* to measure—adsorption capacity," no matter how many potentially conflicting *methods* of measuring that property the patent presents to the skilled artisan. Red Br. 20.

As an initial matter, Ingevity's argument appears nowhere in the Board's reasoning. The Board rejected BASF's indefiniteness challenge because it found (without considering BASF's evidence) that the gravimetric and manometric methods of measuring adsorption capacity

were "comparable" and "would provide consistent results." Appx30. It did not find, as Ingevity now argues, that any inconsistency between the two methods was not relevant to indefiniteness. Appellate counsel "may not supply a reasoned basis for the [Board]'s action that the [Board] itself has not given." *Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017) (quotation marks omitted).

In any event, Ingevity is wrong about the law. This Court has held time and again that "the existence of multiple methods" of measuring a claimed property "leading to different results without guidance … as to which method should be used renders the claims indefinite." *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 634 (Fed. Cir. 2015); *see, e.g.*, *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 693–94, 697–98 (Fed. Cir. 2019); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1338, 1341, 1344–45 (Fed. Cir. 2015); *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1336, 1339–40 (Fed. Cir. 2003).

In the face of this clear and consistent precedent, Ingevity cites two cases that it says reject the proposition "that a claim is indefinite if a claimed property may be measured using different methods yielding inconsistent results." Red Br. 20–22 (citing *Ethicon Endo-Surgery, Inc. v.*

*Covidien, Inc.*, 796 F.3d 1312 (Fed. Cir. 2015), and *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1367 (Fed. Cir. 2014)). But those cases do not come close to adopting Ingevity's position. Instead, the challenged claims in those two cases avoided indefiniteness because (unlike here) a skilled artisan would have known not only *what* property to measure, but *how* to measure that property to achieve consistent results.

In *Ethicon*, the challenged claims for ultrasonic surgical shears required specific values for "clamping pressure." 796 F.3d at 1316. The Court held that the claims were not indefinite because a skilled artisan would know "*how* to arrive at the claimed force and pressure measurements." *Id.* at 1319 (emphasis added). Specifically, "skilled artisans would understand that the average clamping/coaptation pressures recited in the [challenged] claims can be determined by measuring clamping force at the midpoint of the clamping surface area." *Id.* The existence of "different methods to measure clamping force" did not render the claims indefinite because the different methods yielded results that were "quite similar," with only "slight[]" variations "due to natural variances in real-world testing conditions." *Id.* at 1319–20. The

Court distinguished *Honeywell*, one of the cases on which BASF relies, by noting that "the intrinsic evidence in *Honeywell* provided no guidance as to *how to measure* a critical element recited by the claims" and "the different methods of measurement in *Honeywell* produced widely varying results." *Id.* at 1321–22 (emphasis added). This case is like *Honeywell* and unlike *Ethicon*, in that the '553 patent discloses multiple "methods of measur[ing]" a "critical element recited by the claims" that have been shown to "produce[] widely varying results." *Id.*

*Takeda* is similar. There, the challenged claims for an acid reflux drug included specific values for "average particle diameter." 743 F.3d at 1362. The Court held that claims were not indefinite because, although there were "several possible ways to measure average particle diameter," there was "no evidence … that different measurement techniques in fact produced significantly different results for the same sample." *Id.* at 1366–67; *see also id.* at 1367 (finding "no evidence that the differences between these techniques are in fact significant" and substantial evidence that measurements produced using the different methods were "substantially similar" and displayed "a high degree of correlation" (quotation marks omitted)). The Court thus held that "[a]ny *theoretical minor* differences

between the two techniques are … insufficient to render the patent invalid." *Id.* (emphasis added); *see also id.* at 1367 n.4 (distinguishing *Honeywell* because the challenger in *Takeda* had not produced "evidence that the method of measurement is in fact outcome-determinative"). Here, by contrast, BASF presented evidence that there were substantial discrepancies between the two measurement techniques and that Ingevity's own researcher considered the [RESULT] [DESCRIPTOR] Appx3037; Appx6234.

In short, Ingevity's cases apply precisely the same legal rule as the cases BASF cited: A claim is indefinite if, with respect to a "critical element recited by the claims," a skilled artisan would not know how to choose between multiple "methods of measurement" that "produce[] significantly different results for the same sample." *Ethicon*, 796 F.3d at 1321–22; *Takeda*, 743 F.3d at 1367. Nothing in these cases supports Ingevity's proposed rule that so long as a claim identifies some "physical property" to measure, disparities between potential methods of measuring that property are irrelevant.

Ingevity's argument also rewrites the Court's holdings in *Dow*, *Teva*, *Honeywell*, and *HZNP*, contending that they all involved confusion

about "*what* to measure." Red Br. 24. But that is not how the Court characterized the arguments in those cases. In *Dow*, for example, the Court identified the "question" as "whether the existence of multiple methods leading to different results without guidance … as to which method should be used renders the claims indefinite" and answered that it does. 803 F.3d at 633–34; *see also Teva*, 789 F.3d at 1341 (claims were indefinite because patent did not "convey with reasonable certainty the measure of molecular weight to be used" and "each of these measures … would typically yield a different result"); *Honeywell*, 341 F.3d at 1336, 1339–40 (claims reciting polyester yarn with a particular "melting point elevation" were indefinite where multiple "methods [could] be used to measure the MPE" and the results of those methods could "vary greatly"); *HZNP*, 940 F.3d at 697–98 (claims were indefinite because specification disclosed "two different methods for evaluating 'better drying time'" and those methods did "not provide consistent results").

It is not surprising that this Court has never adopted Ingevity's rule, because that rule amounts to a semantic game. Consider the two measurement methods at issue in this case: the gravimetric and manometric methods of determining adsorption capacity. In reality,

those two methods measure two *different* physical properties: The gravimetric method measures changes in an adsorbent material's weight, while the manometric method measures changes in gas pressure. Appx2051–2053. Put another way, the two measurement systems could be said to differ on "*what* to measure," Red Br. 24—gas pressure or the sample's weight. That both are purportedly proxies for the same *third* physical property (adsorption capacity) does not render the properties they are *actually measuring* the same. It is only simplifying convention that allows us to say that both methods are "measuring" the "same property." Such linguistic shorthand is a poor basis for determining whether a claim is indefinite.

This underscores why Ingevity's ruler-vs.-micrometer analogy (Red Br. 29) is a poor one. Both instruments determine the width of a piece of paper by directly measuring the same property—physical distance—with differing degrees of accuracy and precision. The methods at issue here are more like measuring the width of the page first by comparing its weight to that of a roll of 11-inch-high paper of known length, and second by passing it in front of a light bulb and measuring the duration of the eclipse.

Ingevity uses its flawed analogy to imply that the disparate results produced by the gravimetric and manometric methods simply reflect a "difference in accuracy," Red Br. 29, a theme Ingevity repeats throughout its brief. But the Board did not find that either the gravimetric or the manometric method was a *more accurate* method of determining IAC. And the '553 patent says that either method may be used, implying that they are equally accurate for the purpose of determining the scope of the claims. Rather, BASF's evidence showed that regardless of either method's theoretical accuracy, the two methods produce disparate results that can vary by as much as 14%, Appx2056–2059, and Ingevity's own researcher considered the difference between the methods [DESCRIPTOR] Appx3037; Appx6234. That is precisely the type of uncertainty that this Court has held renders a claim indefinite.

### B. Ingevity fails to show that the Board's decision was not arbitrary and capricious.

As BASF explained, the Board's rejection of the indefiniteness ground failed to comply with APA requirements for reasoned decisionmaking in at least two ways: First, the Board failed to consider BASF's evidence showing significant disparities between the two measurement methods taught by the '553 patent. And second, the

Board's decision lacked substantial evidence. Ingevity fails to rebut either argument.

***First***, the Board's refusal to consider BASF's evidence of measurement disparities rendered its decision arbitrary and capricious, requiring (at a minimum) remand. *See* Blue Br. 38–40; *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1325 (Fed. Cir. 2017) (en banc) (lead opinion of O'Malley, J.) ("the [Board] must take account of all the evidence of record"—not just the evidence that favors, "but also the evidence that detracts from the conclusion").

Ingevity's only response is to rewrite the Board's decision by claiming that the Board declined to address only "BASF's characterizations—not its *evidence*." Red Br. 37. The record shows otherwise. After spending the first two pages of its "Discussion" addressing only the evidence submitted by Ingevity, *see* Appx29–30, the Board concluded by stating:

> We find that *the evidence submitted by Patent Owner* as to the gravimetric and volumetric measurement techniques demonstrates that they were well established in the art as comparable methods of measuring adsorption capacity, and accordingly, not a basis for determining claim indefiniteness.
>
> Because *this determination is dispositive* as to Petitioner's indefiniteness challenge, *we need not address Petitioner's*

> *allegations* as to the measurement differences reported by Intertek in Exhibit 1020.

Appx30–31 (emphases added; citation omitted). The Board could not have been clearer: It found Ingevity's evidence persuasive and "dispositive" and therefore declined to consider BASF's contrary evidence. "[A]n agency's refusal to consider evidence bearing on the issue before it is, by definition, arbitrary and capricious." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1352 (Fed. Cir. 2018).

The Board's brief "Discussion" nowhere mentioned that the Board had considered—much less that it had any reasoned basis for rejecting—either the Intertek reports or the Guo memorandum. *See* Appx29–31. Just the opposite: After noting assertions by Ingevity's expert that "persons of ordinary skill in the art understood that gravimetric and volumetric measurement techniques would provide consistent results," Appx30, the Board claimed that "[t]his evidence [was] essentially unrebutted" by BASF. But the Intertek testing and the Guo memorandum addressed and rebutted *precisely* that point by showing that even highly skilled artisans could not get similar results from the two methods. *See* Blue Br. 33–36. Nothing in the Board's written decision explains why it reached a different conclusion.

The Court recently faced a similar fact pattern. *See Provisur Techs., Inc. v. Weber, Inc.*, — F.4th —, 2022 WL 4474941, at *4 (Fed. Cir. Sept. 27, 2022). In *Provisur*, despite the patent owner arguing that "prior art did not render obvious" a particular claim limitation, the "Board's analysis d[id] not explicitly address those arguments or even implicitly explain [its reasoning] in a way that fairly contemplates and resolves those arguments." *Id.* In those circumstances, the Court held that "[t]he Board's adoption of [the petitioner's] argument and evidence, coupled with its mischaracterization of [the patent owner's] arguments, precludes us from engaging in meaningful appellate review and, therefore, violates the APA." *Id.*

Here, although the parties are reversed, the Board's failure is the same. The Board's express refusal to consider BASF's probative evidence; its unexplained, wholesale adoption of Ingevity's position; and its mischaracterization of BASF's arguments as failing to rebut arguments that BASF had in fact rebutted conclusively (including with Ingevity's own research) constitutes the type of "selective weighing of the record evidence" that "does not pass muster under the APA." *Applications in*

*Internet Time*, 897 F.3d at 1353. At a minimum, therefore, remand is required.

***Second***, even setting that error aside, the Board's indefiniteness conclusion is unsupported by substantial evidence. The publications on which the Board relied dealt with circumstances far removed from the challenged claims, and they do not suggest that the gravimetric and volumetric methods are interchangeable for purposes of measuring IAC for n-butane within the critical, low-adsorbency range of the '553 patent. *See* Blue Br. 40–43.

In response (at 31), Ingevity first touts the "three peer-reviewed publications" cited by the Board (Anson, Belmabkhout, and Zielinski). But it fails to acknowledge Anson's statement that it is "difficult to find good correlation between adsorption data obtained by different measurement techniques" and that this led to "great controversy" and "discrepancies around the real sorption capacity of a given carbon material." Appx4158–4159. And it does not dispute that the articles dealt with circumstances far removed from the low-adsorbency context necessary for assessing the scope of the challenged claims, or that in

those circumstances, the articles recognized a disparity of approximately 3% between gravimetric and manometric methods. Appx30.

Ingevity dismisses the articles' finding of a 3% disparity by pointing to the Board's finding that a skilled artisan "would not have seen such a [3%] deviation as significant." Red Br. 32 (quoting Appx30). But the Board's finding was illogical. Ingevity has no response to BASF's point that "significance" is highly context-dependent, and that the articles did not address whether a 3% disparity would be significant in the context of assessing potential infringement by a fuel vapor canister system in what Ingevity's Dr. Guo called the "very critical range to [Ingevity's] low bleed emission patent." Appx3039; Appx6236. By contrast, BASF's evidence—which the Board disregarded—addressed precisely that question. *See, e.g.*, Appx3037 & Appx6234 (Dr. Guo concluding that for a "sample with relatively low [IAC]," the measurement [RESULT] was "[DESCRIPTOR]"); *see also* Appx3034 & Appx6231 (Dr. Guo stating that "testing consistency, especially for samples with incremental adsorption capacities in the range of 30 to 40 g/L, is very important").

In addition, Ingevity concedes that the articles measured adsorption of "hydrogen, nitrogen, and methane," all much smaller and

lighter molecules than n-butane. Red Br. 32; *see* Appx112 (23:20–40). Ingevity pooh-poohs this difference, suggesting that that BASF did not demonstrate the "materiality of the vapor being measured." Red Br. 32. But Ingevity's own expert testified, and its brief concedes, that the identity of the adsorbate is a key variable affecting adsorption capacity. Red Br. 11–12 ("[I]t is well understood in the field that, for a given absorb*ent*, its capacity to adsorb is a function of … the identity of the thing being adsorbed, or adsorb*ate*." (cleaned up; citing Appx4858, Appx4862)). Thus, the evidence before the Board on this question all pointed to adsorbates' materiality. It was up to Ingevity to present evidence tending to *disprove* that fact, which it failed to do.

Ingevity also touts the testimony of Dr. Zielinski, emphasizing that he was "the same person … BASF hired to perform its testing." Red Br. 31. But his testimony does not help Ingevity. Just as the Board did (*see* Appx30), Ingevity plucks out of context Dr. Zielinski's statement that "in an ideal world," "one would expect" the two methods to be "superimposable," while omitting his acknowledgment that in the *real* world, the gravimetric and manometric data gathered by his laboratory "weren't superimposable." Appx5141 (54:16–22); *see also* Appx5162

(139:8–19) (Dr. Zielinski stating that he "was hoping that [he] would have superimposable data because that's a lot easier to explain").

Finally, Ingevity points (at 33–34) to the Board's claim that "numerous additional texts and standards" confirm that the gravimetric and manometric methods "provide consistent results." Appx30. In particular, the Board cited portions of Ingevity's expert report that discussed: (i) a 1997 text describing "various particulars regarding volumetric measurements of adsorption capacity" but not addressing manometric measurements, Appx4875–4877; (ii) a practice by the National Institute for Standards and Technology of using five different instruments to "cross check" measurements of adsorption capacity, Appx4894–4895; and (iii) an international standard for measuring surface area that "identifies various techniques that can supply adsorption capacity measurements," Appx4895–4897. Those briefly referenced sources add nothing to the other evidence the Board discussed. They do not address at all whether volumetric and manometric methods of measuring adsorption capacity yield consistent results, much less whether they do so in the '553 patent's critical range.

Nor is it any answer to say that the differences between the two measurement methods "may not even affect the calculation" of IAC. Red Br. 33. The point is that, without trying both methods, the ordinarily skilled artisan *cannot be sure* if this is an instance in which the measurement systems happen to agree or one in which they differ substantially. This, again, is critical to determining infringement when measuring the IAC of adsorbents in the key 30–40 g/L range. In those circumstances, the artisan cannot have "reasonable certainty … about the scope of the invention" without knowing which of the two measurement systems determines the scope of the claim. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).[1]

## II. The Board's rejection of the obviousness ground was arbitrary and capricious.

Ingevity agrees that the challenged claims include "two sets of key limitations important on appeal": (1) working-capacity limitations for the

[1] Ingevity wrongly claims (at 35 n.12) that BASF "previously lost this [indefiniteness] argument before the International Trade Commission with respect to Hiltzik." BASF was not a party to the ITC proceedings, and the Commission mooted the ALJ's initial indefiniteness decision by determining that Hiltzik was obvious and/or anticipated. *In re Certain Multi-Stage Fuel Vapor Canister Sys. & Activated Carbon Components Thereof*, 2020 WL 1700337 (U.S.I.T.C. Apr. 7, 2020).

vent-side adsorbents, and (2) a low-purge performance limitation. Red Br. 39. As to the first, Ingevity does not dispute that the vent-side adsorbents claimed in the ’553 patent were previously claimed in Hiltzik. And as to the second, Ingevity does not dispute that the Clontz references taught that those adsorbents could be used to easily meet the performance limitation. Instead, Ingevity argues that because the Clontz references may have suggested a preference for other means of meeting the low-purge limitation, the prior art should not be read for all it disclosed. That argument is wrong as a matter of law.

### A. Ingevity fails to show that Hiltzik did not render the vent-side working capacity limitations obvious.

BASF presented a prima facie case of obviousness as to the working-capacity limitations because Hiltzik claimed ranges that “completely encompass[]” the ranges of the challenged claims. Blue Br. 49 (quoting *In re Peterson*, 315 F.3d 1325, 1330 (Fed. Cir. 2003)). The Board nonetheless determined that “Hiltzik alone would not suggest” vent-side adsorbents meeting the ’553 patent’s working-capacity limitations. Appx51. As BASF explained, the Board’s conclusion on this issue was contrary to both the facts and the law. *See* Blue Br. II.A.

**1.** Ingevity's first response is procedural. It argues that because BASF "never presented a ground based on Hiltzik alone," it was somehow improper for BASF to point out that Hiltzik alone taught certain limitations in the challenged claims. Red Br. 40. That is incorrect. In an obviousness analysis, this Court routinely considers whether a particular reference teaches a particular limitation in the challenged claims. There is no requirement that each limitation be taught by all references. *See, e.g.*, *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1371 (Fed. Cir. 2019); *Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*, 814 F. App'x 592, 598 (Fed. Cir. 2020); *Software Rights Archive, LLC v. Facebook, Inc.*, 659 F. App'x 627, 637 n.5 (Fed. Cir. 2016) (per curiam).

For example, in *Realtime Data*, this Court reviewed an IPR that had ruled several claims of a data-compression patent obvious over three prior art references—O'Brien, Nelson, and Welch. 912 F.3d at 1371. The Court held that although the Board had instituted a petition based on obviousness over multiple references, it "was free to come to the very conclusion it reached: that *O'Brien alone* disclosed every element" of several claims. *Id.* at 1373 (emphasis added). The petitioner there had "identified O'Brien as disclosing every element of claim 1," while relying

on Nelson "to demonstrate that O'Brien disclosed a dictionary encoder" and relying on Welch to teach additional limitations of certain dependent claims. *Id.* at 1372–73.

The situation here is similar. BASF argued that Hiltzik alone taught most of the limitations of the challenged claims. Appx189–190; *see also* Appx1095 (noting that Hiltzik "claims the use of adsorbent volumes with IACs between 0 and 35g/L"; "discloses preferred materials with BWC < 8g/dL, with no lower bound"; and "provides test results showing that as IAC and BWC decline, so do DBL emissions"). BASF used the Clontz references for a narrow purpose: to "teach the missing limitations by showing that low emissions with low purge were achievable with the Hiltzik configuration." Appx189–190. Accordingly, it was not "error for the Board to consider Hiltzik alone." Red Br. 40.

**2.** Turning to the merits, Ingevity repeatedly contends that a skilled artisan would not have been motivated to "modify" Hiltzik to arrive at the system in the challenged claims. Red Br. 42, 50. That fundamentally mischaracterizes BASF's argument. No "modification" of Hiltzik's claimed invention was necessary, because Hiltzik *claimed the entire range* of vent-side adsorbents in the challenged claims of the '553 patent.

*E.g.*, Blue Br. 50 ("Hiltzik's teachings completely encompassed the range of working-capacity values claimed in the '553 patent").

Therefore, all that was needed was routine experimentation *within* the relatively small range that Hiltzik already claimed. And, as BASF explained, the experimentation required could scarcely have been more routine. The vent-side adsorbents claimed in the '553 patent (with BWC < 3 g/dL and g-total BWC ≤ 6 g) were not lurking in some dark and unexpected corner of Hiltzik's claims; they were right next door to Hiltzik's Example 2 (BWC of 4 g/dL and g-total BWC of 8 g). *See* Blue Br. 46; Appx2213 (8:10–51).

Nor would the skilled artisan have needed to use some novel method to explore Hiltzik's claimed range: Hiltzik explained how to adjust the working capacity of adsorbents by "volumetrically dilut[ing]" a higher-capacity adsorbent to "flatten[]" its isotherm. Appx2212 (6:23–29). And Hiltzik used the honeycombs disclosed in Park, which taught multiple dilution methods *and* taught "desirable" honeycombs having less than 3 g/dL BWC. *See* Blue Br. 47 n.10.

This Court has made clear that such "routine experimentation" iterating over a known, relatively compact range does not yield a

patentable invention. *See Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1341–42 (Fed. Cir. 2020); *see also In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017); *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012); *Pfizer Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1367 (Fed. Cir. 2007); *Peterson*, 315 F.3d at 1329–30.

**3.** Ingevity tries two arguments to counter BASF's *prima facie* case of obviousness, but both are unavailing. First, Ingevity contends that BASF's reliance on *Peterson* and the other cases cited above "is misplaced because it overlooks that Hiltzik is not related to low-purge systems." Red Br. 50. That is a non sequitur. BASF relied on Hiltzik to teach the *vent-side working capacity* limitations, not the low-purge performance limitation. Hiltzik does not preclude its claimed system's use in low-purge conditions; it states only that "*for a given quantity* of purge gas," lower-capacity vent-side adsorbents will be more effective at reducing emissions. Appx2211 (4:56–61) (emphasis added). And, as discussed in the next section, the Clontz references taught that the Hiltzik system could easily meet the performance limitation in low purge conditions.

Second, Ingevity claims that "[t]o establish *prima facie* obviousness, there must be adequate support in the prior art for the change in

structure." Red Br. 51 (quoting *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1304 (Fed. Cir. 2011)). But here no "change in structure" was required—only routine experimentation within Hiltzik's claimed range and at working-capacity levels little different from those of Hiltzik's exemplary honeycomb.

Ingevity's reliance on *Genetics Institute* is misplaced. The Court there acknowledged that a "*prima facie* case of obviousness *typically* exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." 655 F.3d at 1306 (quoting *Peterson*, 315 F.3d at 1329). But the court recognized an exception for the rare case where the prior-art range is "so broad as to encompass a very large number of possible distinct compositions, thus requiring nonobvious invention" to identify specific compositions within that range. *Id.* (cleaned up). *Genetics Institute* was that rare case: The prior art disclosed 68,000 variants of an extraordinarily complex protein made of 2,322 amino acids; and while the claimed proteins were arguably encompassed within that vast set, they "var[ied] enormously in structure" from most members of the set. *Id.* at 1305–06.

Unlike *Genetics Institute*, this case is "the typical case contemplated in *Peterson*," where "prior art ranges that are not especially broad invite routine experimentation to discover optimum values." *Id.* at 1306 (quotation marks omitted). In *Peterson*, the inventors "simply select[ed] a narrow range from within a somewhat broader range" by "selecting the range of 'about 1-3% rhenium' from the prior art range of '0-7% rhenium.'" *Id.* (quotation marks omitted). Similarly, here, the inventors of the '553 patent simply selected a narrower vent-side working-capacity range from the somewhat broader range claimed in Hiltzik. And unlike the "enormous[]" structural variation in *Genetics Institute*, *id.* at 1305, Hiltzik taught an exemplary honeycomb that was all but identical to those claimed in the '553 patent.

### B. Ingevity does not dispute that the Clontz references showed that Hiltzik's adsorbents could easily meet the low-purge performance standard.

**1.** Given that Hiltzik encompassed nearly all the limitations in the challenged claims, the only question remaining was whether the low-capacity vent-side adsorbents claimed in both Hiltzik and the '553 patent could meet the latter's low-purge performance limitation. The Clontz references demonstrated conclusively that they could. Clontz SAE taught

that Hiltzik's Example 2 honeycomb, with capacity levels only slightly above those claimed in the '553 patent, achieved compliant emission levels at 100 bed volumes of purge air—and when heated, achieved those same levels even when the purge volume was cut in half. And Clontz WIPO taught that with heating, even much smaller and further diluted honeycombs could dramatically exceed the performance required to meet the low-purge limitation. As Ingevity does not dispute, those teachings would have made clear to a skilled artisan that a honeycomb only slightly more diluted than Hiltzik's Example 2 (but still within Hiltzik's claimed range) could easily satisfy the low-purge performance limitation. *See* Blue Br. 52–53.

According to Ingevity, Clontz SAE suggested that the subset of Hiltzik's vent-side adsorbents that are claimed in the '553 patent were "unlikely to be optimum" for low-purge systems. Red Br. 51. But that is beside the point. Clontz SAE may have suggested *other* means of meeting the performance limitation; it may even have suggested that some of those other means might be superior. But a reference is prior art for *all* it teaches, including non-preferred embodiments. *In re Inland Steel Co.*, 265 F.3d 1354, 1361 (Fed. Cir. 2001) ("The fact that Irie teaches that

annealing in addition to adding antimony produces optimal results does not negate Irie's additional teaching that adding antimony is effective even in non-annealed steel."); *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989) ("[T]he fact that a specific [embodiment] is taught to be preferred is not controlling, since all disclosures of the prior art, including unpreferred embodiments, must be considered.").

Here, the Clontz references taught that vent-side adsorbents at the lower end of Hiltzik's range could easily meet the low-purge performance limitation. So even if the Clontz references could be read to suggest that adsorbents with more working capacity might perform *even better* in low-purge conditions, that is not "teaching away" that could overcome obviousness. *See In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.").[2]

---

[2] Even if the Clontz references had *not* taught that adsorbents at the lower end of Hiltzik's claimed range could meet the low-purge performance limitation, their ability to do so would have been an "inherent property" that would have "added no patentable weight" to the challenged claims. *Persion Pharm. LLC v. Alvogen Malta Operations Ltd.*, 945 F.3d 1184, 1190–91 (Fed. Cir. 2019); *see id.* at 1190 ("It is long settled that in the context of obviousness, the mere recitation of a newly

**2.** As BASF has shown, the claim that Clontz SAE "teaches away" from using the claimed system in low-purge conditions is vastly overstated. Clontz SAE's conclusions about the possible advantages of higher-capacity honeycombs were tentative and were directed, at most, to increasing the g-total BWC of a *multi-adsorbent system*, which is not inconsistent with a system in which the last adsorbent in line has a low BWC and g-total BWC. And Clontz WIPO and MECA, both of which post-date Clontz SAE, confirm that artisans still understood the potential benefits of reducing the working capacity of the vent-side adsorbent. *See* Blue Br. 54–60.

Ingevity quibbles with these points but misses the big picture: Even if Clontz SAE had suggested in the strongest possible terms that honeycombs with more working capacity would be more suitable for low-purge conditions, that would not change the fact that (1) Hiltzik already claimed the low-capacity adsorbents in the '553 patent and (2) the Clontz

---

discovered function or property, inherently possessed by things in the prior art, does not distinguish a claim drawn to those things from the prior art."). Here, the Clontz references show that the adsorbents' ability to perform at low purge was not only inherent but *actually known*.

references taught that those adsorbents could meet the low-purge performance limitation. That should be the end of the matter.

In any event, Ingevity's quibbles are mistaken. Ingevity first incorrectly contends that because Clontz SAE "relates to using larger honeycombs" but the challenged claims "require lowering g-total BWC," BASF has "admi[tted] the reference teaches away from the claims." Red Br. 52–53 (cleaned up). But as BASF pointed out, Blue Br. 56, Clontz SAE drew no firm conclusion that increasing g-total BWC was beneficial, much less that doing so was necessary to meet emissions standards at low purge. Instead, it repeatedly stated that "further work is planned," including "to understand the reasons for these performance improvements and to develop a honeycomb with more robust performance at low purge volumes." Appx2269. Clontz SAE, moreover, suggests potential benefits from increasing g-total BWC of the entire "configuration" of honeycombs in the system, which is not the same as increasing the g-total BWC of an individual honeycomb. It theorizes that using multiple honeycombs in sequence could work better because of "flow redistribution and/or increased tortuosity of the flow path." Appx2269. Nothing in that teaching suggests that the final vent-side

honeycomb in the configuration must have a higher g-total BWC, or even that there are benefits to increasing the BWC of any individual honeycomb in the configuration.

Turning to Clontz WIPO, Ingevity acknowledges that it suggests one benefit of adding "electrical conductivity additives" to a honeycomb would be "adjusting the adsorption properties to flatten the equilibrium isotherm slope" (*i.e.*, reducing working capacity). Red Br. 55 (quoting Appx50). Ingevity echoes the Board's statement that this teaching "does not relate to further additives" but to "ingredients … already present in the honeycomb." *Id.* (emphasis omitted; quoting Appx50). That is puzzling given that the teaching is expressly about "additives." Regardless, the key point—which Ingevity does not address—is that Clontz WIPO, consistent with the teachings of Hiltzik, considered "flatten[ing]" the isotherm and reducing honeycomb capacity desirable.

Ingevity next contends that it was not error for the Board to ignore the MECA industry publication because "BASF chose not to include MECA in its obviousness ground." Red Br. 56. But BASF identified MECA as relevant prior art in its petition, Appx140–142, and it was entitled to cite MECA to refute Ingevity's teaching-away argument

regarding Clontz SAE, *see* Appx1100; Appx1554. Ingevity also contends that MECA suggested using "high capacity" honeycombs. Red Br. 56 (emphasis omitted; quoting Appx2233). But MECA went on to clarify that more "advanced" honeycombs "tend to have a *lower* working capacity" because adsorbents with "high working capacity also have a tendency for stronger adsorption or heel during purging," whereas lower-capacity adsorbents "release [hydrocarbons] easily with a small volume of purge." Appx2234 (emphasis added).

Finally, Ingevity contends that "BASF fails to explain why the use of a honeycomb with *higher* working capacity than that required by the challenged claims alongside Clontz SAE's explicit recommendation to use an *even higher* working capacity to meet the low-purge problem would have motivated a POSITA to … lower the working capacity of Hiltzik's honeycomb." Red Br. 57. Ingevity ignores the evidence BASF identified in Hiltzik itself: (1) Hiltzik *claimed* vent-side adsorbents with IAC below 35 g/L with no lower bound; (2) Hiltzik explained that emissions are "lower when the [vent-side] adsorbent has a flatter adsorption isotherm"—that is, a lower BWC and IAC; (3) Hiltzik encouraged using vent-side adsorbents with BWC values "preferably below 8 g/dL," again

with *no lower bound*; (4) the Example 2 honeycomb's BWC and g-total BWC values, while higher than those claimed in the '553 patent, are only slightly outside that range; and (5) Hiltzik explains *why* lower-capacity vent-side adsorbents are "preferred"—their use "retards the rate of bulk phase diffusion" and improves "purge efficiency." *See* Blue Br. 45–47 (cleaned up).

All that means that even trivial, routine experimentation within the range of Hiltzik's claimed honeycomb working capacities—*as Hiltzik suggests and explains how to do*—would have yielded the purported invention in the challenged claims. Hiltzik, in other words, supplied all the motivation a skilled artisan would need.

***

Because Hiltzik claims everything in the challenged claims except the low-purge performance limitation, and because the Clontz references make clear that the Hiltzik system meets emissions standards in low-purge systems, the challenged claims are obvious over those references. That the Clontz references suggest other possible routes to meet emissions standards in low-purge vehicles does not alter that fundamental fact. The Board followed Ingevity into error,

mischaracterizing BASF's arguments as requiring motivation to *modify* Hiltzik's claimed system. But because Hiltzik claimed the entire adsorbency range at issue, no modification was necessary—only the most routine experimentation.

## III. BASF has appellate standing.

BASF is preparing to sell EvapTrap XC, a product whose use in a vehicle's emission system would likely cause Ingevity to accuse BASF of infringing the '553 patent. Ingevity does not dispute that it would accuse EvapTrap XC of infringing if it were "incorporated into a fuel vapor canister in the United States." Red Br. 58. And Ingevity has properly abandoned its argument that Mr. Moonjely, BASF's in-house counsel, is not competent to testify about BASF's business plans.

Instead, Ingevity insists that BASF has not established a "sufficiently concrete likelihood" that EvapTrap XC would be used in vehicles in the United States. Red Br. 60. But as Mr. Moonjely explained, EvapTrap XC was developed for the specific purpose of helping automakers meet *U.S. emissions standards*, which is of course why customers have expressed interest in buying it for use in *U.S. vehicle platforms*. Doc. 16, Moonjely Decl. ¶¶ 3, 6, 29; Blue Br. 64.

Ingevity suggests that BASF must "identify with specificity" *which* vehicles and manufacturers will use its products. Red Br. 60. But it cites no case imposing such a requirement. BASF need only show that it "will *likely* engage in activity that would give rise to a *possible* infringement suit." *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1357 (Fed. Cir. 2020) (emphases added; cleaned up). And this Court must "accept as true [BASF's] material representations of fact for purposes of assessing its standing." *Amerigen Pharms., Ltd. v. UCB Pharma GmbH*, 913 F.3d 1076, 1083 (Fed. Cir. 2019). Nor does Ingevity deny that a jury found it has a history of tortiously misusing the very type of customer information it now demands. *See* Blue Br. 65.

Ingevity next objects that customers who want to incorporate EvapTrap XC into U.S. vehicles might not do so "in the near future" because of a lengthy validation process, and it claims that BASF has the "burden to establish" a "timeline for such activities." Red Br. 61. Again, Ingevity cites nothing for this made-up requirement. The '553 patent, meanwhile, does not expire until 2033. Appx76. So even if it were true that an interested automaker might not be able to incorporate EvapTrap XC into a U.S. vehicle's fuel system for "up to four years," Red Br. 61,

Ingevity would still be likely to sue. And a manufacturer is unlikely to begin the validation process without some assurance that it will be able to sell the resulting vehicles in the United States.

If Ingevity truly believed that BASF is not likely to sell EvapTrap XC in the United States, it could make this appeal go away by providing a covenant not to sue. Ingevity has not offered to do so—further evidence that it knows BASF would be able to sell EvapTrap XC for use in U.S. vehicles if not for the threat of an infringement action.

## CONCLUSION

This Court should reverse the Board's decision and rule that the challenged claims are unpatentable, or in the alternative, vacate the decision below and remand for further consideration.

Respectfully submitted,

*/s/ Paul Alessio Mezzina*

Brian Eutermoser
Mikaela Stone
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202
(720) 535-2300
beutermoser@kslaw.com
mikaela.stone@kslaw.com

Paul Alessio Mezzina
*Counsel of Record*
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
pmezzina@kslaw.com
jmitchell@kslaw.com

October 20, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Federal Circuit Rule 32(a) because it contains 6,992 words, including footnotes and excluding the parts of the brief exempted by Federal Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(f); and

(ii) complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared using Microsoft Office Word and is set in 14-point Century Schoolbook font.

Dated: October 20, 2022

*/s/ Paul Alessio Mezzina*
Paul Alessio Mezzina

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 22-1129

**Short Case Caption:** BASF Corp. v. Ingevity South Carolina, LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 2 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/20/2022

Signature: /s/Paul Alessio Mezzina

Name: Paul Alessio Mezzina